# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ISIDORE CORWIN AND BONNIE CORWIN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No.:  1:07-cv-00152-*** |
| B'NAI B'RITH SENIOR CITIZEN HOUSING, INC., SOUTHEASTERN PROPERTY MANAGEMENT, INC., AND LYNNE ROTAN, an agent, servant or employee of B'Nai B'Rith Senior Citizen Housing, Inc., | ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

---

**DEFENDANTS, B'NAI B'RITH SENIOR CITIZEN HOUSING, INC., SOUTHEASTERN PROPERTY MANAGEMENT, INC., AND LYNN ROTAN,'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FED. R. CIV. P. 12 (b)(6) FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

---

DANIEL A. GRIFFITH, ESQUIRE
Delaware Bar I.D. No. 4209
MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
1220 N. Market Street
P.O. Box 8888
Wilmington, DE 19899-8888
(302) 552-4300
*Attorney for Defendants,*
*B'Nai B'Rith Senior Citizen Housing, Inc.,*
*Southeastern Property Management, Inc.,*
*and Lynn Rotan*

Dated: April 25, 2007

# TABLE OF CONTENTS

**Page**

I.     NATURE AND STAGE OF THE PROCEEDINGS..............................................................1

II.    SUMMARY OF ARGUMENT ..........................................................................................1

III.   STATEMENT OF UNDISPUTED FACTS ......................................................................2

IV.    LEGAL ARGUMENT .......................................................................................................4

   I.    SINCE DEFENDANTS' FLAG-DISPLAY POLICY IS UNIFORM AS TO ALL
       TENANTS AND ALL NATIONAL ORIGINS, PLAINTIFFS' COMPLAINT DOES NOT
       ALLEGE THE FACTS NECESSARY TO ESTABLISH THAT THEY WERE
       DISCRIMINATED AGAINST ON THE BASIS  OF THEIR NATIONAL ORIGIN. .............4

V.     CONCLUSION....................................................................................................................7

## TABLE OF AUTHORITIES

**Cases**

Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 937 (2d Cir.), Aff'd in part, 488 U.S.C. 15, 102 L. Ed. 2d 180, 109, S. Ct. 276 (1988)........................................................9

International Brotherhood of Teamsters v. United States, 431 U.S.C. 324, 335, n.15, 52 L. Led. 2d 396, 97 S.Ct. 1843 (1977).................................................................................................8

Korrn, et al v. Lacey Township, et al, 78 Fed. Appx. 199 (3d Cir. 2003) ....................................9

Lapid-Laurel, LLC, et al v. Zoning Board of Adjustment of the Township of Scotch Plains, et al, 284 F.3d 442, 466 (3d Cir. 2002) ................................................................................................9

Newark Landlord Association, et al v. The City of Newark, 2003 Del. Ch. LEXIS 66 (decided June 13, 2003).................................................................................................................................8

Resident Advisory. v. Rizzo, 564 F.2d 126, 148 (3d Cir. 1977)....................................................9

Saville v. Quaker Hill Place, 531 A.2d 201, 204 (Del. Supr. 1987)..............................................8

United States of America v. Columbus Country Club, 915 F. 2d 877, 880 (3d Cir. 1990)............7

# I.    NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs, Isidore and Bonnie Corwin (hereinafter, "the Corwins" or "Plaintiffs") are residents of the B'Nai B'Rith House Apartments in Claymont, Delaware which are managed and/or owned by the respective Defendants. Plaintiffs contend that the Defendants' policy concerning the manner in which tenants may permissibly display flags discriminates against them on the basis of their national origin in violation of the federal Fair Housing Act, 42 U.S.C. § 3601 et. seq. and the Delaware Fair Housing Act, 6 Del. C. § 4601 et. seq.  Plaintiffs seek a declaratory judgment, injunctive relief and compensatory damages.

Plaintiffs' Complaint was filed on or about March 15, 2007.

This is Defendants' Motion to Dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

# II.    SUMMARY OF ARGUMENT

As the respective owner and manager of the B'Nai B'Rith House Apartments, Defendants published to all tenants a policy concerning the permissible display of flags outside the  tenants' units.  Specifically, the policy permitted tenants to place a flag on a stick in a flower pot or drape a flag on a balcony chair, but prohibited the draping of flags on the tenants' balconies.  The policy applies uniformly to all residents and all types of flags, regardless of national origin.

Plaintiffs claim in this action that their status as Americans places them in a "protected class" as that term is defined under federal and state law.  Plaintiffs further contend that, notwithstanding the policy's uniform application to all flags regardless of national origin, the

policy discriminates against Americans such as the Plaintiffs in violation of the state and federal Fair Housing Acts.

By Plaintiffs' admission, the policy on its face applies to each tenant regardless of that tenant's national origin.  In addition, the impact of policy on the Plaintiffs is no greater or less than the impact on any other tenant of any other national origin.  As such, as a matter of law, Plaintiffs cannot meet the fundamental requirements of the statutes under which they seek relief, 42 U.S.C. § 3601, et. seq. (the federal Fair Housing Act) and 6 Del. C. § 4601 et. seq. (the Delaware Fair Housing Act).  Consequently, their Complaint must be dismissed as a matter of law pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## III.    STATEMENT OF UNDISPUTED FACTS [1]

1.    Plaintiffs were accepted as tenants at the B'Nai B'Rith House Apartments in Claymont on September 24, 2992 and moved into Apartment 608 on October 25, 1992.  (See Exhibit "A",  ¶ 32).

2.    Defendants are the owner and property managers for the Apartments.  (See Exhibit "A", generally ¶ 3-6).

3.    In the 14 ½ years of their tenancy, Plaintiffs have raised numerous complaints against the Defendants (See Exhibit "A", ¶ 56-75).  Specifically, in their Complaint, Plaintiffs identify approximately 16 separate complaints (unrelated to the dispute which is the subject of this litigation) which they have previously made against Defendants during their tenancy, ranging from second hand smoke from a neighbor's unit (paragraph 62) to the denial of

---

[1] The following facts are derived purely from Plaintiffs' Complaint.

Plaintiffs' request to include two Christian holy days in Defendants' newsletter calendar. (Paragraph 73.) (See, Exhibit "A", ¶ 56-76).

4.      In the wake of September 11, 2001, following proper notice to their tenants, Defendants' affixed onto the tenants' balcony rails polyester American flags.  (See Exhibit "A", ¶ 34).

5.      As the week of October 17, 2004 approached (at which time Defendants would be hosting the B'Nai B'Rith International Senior Housing Convention), Defendants directed that the flags be removed inasmuch as they had become worn and tattered after having been displayed outside in that fashion for over 3 years.  (See Exhibit "A", ¶ 41).

6.      Following Defendants' removal of the American flag from the tenants' balconies, Plaintiffs placed their own 3' x 5' American flag on their balcony wall.  (See Exhibit "A", ¶ 44).  Defendants took no immediate action to remove Plaintiffs' flag at that time.  (See Exhibit "A", ¶ 46).

7.      On September 15, 2006, Defendants' advised that flags are not permitted on balconies and requested all tenants who had placed them on their balconies to remove them. (See Exhibit "A", ¶ 47-48).

8.      On or about July 27, 2006, Plaintiffs filed a Complaint with the Department of Housing and Urban Development ("HUD"), charging that the policy reflected in Defendants' September 15, 2006 Memorandum represented discrimination on the basis of national origin. (Exhibit "A", ¶ 52-53).

9.      On or about September 18, 2006, Defendants issued a Memorandum to all tenants stating that a flag (of any origin) may be put on a stick in a flower pot or draped on a chair, but stating that tenants could not hang flags on the tenants' balconies.  (Exhibit "A", ¶ 54).

10.      The Defendants' rules with respect to tenants' display of flags is uniform as to all tenants and to all manners of flag, regardless of national origin.  Nevertheless, Plaintiffs filed this action on March 15, 2007, claiming that Defendants' rules discriminated against Plaintiffs on the basis of their national origin (i.e., Americans) in violation of both the federal and state Fair Housing Acts.

## IV.   <u>LEGAL ARGUMENT</u>

**I.   SINCE DEFENDANTS' FLAG-DISPLAY POLICY IS UNIFORM AS TO ALL TENANTS AND ALL NATIONAL ORIGINS, PLAINTIFFS' COMPLAINT DOES NOT ALLEGE THE FACTS NECESSARY TO ESTABLISH THAT THEY WERE DISCRIMINATED AGAINST ON THE BASIS OF THEIR NATIONAL ORIGIN.**

The federal Fair Housing Act, 42 U.S.C. § 3601 et. seq. makes it unlawful "to make, print, or publish, or cause to be made, printed, or published, any notice, statement or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination".  42 U.S.C. § 3604 (c).  See, also *United States of America v. Columbus Country Club*, 915 F. 2d 877, 880 (3d Cir. 1990).  In the same way, the Delaware Fair Housing Act, 6 Del. C. § 4601 et. seq. makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, national origin, religion, creed, sex, marital status, familial status, age or

handicap.  6 Del. C. § 4607 (2).  *Newark Landlord Association, et al v. The City of Newark*, 2003 Del. Ch. LEXIS 66 (decided June 13, 2003) (Exhibit "B").

The federal Fair Housing Act and the Delaware Fair Housing Act have "similarity in structure, language and purpose".  *Newark Landlord Association, et al supra*, at 37.  There is also "considerable overlap" between analysis under these statutes and other federal anti-discrimination statutes, including Title VII (discrimination in employment).  *Id.*  Courts therefore look to each of these bodies of law for guidance in analyzing claims under the housing discrimination statutes.  *Id.*

There are two "families of discrimination claims" under the Fair Housing Acts: a plaintiff can show either (1) discriminatory treatment; or (2) discriminatory effect.  "Disparate treatment occurs when a decision maker 'simply treats some people less favorably than others because of a protected trait' ".  *Saville v. Quaker Hill Place*, 531 A.2d 201, 204 (Del. Supr. 1987), quoting *International Brotherhood of Teamsters v. United States*, 431 U.S.C. 324, 335, n.15, 52 L. Led. 2d 396, 97 S.Ct. 1843 (1977).  Conversely, when a decision maker's practices are facially neutral in their treatment of different groups but in fact unjustifiably disadvantage one or more groups, a claim for disparate impact exists.  *Id.*

Here, Defendants' policy prohibiting the display of flags applies on its face to all tenants and all manners of flag, regardless of national origin.  As such, it is facially neutral.  Indeed, it does not appear that Plaintiffs claim otherwise.  To the contrary, Plaintiffs only claim seems to be that the enforcement of the policy has a disparate impact on them as "natural citizens" of  the United States of America.

**A. Plaintiffs Cannot Establish That Defendants' Flag-Display Policy Has A Disparate Or Discriminatory Effect.**

In *Resident Advisory. v. Rizzo*, 564 F.2d 126, 148 (3d Cir. 1977), the Third Circuit Court of Appeals joined the ranks of several other circuits which held that, in order to establish a *prima facie* case under the federal Fair Housing Act, a plaintiff must show "that the challenged action by defendant had a … discriminatory effect". This holding has been reiterated in subsequent decisions. See *Korrn, et al v. Lacey Township, et al*, 78 Fed. Appx. 199 (3d Cir. 2003); *Lapid-Laurel, LLC, et al v. Zoning Board of Adjustment of the Township of Scotch Plains, et al*, 284 F.3d 442, 466 (3d Cir. 2002). Discriminatory effect may be proved by showing either "adverse impact to particular minority group" or "harm to the community generally by their perpetuation of segregation". *Korrn, et al v. Lacey Township, et al*, quoting *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 937 (2d Cir.), aff'd in part, 488 U.S. 15, 102 L. Ed. 2d 180, 109, S. Ct. 276 (1988).

In this instance, the Defendants' flag-display policy is uniform on its face. More importantly, the impact of the flag-display policy on each tenant is the same. Plaintiffs do not allege that non-American flags are permitted to be displayed or that other tenants are permitted to display the flag in a fashion that the Plaintiffs cannot. Under the circumstances, even accepting as true each and every allegation in Plaintiffs' Complaint, the flag-display policy has no disparate impact on the Plaintiffs.

In *Korrn v. Lacey Township, et al, supra,* plaintiffs alleged that the defendant-township's enactment of an animal control ordinance violated their rights under the Fair Housing Act (among other statutes) because it was motivated by racial animus. In dismissing plaintiffs' claim under the Fair Housing Act, the Third Circuit Court of Appeals observed:

6

(Plaintiffs) make no showing that the Ordinance affects "a particular minority group". The Ordinance affects all township citizens, white and minority alike. Nor is there any evidence that the Ordinance is likely to affect the township's citizens along racial lines. As the District Court stated, "the fact that the first person an Ordinance affects is a person of color does not negate the fact that such Ordinance is a legitimate governmental exercise". (Citation omitted). As a result, (Plaintiffs) cannot sustain a claim under § 3604(a) of the Fair Housing Act.

The flag-display policy which is at issue here has no impact upon Plaintiffs beyond the impact it has on every tenant, regardless of that tenant's national origin. The Corwins make no showing that the flag-display policy affects a "particular minority group". To the contrary, the flag-display policy affects all tenants, Americans and non-Americans alike. In essence, Plaintiffs are aggrieved because they would like to display their American flag in a manner prohibited by the flag-display policy. Their disenchantment, however, does not render them victims of discrimination under the federal or state Fair Housing Acts.

In sum, the flag-display policy challenged by the Plaintiffs is facially neutral and apply uniformly to all tenants regardless of their national origin. The impact of the policy is the same as to each and every tenant. As such, Plaintiffs cannot establish a *prima facie* case of discrimination under the federal or state Fair Housing Acts.

## V.    <u>CONCLUSION</u>

For all of the foregoing reasons, it is respectfully requested that this Honorable Court dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

*/s/ Daniel A. Griffith DE ID 4209*

_____

DANIEL A. GRIFFITH, ESQUIRE

**EXHIBIT "A"**

# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**ISIDORE CORWIN AND BONNIE CORWIN**

CIVIL ACTION NO.: ___0 7 - 1 5 2 -___

*PLAINTIFFS,*

-AGAINST-

**COMPLAINT**
**(TRIAL BY JURY DEMANDED)**

B'NAI B'RITH SENIOR CITIZEN HOUSING, INC.;
SOUTHEASTERN PROPERTY MANAGEMENT, INC.;
AND LYNNE ROTAN, AN AGENT, SERVANT OR EMPLOYEE OF
B'NAI B'RITH SENIOR CITIZEN HOUSING, INC.

*DEFENDANTS.*

PLAINTIFFS ISIDORE CORWIN AND BONNIE CORWIN, PRO SE, UNDERSIGNED,
BRING THIS COMPLAINT AGAINST THE ABOVE-NAMED DEFENDANTS AND
THEIR AGENTS, SERVANTS, AND EMPLOYEES, AND IN SUPPORT THEREOF
ALLEGE THE FOLLOWING ON PERSONAL KNOWLEDGE AS TO THEMSELVES
AND THEIR OWN ACTIONS, AND UPON INFORMATION AND BELIEF AS TO ALL
OTHER MATTERS.

### PARTIES

1. PLAINTIFF ISIDORE CORWIN ( "I. CORWIN") IS A CITIZEN OF THE UNITED
STATES AND RESIDES IN THE STATE OF DELAWARE AT 8608 SOCIETY DRIVE,
CLAYMONT, COUNTY OF NEW CASTLE, DELAWARE, 19703.

2. PLAINTIFF BONNIE CORWIN ("B. CORWIN") IS A CITIZEN OF THE UNITED
STATES, IS THE LAWFUL SPOUSE OF PLAINTIFF ISIDORE CORWIN, AND
RESIDES WITH HIM AT 8608 SOCIETY DRIVE, CLAYMONT, COUNTY OF NEW
CASTLE, STATE OF DELAWARE, 19703.

3. DEFENDANT B'NAI B'RITH SENIOR CITIZEN HOUSING, INC. ("B'NAI B'RITH
SENIOR") HAS ITS PRINCIPAL PLACE OF BUSINESS AT 8000 SOCIETY DRIVE,
CLAYMONT, DE, 19703, AND ITS CORPORATE OFFICE AT 1103 R. ARRINGTON,
JR. BOULEVARD SOUTH, BIRMINGHAM, ALABAMA, 35205.

1

4. DEFENDANT SOUTHEASTERN PROPERTY MANAGEMENT, INC. ("SPM") IS A MANAGEMENT AGENCY, WITH ITS CORPORATE OFFICE AT 1103 R. ARRINGTON, JR. BOULEVARD SOUTH, BIRMINGHAM, ALABAMA, 35205.

5. DEFENDANT LYNNE ROTAN ("ROTAN") IS A PROPERTY MANAGER, WITH HER RESIDENCE AT 15 PENNSYLVANIA AVENUE, CLAYMONT, DELAWARE, 19703.

6. AT ALL TIMES RELEVANT TO THIS COMPLAINT, DEFENDANT ROTAN ACTED AS AN AGENT, SERVANT, OR EMPLOYEE OF B'NAI B'RITH SENIOR.

## JURISDICTION AND VENUE

7. THE CIVIL ACTION ARISES UNDER TITLE VIII OF THE CIVIL RIGHTS ACT OF 1968, § 801, *ET SEQ.,* AS AMENDED BY THE FAIR HOUSING ACT OF 1988, 42 U.S.C.A. § 3601 *ET SEQ.,* AND, MORE PARTICULARLY, 42 U.S.C.A. § 3604 (B). THERE IS A PENDANT STATE LAW CLAIM UNDER THE DELAWARE FAIR HOUSING ACT, DEL. CODE ANN. 6 § 4601 *ET SEQ.* JURISDICTION IS CONFERRED ON THIS COURT PURSUANT TO 28 U.S.C. § 1331 AND 1343 (A)(3).

8. PLAINTIFFS' CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF ARE AUTHORIZED BY 28 U.S.C. § 2201 AND 2202, BY RULES 57 AND 65 OF THE FEDERAL RULES OF CIVIL PROCEDURE, AND BY THE GENERAL LEGAL AND EQUITABLE POWERS OF THIS COURT.

9. VENUE IS PROPER UNDER 28 U.S.C. § 1391(B) BECAUSE THE HOUSING PRACTICES ALLEGED HEREIN TO BE UNLAWFUL WERE AND ARE NOW BEING COMMITTED WITHIN THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE.

10. THE DISCRIMINATORY ACTS IN THIS LAWSUIT CONCERN NATIONAL ORIGIN DISCRIMINATION ALLEGED BY THE PLAINTIFFS IN THE HANGING OF THEIR AMERICAN FLAG ON THEIR RENTED BALCONY AT DEFENDANTS' B'NAI B'RITH HOUSE APARTMENTS IN CLAYMONT, DELAWARE, WITH PLAINTIFFS' DISCRIMINATION COMPLAINT COMMENCING ON OR ABOUT JULY 27, 2006.

11. ON JULY 27, 2006, PLAINTIFFS TOOK STEPS IN A WRITTEN COMPLAINT TO THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (THE AVAILABLE ADMINISTRATIVE AGENCY AS TO CHARGES OF THE

ALLEGED DISCRIMINATORY CONDUCT BY THE DEFENDANTS IN THEIR FLAG FLYING POLICY FOR TENANTS' BALCONIES AT THE B'NAI B'RITH HOUSE). PLAINTIFFS' COMPLAINT WENT TO THE PROJECT MANAGER, MS. ELAINE GARBON, WANAMAKER BUILDING, 100 PENN SQUARE EAST, PHILADELPHIA, PA, 19107. HUD FORWARDED PLAINTIFFS' GRIEVANCE TO MS. CHRIS KINNIKIN, HOUSING LOAN MANAGEMENT OFFICER, DELAWARE STATE HOUSING AUTHORITY, DOVER, DELAWARE, 19901, FOR INVESTIGATION.

12. THE RESULT OF THE SUBSEQUENT DSHA'S INVESTIGATION WAS, COMPLAINT "RESOLVED", AS DSHA'S ON-SITE OBSERVATION OF AUGUST 16, 2006 WAS THAT THERE WERE NO FLAGS FLYING ON TENANTS' BALCONIES AT THE B'NAI B'RITH HOUSE. DSHA INFORMED PLAINTIFFS OF ITS INVESTIGATIVE COMPLAINT DETERMINATION IN A LETTER DATED AUGUST 31, 2006.

13. SUBSEQUENT TO DSHA'S ABOVE AFOREMENTIONED DETERMINATION, PLAINTIFFS FORWARDED A LETTER TO DEFENDANT ROTAN ON SEPTEMBER 9, 2006, FORMALLY REQUESTING PERMISSION FOR PLAINTIFFS TO HANG AN AMERICAN FLAG ON THEIR RENTED BALCONY AT THE B'NAI B'RITH HOUSE.

14. ON SEPTEMBER 15, 2006, DEFENDANT ROTAN RESPONDED, IN WRITING, TO PLAINTIFFS' ABOVE AFOREMENTIONED REQUEST (AND AT THE SAME TIME TO ALL TENANTS) THAT TENANTS CANNOT HANG FLAGS ON THE THEIR BALCONIES, AND FOR ALL TENANTS, INCLUDING PLAINTIFFS, TO PROMPTLY REMOVE THEIR FLAGS FROM THEIR BALCONIES, OSTENSIBLY FOR SAFETY REASONS.

15. IN THE FACE OF OTHER TENANTS' PROTESTS REGARDING DEFENDANT ROTAN'S AFOREMENTIONED MEMO TO PROMPTLY REMOVE ALL FLAGS FROM TENANT BALCONIES, DEFENDANT ROTAN THEN SUDDENLY PROMULGATED NEW RULES ON SEPTEMBER 18, 2006 WITH A WRITTEN MEMO TO ALL TENANTS, INCLUDING PLAINTIFFS, THAT TENANTS CAN NOT HANG FLAGS, BUT MAY PUT A FLAG ON A STICK IN A FLOWER POT OR MAY DRAPE A FLAG ON A CHAIR ON TENANTS' RESPECTIVE BALCONIES.

16. ON SEPTEMBER 22, 2006, PLAINTIFFS FORWARDED A LETTER TO MRS. ROTAN THAT DRAPING THE AMERICAN FLAG IS AGAINST U.S. FLAG CODE.

3

17. ON OCTOBER 3, 2006, DEFENDANT ROTAN NOTIFIED PLAINTIFFS, IN WRITING, THAT MR. DAVID SCHLECKER (A B'NAI B'RITH SENIOR DESIGNATED DIRECTOR & OFFICER) WAS PLANNING ON ATTENDING THE NEXT B'NAI B'RITH HOUSE TENANT ASSOCIATION MEETING IN ORDER TO ADDRESS THE FLAG ISSUE (TO TENANTS).

18. ON OCTOBER 11, 2006, MR. DAVID SCHLECKER ATTENDED THE OCTOBER 2006 TENANT ASSOCIATION MEETING, WHERE A CERTAIN TENANT, IN OPEN DISCUSSION, BROUGHT TO MR. SCHLECKER'S ATTENTION THAT TENANTS AT THE APARTMENT FACILITY ARE PERMITTED TO HANG PATIO UMBRELLAS ON POLES, STRAPPED ON TENANTS' RESPECTIVE BALCONY RAILS (CONTRARY TO DEFENDANTS' SEPTEMBER 15, 2006 MEMO THAT TENANTS CANNOT HANG FLAGS ON TENANT BALCONIES).

19. SUBSEQUENTLY, ON OCTOBER 12, 2006, PLAINTIFFS FORWARDED A LETTER TO DEFENDANT ROTAN STATING THAT PLAINTIFFS DO NOT CHOOSE TO PUT THEIR AMERICAN FLAG ON A STICK IN A FLOWER POT, AND REQUESTED AN ALTERNATIVE MEANS TO HANG THEIR AMERICAN FLAG, TO STRAP THEIR FLAG ON THEIR RESPECTIVE BALCONY RAIL (AS ARE THE HANGING PATIO UMBRELLAS ON OTHER TENANT'S BALCONIES).

20. ON OCTOBER 23, 2006, PLAINTIFFS REQUESTED, IN WRITING, TO DEFENDANT ROTAN, IF THE DEFENDANT WOULD RESPOND TO PLAINTIFFS' ABOVE AFOREMENTIONED REQUEST PRIOR TO VETERANS DAY 2006, IN ORDER THAT PLAINTIFFS COULD PREPARE FOR THE HOLIDAY.

21. ON OCTOBER 30, 2006, DEFENDANT ROTAN RESPONDED TO THE AFOREMENTIONED PLAINTIFFS' REQUEST (TO STRAP THEIR AMERICAN FLAG ON THEIR BALCONY RAIL), DEFENDANT ROTAN STATING IN A ONE-SENTENCE RESPONSE LETTER TO PLAINTIFFS, "THE ANSWER IS NO…".

22. HENCE, ON VETERANS DAY 2006, BOTH ON NOVEMBER 10, 2006, NATIONALLY OBSERVED VETERANS DAY, AND ON NOVEMBER 11, 2006, VETERANS DAY, PLAINTIFFS WERE DENIED THEIR ABILITY TO HANG THEIR AMERICAN FLAG ON THEIR BALCONY RAIL, WHILE OTHER TENANTS WERE PERMITTED TO OPENLY HANG PATIO UMBRELLAS ON THEIR BALCONY RAILS (UMBRELLAS EVEN LARGER THAN THE PLAINTIFFS' AMERICAN FLAG).

4

23.  ON VETERANS DAY 2006, DEFENDANTS PERMITTED ELEVEN (11) OTHER HANGING-LOCATIONS ON OTHER TENANTS' RESPECTIVE BALCONIES AT THE SUBJECT FACILITY, INCLUDING THE AFOREMENTIONED UMBRELLAS, THERMOMETERS, BALCONY-RAIL PLANTERS, WIND CHIMES, HANGING BELL, HANGING HOOK, AND BALCONY-RAIL FLAG HOLDER, EVEN THOUGH DEFENDANT ROTAN STATES NOTHING IS ALLOWED TO HANG ON TENANTS' BALCONIES AT THE B'NAI B'RITH HOUSE.

24.  ON NOVEMBER 15, 2006, PLAINTIFFS FORWARDED A LETTER TO THE DEFENDANT ROTAN REQUESTING  A "MANAGEMENT REVIEW" OF THE B'NAI B'RITH HOUSE PRESENT POLICY IN AMERICAN FLAG FLYING ON TENANTS' PRIVATE BALCONIES.

25.  ON  NOVEMBER 20, 2006, DEFENDANT ROTAN, IN WRITING,  RESPONDED TO PLAINTIFFS' ABOVE AFOREMENTIONED REQUEST, WITH, "WE HAVE A RULE THAT YOU CANNOT ATTACH ANYTHING TO THE BALCONY...(THE  FLAG) CANNOT BE ATTACHED OR AFFIXED TO THE BALCONY RAIL."

26.  ON MARCH  14, 2007, BASED ON ALLEGED NATIONAL ORIGIN DISCRIMINATION BY THE DEFENDANTS, PLAINTIFFS REPORTED ALL INFORMATION ABOUT THE DEFENDANTS' ALLEGED VIOLATIONS OF THE FAIR HOUSING ACT TO HUD, WHERE PLAINTIFFS EXPLAINED THE FACTS AND CIRCUMSTANCES WHERE OTHERS WERE TREATED DIFFERENTLY FROM PLAINTIFFS, AND THAT THE DISCRIMINATION IS ONGOING, AND WHERE THERE ARE WITNESSES AND OTHERS WHO KNOW WHAT HAPPENED.

27.  ALL STATUTORY PREREQUISITES TO THE FILING OF THE HOUSING DISCRIMINATION COMPLAINT, ACCORDINGLY, HAVE BEEN MET.

FACTS COMMON TO ALL COUNTS

28.  DEFENDANTS B'NAI B'RITH SENIOR CITIZEN HOUSING, INC. OWN AND OPERATE, AND CONTROL THE EIGHT-STORY SENIOR CITIZEN APARTMENT BUILDING ("THE SUBJECT FACILITY") KNOWN AS THE B'NAI B'RITH HOUSE, AT 8000 SOCIETY DRIVE, IN THE CITY OF CLAYMONT, STATE OF DELAWARE, AND IS WHERE AT ALL TIMES RELEVANT HERETO, THE BUILDING'S MANAGEMENT AGENCY WAS AND IS DEFENDANT SOUTHEASTERN

5

PROPERTY MANAGEMENT, INC., WHO MANAGE THE ELDERLY SECTION 202/8
APARTMENT COMPLEX; WITH DEFENDANT PROPERTY MANAGER ROTAN,
WHO WAS AND IS AN AGENT, SERVANT, OR EMPLOYEE OF B'NAI B'RITH
SENIOR CITIZEN HOUSING, INC.

29.  DEFENDANT B'NAI B'RITH SENIOR RECEIVES, AND HAS IN THE PAST
RECEIVED, FEDERAL SECTION 8 SUBSIDES, 42 U.S.C. § 1437F, WHICH IS
DESIGNED TO ALLOW LOW AND LOW-MODERATE INCOME PERSONS TO LIVE
IN PRIVATELY OWNED HOUSING, UNDER SPECIFICALLY HUD'S HOUSING
ASSISTANCE PAYMENT CONTRACT #DE26-H004-007, FOR THE OPERATION AND
MAINTENANCE OF THE SUBJECT FACILITY, AT 8000 SOCIETY DRIVE,
CLAYMONT, DELAWARE.  THE CONTRACT WAS, AND IS, ADMININSTERED BY
THE DELAWARE STATE HOUSING AUTHORITY.

30.  AS A RECIPIENT OF FEDERAL HUD SUBSIDIES, THE DEFENDANTS, AT ALL
TIMES RELEVANT HERETO, HAD, AND HAS, A DUTY UNDER TITLE VIII OF THE
CIVIL RIGHTS ACT OF 1968 AND THE FAIR HOUSING ACT OF 1988, TO REFRAIN
FROM DISCRIMINATING AGAINST TENANTS, INCLUDING PLAINTIFFS, ON THE
BASIS OF RACE, COLOR, RELIGION, OR NATIONAL ORIGIN, AND TO FOLLOW
THE RULES, REGULATIONS, AND GUIDELINES FOR SUBSIDIZED LANDLORDS
SET FORTH IN THE APPLICABLE HUD HANDBOOK NO. 4350.3.

31.  AS THE OPERATOR OF A DWELLING IN THE STATE OF DELAWARE,
DEFENDANT B'NAI B'RITH SENIOR ALSO HAS A DUTY UNDER THE DELAWARE
FAIR HOUSING ACT TO REFRAIN FROM DISCRIMINATING AGAINST TENANTS,
INCLUDING PLAINTIFFS, ON THE BASIS OF RACE, COLOR, RELIGION, OR
NATIONAL ORIGIN.

32.  PLAINTIFF ISIDORE CORWIN AND PLAINTIFF BONNIE CORWIN, SENIOR
CITIZENS, MARRIED TO EACH OTHER, WERE ACCEPTED AS TENANTS AT THE
B'NAI B'RITH HOUSE, BY THE DEFENDANTS, ON SEPTEMBER 24, 1992; AND
MOVED INTO APARTMENT 608 AT THE B'NAI B'RITH HOUSE ON OCTOBER 25,
1992, SHORTLY AFTER THEIR MARRIAGE.

33.  BOTH PLAINTIFFS ISIDORE CORWIN AND BONNIE CORWIN, AS YOUNG
ADULTS, WERE SINCERE MEMBERS OF THE BOY SCOUTS OF AMERICA AND
THE GIRL SCOUTS OF AMERICA, RESPECTIVELY; WHO EXPRESS THEIR

ALLEGIANCE TO AMERICA, IN PART, BY DISPLAYING SYMBOLS THEREOF
SUCH AS THE AMERICAN FLAG IN AND ABOUT THEIR APARTMENT AT SAID
BUILDING, OPERATED AND CONTROLLED BY THE DEFENDANTS.

34. UPON THE TRAGEDY OF SEPTEMBER 11, 2001, DEFENDANT ROTAN, IN A
HUD-APPROVED BUILDING ACTIVITY, WITH PROPER NOTICE TO TENANTS,
ERECTED ONTO TENANTS' BALCONY RAILS, INCLUDING THE PLAINTIFFS'
BALCONY RAIL, POLYESTER AMERICAN FLAGS (12"x 18" FLAGS ON A 24 ½"
STICK POLE) ON EACH BALCONY AT THE SUBJECT FACILITY, TWENTY-FOUR
HOURS A DAY, SEVEN DAYS A WEEK. THE OUTDOOR BALCONY OF EACH
TENANTS' APARTMENT EXTENDS APPROXIMATELY THE LENGTH OF A
TENANTS' LIVING ROOM AND BEDROOM WITH AN APPROPRIATE RAILING.

35. WITH THE ABOVE AFOREMENTIONED DEFENDANTS' AMERICAN FLAG-
HANGING ACTIVITY, THIS IS WHEN THE DEFENDANTS PUT NOTHING IN
WRITING TO THE TENANTS TO THE EFFECT THAT THE BALCONY ACTIVITY
WAS AN *EXCEPTION* TO ANY HOUSE RULE.

36. THE DEFENDANTS' AMERICAN FLAG-HANGING ACTIVITY, STRAPPED
ONTO TENANTS' BALCONY RAILS, INCLUDING PLAINTIFFS' BALCONY RAIL,
DISPLAYED THE AMERICAN FLAG, WHICH DEPICTED THE STARS AND
STRIPES, AND HAD GREAT NATIONAL ORIGIN VALUE TO BOTH PLAINTIFFS.

37. PLAINTIFFS, TOO, PUT AMERICAN SYMBOLS AND PICTURES IN THEIR
B'NAI B'RITH HOUSE APARTMENT (INSIDE), AND ON THEIR AUTOMOBILE'S
VENT WINDOW AND REAR BUMPER, WHERE THE AMERICAN FLAG STICKER
READS "OUR GOD REIGNS". PLAINTIFFS PURCHASED PATRIOTIC DVD'S;
SUNG PATRIOTIC SONGS; VIEWED PATRIOTIC TV; AND ISIDORE CORWIN
(WHO WENT ON DAILY WALKS) SOMETIMES CARRIED THE AMERICAN FLAG
AS HE WALKED (WITH PASSING MOTORISTS "TOOTING THEIR HORNS" IN
AGREEMENT WITH THE DISPLAY).

38. PLAINTIFFS FURTHER EXPRESSED THEIR FERVENT PATRIOTIC
ALLEGIANCE TO AMERICA BY ATTENDING *SENIOR CENTER* LUNCHES,
COMMENCING WITH THE "PLEDGE OF ALLEGIANCE" ("ONE NATION UNDER
GOD"); LODGE NO. 470, B'NAI B'RITH, INC.'S SING-A-LONGS WHERE
PATRIOTIC SONGS WERE SUNG; TRIPS TO HISTORIC BATTLEFIELDS AND

7

MONUMENTS; AND A VISIT TO THE GRAVESIDE OF ISIDORE CORWIN'S
FATHER (A VETERAN OF WORLD WAR I) WHERE THE FLAG WAS PLACED.

39. THE PRESENCE OF PLAINTIFFS' AMERICAN SYMBOLS AND IMAGES,
INCLUDING THE AMERICAN FLAG, IN AND ABOUT THE PLAINTIFFS'
APARTMENT UNIT, WAS KNOWN TO, OR SHOULD HAVE REASONABLY BEEN
KNOWN TO, THE DEFENDANTS, PARTICULARLY DEFENDANT ROTAN,
MANAGER OF THE SUBJECT FACILITY, THROUGH HER INSPECTIONS OF
PLAINTIFFS' UNIT ONE OR TWO TIMES A YEAR AND HER RECEIPT OF
PLAINTIFFS' "DECLARATION OF SECTION 214 CITIZENSHIP STATUS FORM", IN
THE NORMAL COURSE OF HER WORK.

40. ON VETERANS DAY 2002 AND ON VETERANS DAY 2003, THE DEFENDANTS'
HUD-SUBSIDIZED AMERICAN FLAG-HANGING ACTIVITY ON TENANTS'
BALCONY RAILS WAS ACTIVE AND ONGOING.

41. WITH VETERANS DAY 2004, AND THE WEEK OF OCTOBER 17, 2004
APPROACHING (WHERE THE DEFENDANTS' HOSTED THE B'NAI B'RITH
INTERNATIONAL SENIOR HOUSING CONVENTION) DEFENDANT ROTAN
DIRECTED HER MAINTENANCE STAFF TO REMOVE ALL AMERICAN FLAGS IN
THE DEFENDANTS' FLAG-HANGING ACTIVITY, FROM ALL TENANTS'
BALCONY RAILS, OSTENSIBLY BECAUSE THE AMERICAN FLAGS HAD BECOME
"WORE AND TATTERED".

42. IN THE ABOVE AFOREMENTIONED 2004 DEFENDANTS' *REMOVAL* OF ITS
AMERICAN FLAGS FROM THE TENANTS' RENTED BALCONY RAILS, THIS IS
WHEN THE DEFENDANTS PUT NOTHING IN WRITING TO THE TENANTS TO
THE EFFECT.

43. POST THE DEFENDANTS' AMERICAN FLAG REMOVAL FROM THE TENANTS'
PRIVATE BALCONY RAILS, SOME TENANTS HUNG THEIR OWN FLAGS ON
THEIR RESPECTIVE BALCONIES, SOME FLAGS EVEN LARGER THAN THE
DEFENDANTS' AMERICAN FLAG.

44. PLAINTIFFS, TOO, REPLACED DEFENDANTS' AMERICAN FLAG WITH THEIR
OWN HANGING POLYESTER AMERICAN FLAG (3' x 5' FLAG WITHOUT A STICK
POLE) WHICH HUNG ON PLAINTIFFS' BALCONY WALL ON CERTAIN
NATIONAL HOLIDAYS, AS A CONTINUED EXPRESSION OF PATRIOTISM.

45. AT THE SAME TIME THAT PLAINTIFFS DISPLAYED THEIR AMERICAN FLAG AND PATRIOTIC IMAGES, OTHER TENANTS AND THE BUILDING MANAGEMENT PROMINENTLY DISPLAYED SYMBOLS OF THEIR OWN OF AMERICA, SUCH AS FLAGS OR STICKERS DEPICTING THE AMERICAN FLAG AT THE SUBJECT FACILITY.

46. UPON INFORMATION AND BELIEF, BETWEEN THE YEARS 2001 AND 2005, THERE WAS A PASSIVE ACCEPTANCE BY THE DEFENDANTS IN FLAG FLYING ON TENANT RESPECTIVE BALCONIES AT THE SUBJECT FACILITY.

47. ON THE HEELS OF VETERANS DAY 2006, SPECIFICALLY ON SEPTEMBER 15, 2006, DEFENDANT ROTAN GAVE WRITTEN NOTICE TO THE TENANTS, INCLUDING PLAINTIFFS, OF THE STATUS OF DEFENDANTS' INTENTIONS, OF THEIR REPEATING (ALTHOUGH THEY HOPED NOT TO) THEIR AMERICAN FLAG HANGING ACTIVITY ON TENANTS' BALCONIES, IF THE NATION EXPERIENCED ANOTHER TERRORIST ATTACK, *STATING*:

> "WE HUNG SMALL FLAGS ON THE BALCONIES...A SPECIAL CIRCUMSTANCE, WHICH WE HOPE WE NEVER HAVE TO REPEAT." (ROTAN MEMO, 9/15/06 ).

48. ADDITIONALLY, IN THE ABOVE AFOREMENTIONED SEPTEMBER 15, 2006 MEMO, IS WHERE MRS. ROTAN RESPONDED TO PLAINTIFFS' PARTICULAR SEPTEMBER 9, 2006 REQUEST (WHERE PLAINTIFFS REQUESTED PERMISSION TO HANG THEIR AMERICAN FLAG ON THEIR PRIVATE BALCONY), MRS. ROTAN STATING IN THE 9/15/06 MEMO THAT FLAGS ARE NOT ALLOWED ON BALCONIES AND FOR ALL TENANTS TO PROMPTLY REMOVE THEIR FLAGS.

49. ON OCTOBER 30, 2006, DEFENDANT ROTAN GAVE WRITTEN DENIAL TO PLAINTIFFS' OCTOBER 23, 2006 ALTERNATIVE REQUEST FOR PERMISSION TO HANG PLAINTIFFS' AMERICAN FLAG ON THEIR BALCONY RAIL (AS DEFENDANTS PERMIT OTHER TENANTS TO HANG PATIO UMBRELLAS ON THEIR BALCONY RAILS), THEREBY MAKING UNAVAILABLE PLAINTIFFS' ABILITY TO HANG THEIR FLAG ON THEIR BALCONY RAIL, VETERANS DAY.

50. ON VETERANS DAY 2006, DEFENDANTS PERMITTED OTHER TENANTS AT THE SUBJECT FACILITY TO HANG SUCH THINGS ON THEIR BALCONIES AS WIND CHIMES HANGING FROM PARTICULAR BALCONY CEILINGS; THERMOMETERS HANGING ON PARTICULAR BALCONY WALLS; PLANTERS

9

HANGING ON PARTICULAR BALCONY RAILS; BELL HANGING FROM A
PARTICULAR BALCONY CEILING; HOOKS HANGING ON PARTICULAR
BALCONY WALLS; FLAG HOLDERS HANGING ON PARTICULAR  BALCONY
RAILS; AND EVEN THE AFOREMENTIONED HANGING UMBRELLAS ON
PARTICULAR BALCONY RAILS.

51. DEFENDANTS PERMITTED THESE ABOVE AFOREMENTIONED ITEMS TO BE
HUNG OR TO BE FASTENED OR STRAPPED ON OTHER TENANTS' BALCONIES
AND BALCONY RAILS ON VETERANS DAY 2006, AND THE SUBSEQUENT
WINTER HANGING OF SEASONAL DECORATIONS SUCH AS WREATHES ON THE
TENANTS' BALCONY WALLS AND BALCONY RAILS,  EVEN THOUGH
DEFENDANT ROTAN STATED THAT SUCH HANGINGS ON BALCONIES ARE NOT
PERMITTED AT THE SUBJECT FACILITY.

52.  IN THE FACE OF DEFENDANTS' ALLEGED DISCRETIONARY AUTHORITY TO
REPEAT DEFENDANTS' HUD-SUBSIDIZED HANGING OF THE AMERICAN FLAG
ACTIVITY ON TENANTS' BALCONY RAILS, INCLUDING PLAINTIFFS' BALCONY
RAIL; AUTHORITY TO ACCEPT OTHER TENANTS' HANGING PATIO
UMBRELLAS ON TENANTS' BALCONY RAILS; AUTHORITY TO ACCEPT OTHER
TENANTS' DECORATIONS ON TENANTS' BALCONIES; AND YET DENY
PLAINTIFFS' ABILITY TO HANG THEIR AMERICAN FLAG ON THEIR RENTED
APARTMENT'S BALCONY RAIL ON A NATIONAL HOLIDAY, HAS HAD A
DISPROPORTIONATE IMPACT ON PLAINTIFFS AND CAUSED PLAINTIFFS
GREAT MENTAL ANGUISH AND EMOTIONAL, AND EVEN PHYSICAL DISTRESS.

53.  ON JULY 27, 2006, PLAINTIFFS HAD MADE THE AFOREMENTIONED
HOUSING DISCRIMINATION COMPLAINT WITH HUD (THE AGENCY
PRIMARILY CHARGED WITH THE FAIR HOUSING ACT IMPLEMENTATION AND
ADMINISTRATION) WHERE PLAINTIFFS REPORTED ALLEGED NATIONAL
ORIGIN DISCRIMINATION IN THE REPORTED PLAINTIFFS' INABILITY TO
HANG THEIR AMERICAN FLAG ON THEIR RESPECTIVE BALCONY.

54.  ONLY AFTER HUD'S FORWARDING OF THE ABOVE AFORESAID ALLEGED
DISCRIMINATION COMPLAINT TO DSHA FOR DETERMINATION, AND DESPITE
DEFENDANT BUILDING MANAGER ROTAN'S RULES ISSUED ON OR ABOUT
SEPTEMBER 15, 2006, FOR ALL THE TENANTS, INCLUDING PLAINTIFFS, TO

PROMPTLY REMOVE THEIR FLAGS FROM TENANTS' RESPECTIVE BALCONIES, DID DEFENDANT ROTAN SUDDENLY PROMULGATE NEW RULES ON SEPTEMBER 18, 2006, STATING, IN WRITING, THAT TENANTS CAN NOT HANG FLAGS ON TENANTS' PRIVATE BALCONIES, BUT THAT A FLAG MAY BE PUT ON A STICK IN A FLOWER POT OR A FLAG MAY BE DRAPED ON A CHAIR.

55. DEFENDANTS' FOREGOING ACTS ON 9/15/06, INSTRUCTING TENANTS, INCLUDING PLAINTIFFS, TO PROMPTLY REMOVE THEIR FLAGS ON THEIR RENTED BALCONIES; ON 9/18/06, INSTRUCTING TENANTS, INCLUDING PLAINTIFFS, THAT THEY MAY NOW PUT THEIR FLAG IN A FLOWER POT OR DRAPE THEIR FLAG ON A CHAIR; ON 10/30/06, PROHIBITING PLAINTIFFS FROM STRAPPING THEIR AMERICAN FLAG ON THEIR RESPECTIVE BALCONY RAIL, WHILE DEFENDANTS PERMIT PATIO UMBRELLAS TO BE STRAPPED ON OTHER TENANT'S BALCONY RAILS, AS WELL AS OTHER HANGINGS ON OTHER TENANT'S BALCONY CEILINGS, WALLS, AND RAILS; AND, ON 9/15/06, WHERE DEFENDANTS GIVE THEMSELVES, IN PARTICULAR CIRCUMSTANCES, PERMISSION TO STRAP THEIR AMERICAN FLAGS ON TENANTS' BALCONY RAILS, TOOK PLACE IN A CONTEXT OF OTHER ALLEGED DEFENDANTS' DISCRIMINATORY ACTS TOWARDS PLAINTIFFS.

56. IN ABOUT 1993, DEFENDANT ROTAN HARASSED AND TRIED TO INTIMIDATE THE PLAINTIFFS DURING INSPECTIONS OF THEIR APARTMENT. SHE ORDERED PLAINTIFFS TO REMOVE A CERTAIN KIND OF PEEL-BACKING WALLPAPER BORDER FROM ABOVE THE TOP EDGE OF THEIR HALLWAY CLOSET METAL DOOR. AT ABOUT THE SAME TIME, UPON INFORMATION AND BELIEF, DEFENDANT ROTAN PERMITTED ANOTHER TENANT TO KEEP THE SAME KIND OF WALLPAPER BORDER ON THAT TENANT'S ENTIRE KITCHEN WALL, EVEN THOUGH ROTAN STATED TO PLAINTIFFS THAT SUCH A TYPE WALLPAPER BORDER WAS NOT PERMITTED IN THE B'NAI B'RITH HOUSE.

57. ON ANOTHER OCCASION, IN THE EARLY MID 1990'S, DEFENDANT ROTAN CALLED PLAINTIFFS CORWIN TO HER OFFICE AND, IN AN ACCUSATORY TONE AND ON THE BASIS OF AN ALLEGED REPORT TO HER FROM SOMEONE ELSE, ASKED PLAINTIFFS IF THEY HAD UNDERREPORTED THE NUMBER OF CARS THEY HAD AT B'NAI B'RITH HOUSE. IN FACT, PLAINTIFFS HAD NOT.

11

58. IN 1997, DESPITE THE FACT THAT PLAINTIFFS ALWAYS PAID THEIR RENT ON TIME, DEFENDANT ROTAN BEGAN HARASSING PLAINTIFFS ON THE SUBJECT OF THEIR MEDICAL EXPENSES AND MEDICAL APPOINTMENT CAR MILEAGE EXPENSE IN THEIR ANNUAL HUD SECTION 8 RENT RECERTIFICATION.  MRS. ROTAN DENIED PLAINTIFFS' ABILITY TO CLAIM MEDICAL APPOINTMENT MILEAGE EXPENSES IN USE OF THEIR OWN AUTOMOBILE, UNTIL A CERTAIN HUD OFFICIAL IN WASHINGTON, D.C., INSTRUCTED HER TO ALLOW THE CLAIM.  EVEN THEN, DEFENDANT ROTAN CONDITIONED HER COMPLIANCE BY INSTRUCTING THE PLAINTIFFS TO TELL NO OTHER TENANT AT THE B'NAI B'RITH HOUSE ABOUT IT.

59. IN 1998, DEFENDANT ROTAN AGAIN HARASSED PLAINTIFFS ABOUT THEIR ANNUAL RENT RECERTIFICATION HEALTH EXPENSES, WHEN SHE ACCUSED PLAINTIFFS OF "PADDING" THEIR RECEIPTS BY PURCHASING TOO MANY AIR CLEANERS.  IN FACT, DUE TO THE INDUSTRIAL FUMES IN CLAYMONT - DELAWARE RIVER AREA, THE PLAINTIFFS NEEDED SMALL AIR CLEANERS FOR THE FOUR ROOMS IN APARTMENT UNIT.

60. IN THE LATE 1990'S, DEFENDANT ROTAN HARASSED AND TRIED TO INTIMIDATE THE PLAINTIFFS DURING INSPECTION OF THEIR APARTMENT. DEFENDANT ROTAN ORDERED PLAINTIFFS TO REMOVE A CHRISTIAN PRAYER  HUNG ON PLAINTIFFS' APARTMENT FRONT DOOR, OBSTENSIBLY BECAUSE IT WAS HUNG BY A SMALL SCREW.

61. AT ABOUT THE SAME TIME, DEFENDANT ROTAN PERMITTED OTHER TENANTS TO KEEP ITEMS ON THEIR FRONT DOORS WHICH HUNG ON SMALL SCREWS AND EVEN LARGER NAILS, INCLUDING PICTURE FRAMES, WREATHES, ANGELS, AND MAZZUAZAHS, EVEN THOUGH ROTAN STATED TO PLAINTIFFS THAT SUCH HANGINGS ON APARTMENT FRONT DOORS WERE NOT PERMITTED TO BE HUNG BY A NAIL OR SCREW AT THE FACILITY.

62. BEGINNING 2000, DEFENDANT ROTAN WAS RELUCTANT AND TARDY IN ACTING TO RESOLVE THE PROBLEM OF DELETERIOUS SECOND-HAND SMOKE COMING INTO PLAINTIFFS' UNIT FROM THE UNIT NEXT DOOR OCCUPIED BY A HEAVY CIGARETTE SMOKER, AND ALTHOUGH THIS PROBLEM WAS BROUGHT TO SAID DEFENDANT'S ATTENTION SEVERAL TIMES.

63. IN 2001, DEFENDANT ROTAN DENIED PLAINTIFF'S REQUEST THAT THEY BE ALLOWED TO HANG A FLOWER BASKET ON THEIR PERSPECTIVE BALCONY RAIL TO BLOCK OUT A NEARBY STROBE LIGHT'S GLARE, EVEN THOUGH OTHER TENANTS WERE PERMITTED TO MAINTAIN SUCH HANGING FLOWER BASKETS OR FLOWER BOXES ON THEIR BALCONY RAILS.

64. IN OR ABOUT DECEMBER 05, 2003, IN TENANTS' DISPUTE AT THE SUBJECT FACILITY BETWEEN THOSE TENANTS THAT WANTED NATIVITY SCENES AND THOSE TENANTS THAT COMPLAINED ABOUT NATIVITY SCENES IN THE BUILDING'S HOLIDAY SETTINGS, DEFENDANT ROTAN BEGAN REMOVING TENANTS' PERSONALLY OWNED NATIVITY SCENES IN THE COMMON AREAS OF THE APARTMENT BUILDING, OSTENSIBLY BECAUSE THE NATIVITY SCENES WERE A VIOLATION OF THE DELAWARE AND FEDERAL FAIR HOUSING ACT (AND IN SOME CASES DISCARDED THE NATIVITY SCENES).

65. IN OR ABOUT JANUARY, 2004, DEFENDANT ROTAN VERBALLY DEMANDED PLAINTIFFS NOT TO DONATE ITEMS TO OTHER TENANTS WHEN PLAINTIFFS HAD DONATED A PERSONAL ITEM AT A FLOOR'S COMMON AREA TABLE.

66. AT ABOUT THE SAME TIME, UPON INFORMATION AND BELIEF, OTHER TENANTS ARE PERMITTED TO DONATE ITEMS TO EACH OTHER IN THE COMMON AREAS ON ALL FLOORS AT THE SUBJECT FACILITY.

67. IN OR ABOUT FEBRURARY 4, 2004, DEFENDANT ROTAN CHARGED AND DEMANDED OF THE PLAINTIFFS AN EVEN GREATER AMOUNT OF MONTHLY RENTAL MONIES WITHOUT PROVIDING THE PLAINTIFFS THEIR RIGHT TO AN INTERIM 202/8 LEASE AND THEIR RIGHT TO SIGN A 202/8 LEASE.

68. IN OR ABOUT FEBRUARY 23, 2004, DEFENDANT ROTAN REQUESTED THE PLAINTIFFS TO REMOVE THEIR OUTDOOR FURNITURE DECK BOX FROM THEIR PRIVATE BALCONY AFTER THE DECK BOX HAD BEEN THROUGH INSPECTIONS WITHOUT CITATION.

69. IN OR ABOUT APRIL 20, 2004, DEFENDANT ROTAN REQUESTED THAT PLAINTIFFS REMOVE THEIR 7 ½" LONG CRUCIFIX, HANGING ON PLAINTIFFS' PRIVATE BALCONY WALL, AFTER THE CRUCIFIX, SECURELY FASTENED, HAD BEEN THROUGH INSPECTION WITHOUT CITATION SINCE 1993.

70. AT ABOUT THE SAME TIME, DEFENDANT ROTAN PERMITTED AND SET

13

DIFFERENT PRIVILEGES FOR OTHER TENANTS TO HANG FLOWER BOXES;
PLANTS; UMBRELLAS; PLANTERS; WIND CHIMES; FLAGS; THERMOMETERS;
BELL; HANGING SEASONAL DECORATIONS; AND PINWHEELS ON THEIR
BALCONIES EVEN THOUGH DEFENDANT ROTAN STATED THAT SUCH
HANGINGS ON BALCONIES ARE NOT PERMITTED AT THE B'NAI BRITH HOUSE
FOR SENIOR CITIZENS.

71. IN LATE SUMMER 2004, DEFENDANT ROTAN GAVE WRITTEN NOTICE TO
ALL TENANTS AT THE FACILITY, INCLUDING PLAINTIFFS, THAT TENANTS
MUST ATTEND MANDATORY MEETINGS WITH DEFENDANT ROTAN, WHERE,
UPON INFORMATION AND BELIEF, TENANTS WERE FORCED TO REGISTER,
AND EVEN THOUGH SUCH MANDATORY MEETINGS ARE ILLEGAL IN THE
HUD-SUBSIDIZED FACILITY.

72. BEGINNING 2006 (AND RETROACTIVE TO 2002) UPON INFORMATION AND
BELIEF, DEFENDANT ROTAN FAILED TO ENSURE PLAINTIFFS THE PROPER
EXCLUSIONS AND DEDUCTIONS IN DEFENDANT ROTAN'S CALCULATION OF
PLAINTIFFS' RENT AMOUNT, RESULTING IN PLAINTIFFS' RENT BEING
OVERCHARGED.

73. ON OR ABOUT NOVEMBER 20, 2006, DEFENDANT ROTAN, IN WRITING,
DENIED PLAINTIFFS' WRITTEN REQUEST OF OCTOBER 16, 2006 FOR
DEFENDANTS TO INCLUDE TWO (2) CHRISTIAN HOLY DAYS (ASH WEDNESDAY
AND THREE KING DAY) IN DEFENDANTS' NEWSLETTER CALENDAR,
OSTENSIBLY BECAUSE DEFENDANTS "CANNOT AND DO NOT LIST EVERY
HOLY DAY" (UNLESS THERE IS A PERQUISITE FOR A RELIGIOUS SERVICE
THAT DAY AT THE SUBJECT FACILITY OR IF THE BUILDING IS CLOSED).

74. AT ABOUT THE SAME TIME, UPON INFORMATION AND BELIEF,
DEFENDANT ROTAN PERMITS OTHER RELIGIOUS HOLY DAYS, SUCH AS THE
PASSOVER, TO BE LISTED IN THE DEFENDANTS' BUILDING NEWSLETTER
CALENDAR ACTIVITY, AND WITHOUT THE ABOVE AFOREMENTIONED
PERQUISITE.

75. DEFENDANT ROTAN'S MOST RECENT ACT OF ALLEGED DISCRIMINATION
OCCURRED ON OR ABOUT DECEMBER 7, 2006, WHERE DEFENDANT ROTAN
REQUESTED, IN WRITING, THAT ALL TENANTS, INCLUDING PLAINTIFFS,

14

MUST REMOVE ANY HANGING ITEM OVER THEIR APARTMENT FRONT DOOR
WHERE, SUBSEQUENTLY, PLAINTIFFS HAD TO REMOVE THEIR 3" x 5"
CRUCIFIX (EVEN THOUGH THE CRUCIFIX WAS SECURELY FASTENED).

76. AT ABOUT THE SAME TIME, UPON INFORMATION AND BELIEF,
DEFENDANT ROTAN PERMITTED ANOTHER TENANT TO HANG A SLEIGH AND
RAINDEER DECORATION OVER THAT TENANTS' APARTMENT FRONT DOOR,
MUCH LARGER THAN THE PLAINTIFFS' CRUCIFIX, AND EVEN THOUGH
DEFENDANT ROTAN STATES THAT SUCH HANGINGS OVER TENANTS' FRONT
DOOR ARE NOT PERMITTED.

77. DESPITE DEFENDANTS' EFFORTS IN DENYING PLAINTIFFS THE ABILITY
TO HANG THEIR AMERICAN FLAG ON THEIR RESPECTIVE BALCONY RAIL,
WHILE PERMITTING OTHER TENANTS TO HANG EVEN LARGER PATIO
UMBRELLAS ON THEIR BALCONY RAILS, SYMBOLS OF THE AMERICAN FLAG
REMAIN PROMINENT IN THE BUILDING. THEY INCLUDE THE AMERICAN
FLAG (ON A STAND) AND AN AMERICAN FLAG BARNSIDE PAINTING, IN THE
SOLARIUM; THE AMERICAN FLAG (ON A STAND) AT THE MACHZIKEY HADAS
CONGREGATION'S RISER; THE AMERICAN FLAG (HOISTED A POLE) ON
WEEKDAYS AT THE SUBJECT FACILITY'S OUTSIDE ENTRANCE; A SEASONAL
STARS AND STRIPE DECORATION AT THE DEFENDANTS' OFFICE DOOR; TWO
(2) AMERICAN FLAGS AT THE TENANTS ASSOCIATION LOBBY COMMISSARY
DOORS; THE AMERICAN FLAG POSTED ON DEFENDANTS' NEWSLETTER
COVER, IN THE PAST; THE STONE SCHOOL HOUSE AMERICAN FLAG
PAINTING, THE COURT HOUSE AMERICAN FLAG PAINTING, AND THE GRAND
OPERA HOUSE AMERICAN FLAG PAINTING, IN THE DELAWARE ROOM; THE
AMERICAN FLAG ON TWENTY-THREE (23) TENANTS' APARTMENT DOORS;
THE AMERICAN FLAG STICKERS ON THREE (3) TENANTS' LOBBY MAILBOXES;
AND THE AMERICAN FLAG (12"x 18" FLAG ON A 24 ½" STICK POLE) HANGING
OVER THE SUBJECT FACILITY'S OUTSIDE MAINTENANCE GARAGE DOOR ON
NATIONALLY-OBSERVED VETERANS DAY 2006 AND CONTINUING.

78. THE HISTORIC BACKDROP OF DEFENDANTS IN A PREVIOUS ALLEGED
FAIR HOUSING DISCRIMINATION COMPLAINT, IS WHERE DEFENDANTS
SETTLED AND THEIR APARTMENT MANAGEMENT AGENCY, SPM. INC.,

ON JUNE 15, 2006, REIMBURSED PLAINTIFFS' OUT-OF-POCKET COSTS, BUT
WHERE DEFENDANTS HAVE NEVER COMMUNICATED WITH PLAINTIFFS IN
PLAINTIFFS' AMERICAN FLAG HANGING COMPLAINT IN ORDER TO MINIMIZE
DEFENDANTS' FLAG HANGING POLICY, SO THAT THERE WOULD BE LESS
IMPACT ON PLAINTIFFS IN THE HANGING OF AN AMERICAN FLAG ON THEIR
BALCONY FOR VETERANS DAY 2006.

79. AT OTHER B'NAI B'RITH APARTMENT HOUSES, UPON INFORMATION AND
BELIEF CONCERNING VETERANS DAY 2006, IS WHERE THE TENANTS'
AMERICAN FLAG HANGING IS PERMISSIBLE EITHER ON BALCONY RAILS OR
AS LONG AS THE AMERICAN FLAG IS HUNG ON THE TENANTS' RESPECTIVE
BALCONY AT RAIL-HIGH MEASUREMENT.

80. AT THE SUBJECT FACILITY IN CLAYMONT, DELAWARE, DEFENDANTS'
POLICY FOR TENANTS' BALCONY FLAG FLYING, INCLUDING ON PLAINTIFFS'
BALCONY, IS ALLEGEDLY "EXCESSIVE" WITH IT'S *NO* FLAG HANGING"
POLICY (WHERE A TENANT CANNOT ATTACH HIS OR HER AMERICAN FLAG
TO HIS OR HER BALCONY OR HIS OR HER BALCONY RAIL), AND WHERE THE
DEFENDANTS' FLAG POLICY IS ALLEGEDLY UNFAIR (SEE HUD HANDBOOK
5301.3 § 69, WHICH STATES THAT HOUSE RULES MUST NOT INFRINGE ON
TENANTS CIVIL RIGHTS) AND THIS IS WHERE CERTAIN OTHER TENANTS AT
THE SUBJECT FACILITY, ON VETERANS DAY 2006, SIMPLY IGNORED THE
HOUSE RULES, USING THEIR OWN COMMON SENSE, AND HUNG THEIR
AMERICAN FLAGS ON THEIR BALCONIES ANYWAY.

81. DEFENDANTS HAVE PUBLISHED A NOTICE TO ALL TENANTS, INCLUDING
THE PLAINTIFFS, WARNING THAT THEY ARE SUBJECT TO EVICTION IF THEY
DO NOT COMPLY WITH DEFENDANTS' POLICIES.

82. PLAINTIFFS HAVE REFRAINED FROM HANGING THEIR AMERICAN FLAG
ON THEIR PERSPECTIVE BALCONY RAIL, FOR FEAR OF EVICTION OR OTHER
FORMS OF DISCRIMINATORY ACTION AGAINST THEM.

COUNT I
(VIOLATION OF FAIR HOUSING ACT, 42 U.S.C. § 3601, ET SEQ.)

83. PLAINTIFFS HEREBY INCORPORATE BY REFERENCE § 1-82 OF THIS
COMPLAINT.

84. THE ACTIONS OF DEFENDANTS CONSTITUTE UNLAWFUL NATIONAL ORIGIN DISCRIMINATION AGAINST PLAINTIFFS IN VIOLATION OF THE FAIR HOUSING ACT, TITLE VIII OF THE CIVIL RIGHTS ACT OF 1968, 42 U.S.C. § 3601, AND IN PARTICULAR (BUT WITHOUT LIMITATION) 42 U.S.C. § 3604 (B), WHICH PROHIBITS DISCRIMINATION AGAINST ANY PERSON IN THE TERMS, CONDITIONS, OR PRIVILEGES OF SALE OR RENTAL OF A DWELLING, OR IN THE PROVISION OF SERVICES OR FACILITIES IN CONNECTION THEREWITH, BECAUSE OF... NATIONAL ORIGIN.

85. PLAINTIFFS ARE MEMBERS OF A PROTECTED CLASS SET FORTH IN THE FAIR HOUSING ACT, IN THAT THEY ARE  CITIZENS OF THE UNITED STATES OF AMERICA.

86. DEFENDANTS DIRECTLY DISCRIMINATED AGAINST PLAINTIFFS ON ACCOUNT OF THEIR NATIONAL ORIGIN BY BANNING PLAINTIFFS' AMERICAN FLAG FROM HANGING ON PLAINTIFFS' BALCONY RAIL, WHILE DEFENDANTS PERMITTED OTHER TENANTS TO HANG PATIO UMBRELLAS AND OTHER SUCH HANGING ON THEIR PERSPECTIVE BALCONY RAILS AND WHERE DEFENDANTS EVEN GAVE THEMSELVES PERMISSION, IN A PARTICULAR SITUATION, TO REPEAT THEIR AMERICAN FLAG HANGING ACTIVITY ON TENANTS' BALCONY RAILS, INCLUDING PLAINTIFFS' BALCONY RAIL (EVEN THOUGH THE DEFENDANTS  HOPED THEY WOULD NEVER HAVE TO).

87. DEFENDANTS HAVE SELECTIVELY ENFORCED AGAINST PLAINTIFFS, BUT NOT AGAINST OTHER B'NAI B'RITH HOUSE TENANTS, THEIR ALLEGED HOUSING POLICY REGARDING HANGING ITEMS ON BALCONIES AND THEREBY INTERFERED TO KEEP PLAINTIFFS FROM THE FULL BENEFIT OF THE FEDERAL FAIR HOUSING LAW.

88. DEFENDANTS FURTHER UNLAWFULLY FAILED TO ACCOMMMODATE PLAINTIFFS' NATIONAL ORIGIN BELIEFS AND OBSERVANCES, DESPITE A REQUEST FOR, AND/OR DEFENDANTS' KNOWLEDGE OF THE NEED, FOR SUCH ACCOMMODATION, AND ONLY INFORMALLY (AND NON-BINDINGLY) SUDDENLY WITHDREW THEIR REFUSAL TO ACCOMMODATE TENANTS' FLAGS, INCLUDING THE PLAINTIFFS' FLAG, BY INSTRUCTING TENANTS THAT THEY MAY PLACE THEIR FLAGS IN A FLOWER POT, AND *AFTER* COMPLAINTS

WERE MADE AT DEFENDANT ROTAN'S OFFICE BY OTHER TENANTS.

89. WHERE DEFENDANTS COULD HAVE MADE A LESS DISCRIMINATORY EFFECT BY ADOPTING A FLAG FLYING POLICY THAT WOULD ENABLE PLAINTIFFS' AMERICAN CITIZENSHIP INTEREST SERVED WITH LESS DISCRIMINATORY IMPACT, OTHER THAN PLACING THE AMERICAN FLAG IN A FLOWER POT, DEFENDANTS DID NOT; BUT PUT "EXCESSIVE" LIMITS ON ALL TENANTS, INCLUDING PLAINTIFFS, IN FLAG HANGING ON THEIR BALCONIES.

90. DEFENDANTS' ACTIONS HAVE, MOREOVER, CREATED A HOSTILE ENVIRONMENT IN WHICH THE CONDITIONS AND TERMS OF RENTAL OCCUPANCY WERE CHANGED IN A DISCRIMINATAORY MANNER.

91. DEFENDANTS' ACTIONS WERE BOTH WILLFUL AND MALICIOUS.

92. PLAINTIFFS REASONABLY FEAR THAT ABSENT JUDICIAL INTERVENTION BY WAY OF INJUNCTIVE RELIEF, THEY WILL BE IRREPARABLY HARMED BY FUTURE VIOLATION OF THEIR NATIONAL ORIGIN BELIEFS AND EXPRESSIONS IN THE MANNER PLEADED ABOVE, AS WELL AS BEING SUBJECT TO EVICTION ON ACCOUNT OF THEIR NATIONAL ORIGIN BELIEFS.

**COUNT II**
(VIOLATION OF DELAWARE FAIR HOUSING ACT, 6 DEL.C. § 4601, ET SEQ.)

93. PLAINTIFFS HEREBY INCORPORATE HEREIN BY REFERENCE OF COUNT I OF THIS COMPLAINT, § 1-82 AND § 85- 92 .

94. DEFENDANTS' ACTIONS VIOLATE THE DELAWARE FAIR HOUSING ACT, 6 DEL.C. § 4601, ET SEQ AND, IN PARTICULAR, § 4603 (B)(2), WHICH PROHIBITS DISCRIMINATION AGAINST ANY PERSON IN THE TERMS, CONDITIONS OR PRIVILEGES OF SALE OR RENTAL OF A DWELLING, OR IN THE PROVISION OF SERVICES OR FACILITIES IN CONNECTION THEREWITH, BECAUSE OF… NATIONAL ORIGIN.

95. DEFENDANTS' ACTIONS WERE BOTH WILLFUL AND MALICIOUS.

96. PLAINTIFFS REASONABLY FEAR THAT ABSENT JUDICIAL INTERVENTION BY WAY OF INJUNCTIVE RELIEF, THEY WILL BE IRREPARABLY HARMED BY FUTURE VIOLATION OF THEIR NATIONAL ORIGIN BELIEFS AND EXPRESSIONS AND IN THE MANNER PLEADED ABOVE.

18

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS SEEK JUDMENT BY THIS COURT AGAINST DEFENDANTS, JOINTLY, AND SEVERALLY, FOR THE FOLLOWING RELIEF:

### AS TO COUNT I:

**A.**    AN AWARD OF COMPENSATORY AND PUNITIVE DAMAGES;

**B.**    REASONABLE ATTORNEY'S FEES PURSUANT TO 42 U.S.C. § 3613(C)(2);

**C.**    AN EFFECTIVE PERMANENT INJUNCTION AGAINST FUTURE DISCRIMINATORY ACTS BY DEFENDANTS;

**D.**    SUCH OTHER RELIEF AS THIS COURT MAY DEEM JUST AND PROPER.

### AS TO COUNT II:

**A.**    AN AWARED OF COMPENSATORY AND PUNITIVE DAMAGES;

**B.**    REASONABLE ATTORNEY'S FEES PURSUANT TO 6 DEL.C. § 4613(B)(3);

**C.**    AN EFFECTIVE PERMANENT INJUNCTION AGAINST FUTURE DISCRIMINATORY ACTS BY DEFENDANTS;

**D.**    SUCH OTHER RELIEF AS THIS COURT MAY DEEM JUST AND PROPER.

### JURY DEMAND

PLAINTIFFS HEREBY DEMAND TRIAL BY JURY OF ALL ISSUES SO TRIABLE.

# # #

19

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE
AND CORRECT.

SIGNED THIS ___*14th*___ DAY OF ___*March*___ , 2007

___*Deidre Corwin POA Bonnie Corwin*___
SIGNATURE OF PLAINTIFF #1

___*Bonnie Corwin*___
SIGNATURE OF PLAINTIFF #2

*PRO-SE* LITIGATES
B'NAI B'RITH HOUSE
8000 SOCIETY DRIVE
APARTMENT #608
CLAYMONT, DELAWARE 19703-1749
TELE/FAX (302) 798-5116

20

**EXHIBIT "B"**

**NEWARK LANDLORD ASSOCIATION, a corporation of the State of Delaware, JOHN BAUSCHER, EARLE F. ANDERSON, JR., ROBERT BRUNER, JOHN REDDEN, ROSANE M. CORULLON, BRUCE HARVEY, and SUSAN HEAGY, Plaintiffs, v. CITY OF NEWARK, Defendant.**

C.A. No. 17583-NC

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2003 Del. Ch. LEXIS 66*

**January 28, 2003, Submitted
June 13, 2003, Decided**

**SUBSEQUENT HISTORY:** Later proceeding at *Newark Landlord Ass'n v. City of Newark, 2003 Del. Ch. LEXIS 124 (Del. Ch., Nov. 17, 2003)*

**DISPOSITION:**    [*1] Plaintiffs granted partial summary judgment. City's cross-motion for partial summary judgment denied.

**LexisNexis(R) Headnotes**

*Governments > Local Governments > Ordinances & Regulations*
*Real Property Law > Zoning & Land Use > Ordinances*
*Real Property Law > Zoning & Land Use > State & Regional Planning*
[HN1] Newark, Del., Ordinance 99-14 regulates the location where students may live in the city by first amending the Newark, Del., City Code § 32-4 by establishing a new classification of housing: a "Student Home." Newark, Del., Ordinance 99-14, by then amending Newark, Del., City Code §§ 32-9, -10, -11 and -13, forbids Student Homes within the city's RH (single-family, detached residential), RD (single-family, semi-detached residential), RM (multifamily dwellings-garden apartments) and RR (row or townhouses) zoning districts unless the rental units are in compliance with certain conditions. These conditions include, inter alia, a minimum distance between Student Homes equal to 10 times the minimum lot width in the zoning district where the Student Home is located and an occupancy limit of no more than three persons.

*Real Property Law > Landlord & Tenant > Lease Agreements > Residential Leases*
*Real Property Law > Zoning & Land Use > State & Regional Planning*
[HN2] Under Newark, Del., Ordinance 99-14, "Student Home" is defined as a living arrangement in a single-family detached dwelling comprised of post-secondary students, unrelated by blood, marriage, or legal adoption attending or about to attend a college or university or who are on a semester, winter, or summer break from studies at a college or university, or any combination of such persons. Student homes shall not include RM zoning-permitted boarding houses, rooming houses, fraternities, and sororities; nor shall they include the taking of nonstudent nontransient boarders or roomers in any residence district; nor shall they include dwellings with one occupant only. Also, expressly excluded from the definition of a "Student Home" are single-family detached, semidetached, or row dwellings located within subdivisions or fronting on specified streets (the "exempt areas"). Thus, while in the exempt areas landlords may freely rent dwellings that would otherwise be Student Homes, the ability of landlords to rent Student Homes in non-exempt portions of the city also located within RH, RD, RM and RR zoning districts (the "non-exempt areas") is subject to various conditions.

*Governments > Local Governments > General Overview*
*Real Property Law > Zoning & Land Use > Nonconforming Uses*
*Real Property Law > Zoning & Land Use > State & Regional Planning*
[HN3] The separation of student and non-student city

residents pursuant to Newark, Del., Ordinance 99-14 is tempered by the city's grandfathering of nonconforming uses: nonconforming uses, such as, for example, two Student Homes located next to each other in a non-exempt area, are permitted to continue only on the condition that the nonconforming use is not discontinued for a period of one year. Newark, Del., City Code § 32-51(b).

*Contracts Law > Types of Contracts > Lease Agreements > General Overview*
*Governments > Local Governments > Ordinances & Regulations*
*Real Property Law > Zoning & Land Use > State & Regional Planning*
[HN4] Newark, Del., Ordinance 99-10 is aimed at curbing student misbehavior, but it operates through a different regulatory channel. Ordinance 99-10, which amends the Housing and Property Maintenance portion of Newark, Del., City Code ch.17-4, creates a lease-based penal regime by requiring that all rental agreements for units subject to a city rental permit.

*Real Property Law > Landlord & Tenant > Lease Agreements > Residential Leases*
*Real Property Law > Zoning & Land Use > State & Regional Planning*
[HN5] See Newark, Del., Ordinance 99-10.

*Contracts Law > Types of Contracts > Lease Agreements > General Overview*
*Real Property Law > Landlord & Tenant > Lease Agreements > Residential Leases*
*Real Property Law > Zoning & Land Use > State & Regional Planning*
[HN6] Newark, Del., Ordinance 99-10 mandates the inclusion of terms in rental agreements that, upon certain infractions by a tenant, trigger the termination of the rental agreement and the ouster within one week of all tenants occupying the rental unit under that rental agreement. Furthermore, these measures not only act upon the offender, but also terminate the rights of others who live in the same household.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Partial*

*Summary Judgments*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN7] Under Del. Ch. Ct. R. 56, summary judgment may be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. When presented with cross-motions for summary judgment, a trial court is not relieved of its obligation to deny summary judgment if a dispute of material fact exists; a trial court is to examine each motion separately and may only grant a motion for summary judgment if the standards of Rule 56 are satisfied. In considering the motions, the court must view the evidence, and all reasonable inferences taken therefrom, in the light most favorable to the non-moving party.

*Civil Procedure > Justiciability > Standing > Injury in Fact*
*Environmental Law > Zoning & Land Use > Constitutional Limits*
[HN8] For statutes, as well as constitutional inquiries, the general test of standing is whether: (1) there is a claim of injury in fact and (2) the interest sought to be protected is arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question. This analysis, however, is subservient to more specific directives from the general assembly, for while the general principles of standing are helpful, the real determinant is the statutory language itself.

*Civil Procedure > Justiciability > Standing > General Overview*
*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > General Overview*
[HN9] Under the Delaware Fair Housing Act (DFHA), Del. Code Ann. tit. 6, ch. 46, any law of the state or any political subdivision thereof that purports to require or permit any action that would be a discriminatory housing practice under this chapter shall to that extent be invalid. *Del. Code Ann. tit. 6, § 4617.* Section 4613(a) of the DFHA permits an aggrieved person to commence a civil action in the county in which the discriminating housing practice is alleged to have occurred to challenge an allegedly discriminatory law. *Del. Code Ann. tit. 6, § 4613(a)(1)(a).*

*Civil Procedure > Justiciability > Standing > General Overview*

2003 Del. Ch. LEXIS 66, *1

*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Leasing & Sales*
*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Prohibited Acts*
[HN10] See *Del. Code Ann. tit. 6, § 4602(2).*

*Civil Procedure > Justiciability > Standing > Injury in Fact*
*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > General Overview*
*Public Health & Welfare Law > Housing & Public Buildings > Fair Housing*
[HN11] The federal equivalent of the Delaware Fair Housing Act, Del. Code Ann. tit. 6, ch. 46, is Title VIII of the Civil Rights Act, *42 U.S.C.S. §§ 3601-3631* (the Federal Fair Housing Act). In 1974, the Federal Fair Housing Act was extended to prevent discrimination on the basis of "sex." The scope of the Federal Fair Housing Act was again expanded in 1988 to prohibit discrimination based on "familial status" and "handicap status." The Federal Fair Housing Act confers standing upon "aggrieved persons." *42 U.S.C.S. § 3610(a)(1)(i).* This statutory grant of standing has been interpreted to be as broad as is permitted by U.S. Const. art. III. Accordingly, plaintiffs claiming standing to pursue a Federal Fair Housing Act claim need show, inter alia, that they suffer an injury in fact.

*Civil Procedure > Justiciability > Standing > General Overview*
*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act*
*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Leasing & Sales*
[HN12] Statutory standing under the Delaware Fair Housing Act (DFHA), Del. Code Ann. tit. 6, ch. 46, is not expressly confined to present injuries because an aggrieved person is also one who believes that such person will be injured, directly or indirectly, by a discriminatory housing practice that is about to occur. *Del. Code Ann. tit. 6, § 4602(2)(b).* While some limit may be imposed concerning how far in the future an injury may occur, clearly the DFHA contemplates standing for more than those persons who suffer immediate injury.

*Civil Procedure > Justiciability > Standing > General Overview*

*Contracts Law > Types of Contracts > Lease Agreements > General Overview*
*Real Property Law > Landlord & Tenant > Lease Agreements > Residential Leases*
[HN13] The statutory grant of standing of the Delaware Landlord-Tenant Code, Del. Code Ann. tit. 25, ch. 51-59, statutory grant of standing provides for any violation of the rental agreement or this Code, or both, by either party, the injured party shall have a right to maintain a cause of action in any court of competent civil jurisdiction. *Del. Code Ann. tit. 25, § 5117.*

*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Leasing & Sales*
*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Prohibited Acts*
[HN14] See *Del. Code Ann. tit. 25, § 5116(c).*

*Civil Procedure > Declaratory Judgment Actions > General Overview*
[HN15] See *Del. Code Ann. tit. 10, § 6502.*

*Civil Procedure > Declaratory Judgment Actions > State Judgments > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Advisory Opinions*
*Constitutional Law > The Judiciary > Case or Controversy > Ripeness*
[HN16] The Delaware Declaratory Judgment Act, Del. Code Ann. tit. 10, ch. 65, does not authorize courts to render advisory opinions or to adjudicate hypothetical questions because the courts will entertain declaratory judgment actions only where the alleged facts are such that an "actual controversy" exists and eventual litigation appears to be unavoidable. The oft-stated standards for determining whether an "actual controversy" exists are: (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.

*Governments > Local Governments > Ordinances & Regulations*

*Real Property Law > Zoning & Land Use > Judicial Review*
*Real Property Law > Zoning & Land Use > Ordinances*
[HN17] It is true that municipal zoning ordinances are presumed to be valid and are afforded deference by a reviewing court. It is a necessary corollary to the relationship between the state, acting through its legislature, and the municipal corporation that where a conflict exists between a state statute and a municipal ordinance, the statute must always prevail. The question is whether the provisions of the ordinances, enacted pursuant to the grant of power by the general assembly to the city, conflict with other legislative enactments so as to preclude the application of the ordinances.

*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
*Real Property Law > Zoning & Land Use > State & Regional Planning*
[HN18] As an attribute of governmental authority, zoning is a legislative function and is presumed to be valid unless shown to be arbitrary or capricious. The burden of rebutting the presumption of validity rests with the party challenging the zoning. Zoning regulations have been invalidated if found to be in conflict with federal antidiscrimination statutes.

*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act*
*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Leasing & Sales*
*Governments > Legislation > Interpretation*
[HN19] The task of interpreting a statute is essentially one of ascertaining and giving effect to legislative intent. The broad ameliorative goals of the Delaware Fair Housing Act (DFHA), Del. Code Ann. tit. 6, ch. 46, cannot be disputed. The statute itself notes that its purpose is to eliminate, as to housing offered to the public for sale, rent or exchange, discrimination based upon race, color, national origin, religion, creed, sex, marital status, familial status, age or handicap. *Del. Code Ann. tit. 6, § 4601(a).* The DFHA is to be liberally construed to the end that its purposes may be accomplished and all persons may fully enjoy equal rights and access to housing for themselves and their families. *Section 4601(b).* Achieving the desirable ends set forth is of such importance that, in defining the scope or extent of any duty imposed by the DFHA, higher or more comprehensive obligations established by otherwise

applicable federal, state or local enactments may be considered. When the language of a statute is unambiguous, the court's only role is to apply the literal meaning of those words. In so doing, the words are given their common, ordinary meaning.

*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > General Overview*
*Labor & Employment Law > Discrimination > Age Discrimination > Defenses & Exceptions > General Overview*
*Labor & Employment Law > Discrimination > Age Discrimination > Proof > General Overview*
[HN20] Pursuant to *§ 4617* of the Delaware Fair Housing Act (DFHA), *Del. Code Ann. tit. 6, § 4617*, any law of the state or any political subdivision thereof that purports to require or permit any action that would be a discriminatory housing practice under Del. Code Ann. tit. 6, ch. 46 shall to that extent be invalid. A "discriminatory housing practice" is an act that is unlawful under *Del. Code Ann. tit. 6, §§ 4603, 4604, 4605, 4606* or *4618* of the DFHA. *Del. Code Ann. tit. 6, § 4602(10).* Under the DFHA, engaging in any of a number of forms of discrimination, including discrimination on the basis of "marital status" or "age," constitutes a discriminatory housing practice.

*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Leasing & Sales*
*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Prohibited Acts*
[HN21] See *Del. Code Ann. tit. 6, § 4603(b)(1-2).*

*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > General Overview*
*Labor & Employment Law > Discrimination > Age Discrimination > General Overview*
*Tax Law > Federal Taxpayer Groups > S Corporations > Basis (IRC secs. 1361, 1367)*
[HN22] "Marital status" is the legal relationship of parties as determined by the laws of marriage applicable to them or the absence of such a legal relationship. *Del. Code Ann. tit. 6, § 4602(16).* "Age," for purposes of defining what is a discriminatory housing practice, means any age 18 years or older. *Section 4602(1).* In certain respects, the Delaware Fair Housing Act (DFHA), Del. Code Ann. tit. 6, ch. 46, is broader in its antidiscriminatory protections than those of its federal counterpart, the Federal Fair

Housing Act. Importantly, the DFHA, unlike the Federal Fair Housing Act, expressly includes "marital status" and "age" as bases for housing discrimination. Thus, in an expansion of its federal counterpart, the DFHA forbids discrimination on the basis of a person's status as married or unmarried, or on the basis of a person's age over 18 years old.

*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Leasing & Sales*
[HN23] See *Del. Code Ann. tit. 6, § 4606.*

*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Fair Housing Act*
*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Prohibited Acts*
*Public Health & Welfare Law > Housing & Public Buildings > Fair Housing*
[HN24] A natural source of guidance in construing the Delaware Fair Housing Act, Del. Code Ann. tit. 6, ch. 46, due to the similarity in structure, language and purpose between the underlying statutes, are decisions construing the provisions of the Federal Fair Housing Act. Although such similarity exists between *Del. Code Ann. tit. 6, § 4603* and Title VIII, federal case law indicates that there is considerable overlap between analysis under Title VII and analysis under other federal antidiscrimination statutes, including Title VIII. Additionally, a comprehensive body of decisional law has developed under Title VII involving analysis of the issue of whether particular evidence demonstrates an intent to discriminate.

*Education Law > Discrimination > Age Discrimination*
*Labor & Employment Law > Discrimination > Disparate Impact > Class Actions*
*Labor & Employment Law > Discrimination > Disparate Treatment > Family Status Discrimination*
[HN25] Two families of discrimination claims may be brought by an aggrieved person under the Delaware Fair Housing Act, Del. Code Ann. tit. 6, ch. 46. To make out a prima facie case under Title VIII, a plaintiff can show either discriminatory treatment or discriminatory effect alone, without proof of discriminatory intent. Disparate treatment occurs when a decision maker simply treats some people less favorably than others because of a protected trait. A claim by an aggrieved person that a statute or ordinance impermissibly discriminates on its face is a form of disparate treatment claim. Conversely, when a decision maker's practices are facially neutral in their treatment of different groups but in fact unjustifiably disadvantage one or more groups, a claim for disparate impact exists. The distinction between these two categories of claims is a critical one because the differences in the nature and quality of evidence required in such cases are significant. The standards have been applied when determining the order and allocation of the burdens of production and persuasion in private, non-class actions, *Del. Code Ann. tit. 6, § 4603(1)* discrimination cases.

*Evidence > Procedural Considerations > Burdens of Proof > Initial Burden of Persuasion*
*Labor & Employment Law > Discrimination > Disparate Treatment > Family Status Discrimination*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN26] When analyzing claims of disparate treatment, the respective burdens of proof of the parties in litigating claims of disparate treatment are measured under the test announced in the trilogy of McDonnell Douglas, Board of Trustees of Keene State College, and Texas Dept. of Community Affairs. The Courts of Delaware follow the standard established by McDonnell Douglas Corp. that the complainant has the initial burden of establishing a prima facie case of discrimination. If that is done, then the burden shifts to the person charged with discrimination to articulate some legitimate, nondiscriminatory, reason for the rejection. Finally, if the respondent succeeds, the burden of going forward reverts to the complainant to prove that the stated reason was a sham. In disparate treatment cases, proof of motive to discriminate is an essential element of the complainant's case. On the other hand, the test for cases of disparate impact has evolved separately from that of the standard for deciding claims of disparate treatment.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN27] The analysis under the McDonnell Douglas/Burdine test is neither rigid nor mechanized and the general requirements of proof must be flexibly tailored to the facts of each case.

*Civil Rights Law > Contractual Relations & Housing > Fair Housing Rights > Family Status Discrimination*

*Civil Rights Law > Contractual Relations & Housing >*
*Fair Housing Rights > Prohibited Acts*
*Labor & Employment Law > Discrimination >*
*Disparate Treatment > Family Status Discrimination*
[HN28] Under the McDonnell Douglas Corp./Burdine test involving a claim of disparate treatment, a plaintiff must first make a modest showing that a prima facie housing discrimination claim exists. This burden is satisfied if a plaintiff demonstrates that the statute or ordinance at issue is facially discriminatory. A plaintiff makes out a prima facie case under Title VIII by showing either: (1) intentional disparate treatment; or (2) disparate impact alone, without proof of discriminatory intent. A case of disparate treatment may be established against a public entity by demonstrating that a given legislative provision discriminates against a protected class or trait on its face.

*Civil Rights Law > Contractual Relations & Housing >*
*Fair Housing Rights > Fair Housing Act*
*Civil Rights Law > Contractual Relations & Housing >*
*Fair Housing Rights > Prohibited Acts*
*Public Health & Welfare Law > Housing & Public*
*Buildings > Fair Housing*
[HN29] To establish that an ordinance is facially invalid, a plaintiff must show that the accused ordinance treats someone protected by the Federal Fair Housing Act in a different manner than others are treated. A legislative provision discriminates on its face when it applies different rules to the members of a protected class than are applied to others. While proof of discriminatory motive is critical, it can in some situations be inferred from the mere fact of differences in treatment. The absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. In those instances of ordinances which facially discriminate against a protected trait, a plaintiff need not prove the malevolent motives of the legislative body.

*Civil Rights Law > Contractual Relations & Housing >*
*Fair Housing Rights > Enforcement*
*Evidence > Procedural Considerations > Burdens of*
*Proof > Allocation*
*Labor & Employment Law > Discrimination >*
*Disparate Treatment > Proof > Burden Shifting*
[HN30] Once a complainant establishes his prima facie case of housing discrimination, the burden of production shifts to the person charged with discrimination to

articulate a legitimate, non-discriminatory reason for her discriminatory actions. As distinguished from the burden of persuasion, the defendant, in order to satisfy this burden of production, need only produce evidence which raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's discriminatory treatment by the defendant. The explanation must be legally sufficient to justify a judgment for the defendant. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Civil Rights Law > Contractual Relations & Housing >*
*Fair Housing Rights > Leasing & Sales*
*Civil Rights Law > Contractual Relations & Housing >*
*Fair Housing Rights > Prohibited Acts*
[HN31] See *Del. Code Ann. tit. 6, § 4607(c).*

*Contracts Law > Types of Contracts > Lease*
*Agreements > General Overview*
*Real Property Law > Landlord & Tenant > Lease*
*Agreements > Residential Leases*
*Real Property Law > Zoning & Land Use > Ordinances*
[HN32] Newark, Del., Ordinance 99-10 requires that rental agreements under a city rental permit contain specific provisions. If individual landlords would violate the Delaware Landlord-Tenant Code, Del. Code Ann. tit. 25, ch. 51-59, a state law, by including such provisions in their rental agreements, then the city is also precluded from requiring landlords to include a similarly offensive provision. To hold otherwise would negate the hierarchical relationship between state and local governments.

*Contracts Law > Types of Contracts > Lease*
*Agreements > Oral Agreements*
*Real Property Law > Landlord & Tenant > Lease*
*Agreements > Residential Leases*
[HN33] See *Del. Code Ann. tit. 25, § 5101.*

2003 Del. Ch. LEXIS 66, *1

*Governments > Local Governments > Ordinances & Regulations*
*Real Property Law > Landlord & Tenant > Lease Agreements > Residential Leases*
[HN34] Municipal ordinances are not within the scope of *Del. Code Ann. tit. 25, § 5101(a)*, as *§ 5101(a)* only addresses the enforceability of "agreements" and, thus, cannot be invalidated pursuant to *§ 5101(a)*.

*Contracts Law > Types of Contracts > Lease Agreements > General Overview*
*Real Property Law > Landlord & Tenant > Lease Agreements > Residential Leases*
[HN35] Pursuant to Newark, Del., Ordinance 99-10, in the event of two or more convictions for a variety of detailed offenses by any tenant, the termination of the rental agreement results. Additionally, all tenants at the address of the violator have no more than seven days to vacate the dwelling from the date of the second such conviction. However, this express, fixed time-frame for vacating the rental unit violates the protective provisions established in the Delaware Landlord-Tenant Code.

*Real Property Law > Landlord & Tenant > Lease Agreements > Residential Leases*
[HN36] See *Del. Code Ann. tit. 25, § 5513(a)(3)*.

*Governments > Courts > Justice Courts*
*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > General Overview*
[HN37] The grounds for and procedures governing an action for summary possession are set forth in the Delaware Landlord-Tenant Code, Del. Code Ann. tit. 25, ch. 57, and the Rules Governing Civil Practice in the Justice of the Peace Court of the State of Delaware. Notably, notice of hearing for summary possession and the complaint shall be served at least five days and not more than 30 days before the time at which the complaint for summary possession is to be heard. *Del. Code Ann. tit. 25, § 5705(a)*. Also, significantly, a defendant in an action for summary possession may demand a trial by jury within 10 days after being served. *Del. Code Ann. tit. 25, § 5713(a)*; Del. J.P. Ct. Civ. R. 38.

*Real Property Law > Landlord & Tenant > Landlord's Remedies & Rights > Eviction Actions > General Overview*
[HN38] See *Del. Code Ann. tit. 25, § 5715*.

**COUNSEL:** Arthur G. Connolly, Jr., Esquire, M. Edward Danberg, Esquire and Max B. Walton, Esquire of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware, for Plaintiffs.

Kevin J. Connors, Esquire of Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware, for Defendant.

**JUDGES:** John W. Noble, Vice Chancellor.

**OPINION BY:** John W. Noble

**OPINION**

**MEMORANDUM OPINION**

NOBLE, Vice Chancellor

Plaintiffs, landlords within the territorial limits of Defendant City of Newark, Delaware (the "City"), and their representative association, attack two ordinances enacted by the City regulating the location and the terms of student housing within the City. Specifically, Plaintiffs claim that the challenged ordinances directly violate the Delaware Fair Housing Act (the "DFHA") [1] because they impermissibly discriminate on the basis of age and marital status. Additionally, Plaintiffs contend that the ordinances directly violate the antidiscrimination provisions of the Delaware Residential Landlord-Tenant Code (the "DLTC"). [2] Finally, Plaintiffs seek to invalidate the ordinances because they compel [*2] landlord Plaintiffs to engage in behavior which violates the prohibitions against discrimination enshrined in the DFHA and the DLTC and the procedural protections granted to tenants by the DLTC. Before the Court are cross-motions for partial summary judgment addressed to Plaintiffs' challenges based upon these statutes.

1   *6 Del. C. Ch. 46.*
2   *25 Del. C. Ch. 51-59.*

**I. BACKGROUND**

A. *The Parties and Other Interested Persons*

Plaintiffs, John Bauscher ("Bauscher"), Earle F. Anderson, Jr. ("Anderson"), Robert Bruner ("Bruner"),

John Redden ("Redden"), Rosane M. Corullon ("Corullon"), Bruce Harvey ("Harvey") and Susan Heagy ("Heagy") (collectively, the "Individual Plaintiffs") are landlords renting residential properties within the City. The remaining Plaintiff, the Newark Landlord Association (the "NLA") (collectively, with the Individual Plaintiffs, the "Plaintiffs"), is a Delaware corporation established in 1997 to represent the interests of landlords owning rental properties in the City. [3]

> 3    Though its exact membership is disputed, apparently all landlords in the City are eligible for membership in the NLA.

The City [4] is a municipal corporation [*3] of the State of Delaware, located in New Castle County, and home to the University of Delaware (the "University"). Like many institutions of higher learning and the municipalities where they are located, the University and the City have long grappled with the problem of providing suitable living accommodations to the student body. Currently, approximately one-half of the students attending the University reside in off-campus housing. [5] Presumably, many of these students reside within the City's boundaries.

> 4    The Second Amended Verified Complaint added the Mayor, City Councilpersons, and certain City officials as defendants and brought constitutional claims under *42 U.S.C. § 1983* and claims of civil conspiracy. Those claims are not before the Court.
>
> 5    In the fall of 2001, 15,731 full-time undergraduate students and 2,942 graduate students were enrolled in the University. App. to Opening Br. in Supp. of Cross-Mot. of Def., City of Newark, for Partial Summ. J. on State Law Claims and Answering Br. of Def., City of Newark, in Opp'n to Pls.' Mot. for Partial Summ. J. on State Law Claims ("Def.'s App.") at A00668.

However, although students are an important [*4] constituency of the City, they are not the only constituency, for also living in the City are families and others who are not college students. This proximity of students and non-students has created tensions. Most students generally conduct themselves in accordance with accepted community standards, but, at times, some students have behaved . . . well, like college students. Non-student City residents have complained about a litany of offenses, including excessive noise, littering and various drinking violations, often occurring in concert. Responding to these complaints, and after much careful study and public comment, [6] the City sought to limit such behavior by enacting, on April 26, 1999, City Ordinance 99-10 ("99-10") [7] and, on May 24, 1999, City Ordinance 99-14 ("99-14") [8] (collectively, the "Ordinances").

> 6    For example, the City reviewed data and ordinances from a number of university communities, including Lower Merion Township, Pennsylvania, and State College, Pennsylvania. *See id.* at A00580-606. The City also analyzed data comparing arrests and City code violations to housing type. The data collected showed that, although single-family rentals represented only 971 of 8,400 housing units, or 11.8%, such housing accounted for 41.9% of police department arrests and 58.0% of housing violations in the City. The City, in conjunction with a University economist, also developed data demonstrating that single-family rental properties, as contrasted with owner-occupied properties, accounted for a disproportionate number of arrests and violations, on a per unit basis. *See id.* at A00655-62.

[*5]

> 7    Entitled, "An Ordinance Amending Chapter 17, Housing and Property Maintenance, Code of the City of Newark, Delaware, By Adding Additional Site Specific Violations to the Two-Time Conviction/Eviction Provisions of the Code."
>
> 8    Entitled, "An Ordinance Amending Chapter 32, Zoning, Code of the City of Newark, Delaware, By Establishing a Definition of a Student Home and Regulations for the Same."

**B.** *The Ordinances*

99-14 [HN1] regulates the location where students may live in the City by first amending Section 32-4 of the Code of the City of Newark (the "City Code") by establishing a new classification of housing: a "Student Home." 99-14, by then amending Sections 32-9, 10, 11 and 13 of the City Code forbids Student Homes within the City's RH (single-family, detached residential), RD (single-family, semi-detached residential), RM (multifamily dwellings-garden apartments) and RR (row or townhouses) zoning districts unless the rental units are in compliance with certain conditions. These conditions

2003 Del. Ch. LEXIS 66, *5

include, *inter alia*, a minimum distance between Student Homes equal to ten times the minimum lot width in the zoning district where the Student Home is located and an occupancy [*6] limit of no more than three persons.

A [HN2] Student Home is defined as:

> A living arrangement in a single-family detached dwelling comprised of post-secondary students, unrelated by blood, marriage, or legal adoption attending or about to attend a college or university or who are on a semester, winter, or summer break from studies at a college or university, or any combination of such persons. Student homes shall not include RM zoning-permitted boarding houses, rooming houses, fraternities, and sororities; nor shall they include the taking of nonstudent nontransient boarders or roomers in any residence district; nor shall they include dwellings with one occupant only. [9]

Also, expressly excluded from the definition of a "Student Home" are "single-family detached, semidetached, or row dwellings located within . . . subdivisions or fronting on [specified] . . . streets" (the "exempt areas"). [10] Thus, while in the exempt areas landlords may freely rent dwellings that would otherwise be Student Homes, the ability of landlords to rent Student Homes in non-exempt portions of the City also located within RH, RD, RM and RR zoning districts (the "non-exempt areas") is subject [*7] to various conditions. The ultimate effect of 99-14 is to create tracts of the City which are unavailable for student housing of even modest density. [HN3] This separation of student and non-student City residents, however, is tempered by the City's grandfathering of nonconforming uses: nonconforming uses, such as, for example, two Student Homes located next to each other in a non-exempt area, are permitted to continue only on the condition that the nonconforming use is not discontinued for a period of one year. [11]

9  City of Newark, Del., Ordinance 99-14.
10  *Id.*
11  City of Newark, Del., City Code § 32-51(b); *see also Williams v. Board of Adjustment of City of Newark*, 1993 Del. Super. LEXIS 261, 1993

WL 331060, at *3 (Del. Super. 1993).

99-10 [HN4] also is aimed at curbing student misbehavior, but it operates through a different regulatory channel. 99-10, which amends Chapter 17-4 of the Housing and Property Maintenance portion of the City Code, creates a lease-based penal regime by requiring that all rental agreements for units subject to a City rental permit:

> [HN5] Prominently stipulate that the conviction of any renter, boarder, or roomer, who violates Chapter 20A, Noise; the [*8] occupancy limitations of this chapter and Chapter 32, Zoning; any property maintenance requirements of this chapter attributable to a renter, boarder, or roomer; any on-site violations of Chapter 22, Police Offenses, attributable to a renter, boarder, or roomer; and on-site violations of Chapter 19, Minors, Section 19-5, Minors prohibited from possessing or consuming alcoholic beverages, of this code, more than one time within a one-year period, shall result in the termination of the rental agreement, contract, lease, or sublease as it applies to all renters, boarders, and roomers at the address of the violator, and provided that all said renters, boarders, and roomers have no more than seven days to vacate the dwelling from the date of the second such conviction. Offenses at any single leased premise shall be cumulative. Convictions under this section of two different persons for violations as expressed herein whose names are on the same lease shall result in imposition of the penalties set forth in this section. This section, however, shall not prohibit the execution of a new lease between the landlord and any individual on the prior lease who was not subject to either of the two [*9] convictions that resulted in the termination of the lease. It also shall be a further violation of this section to execute a new lease at the same address with an individual who has been evicted hereunder for a period of one year from the date of eviction. [12]

Thus, 99-10 [HN6] mandates the inclusion of terms in rental agreements that, upon certain infractions by a tenant, [13] trigger the termination of the rental agreement and the ouster within one week of all tenants occupying the rental unit under that rental agreement. Furthermore, these measures not only act upon the offender, but also terminate the rights of others who live in the same household. [14]

> 12  City of Newark, Del., Ordinance 99-10.
> 13  These infractions parallel those complaints voiced by non-student residents of the City.
> 14  The landlord may, but need not, enter into a new rental agreement with those other tenants who were not convicted of the criminal activity.

## II. CONTENTIONS

The Plaintiffs attack the Ordinances both as directly violating the DFHA and the DLTC and as compelling the Individual Plaintiffs to violate the terms of the DFHA and the DLTC in their business dealings. First, the [*10] Plaintiffs allege that 99-14 directly violates state law by impermissibly discriminating against protected classes and traits in violation of the DFHA and DLTC. They argue that 99-14 facially discriminates against unmarried students, thereby contravening the DFHA's and the DLTC's prohibitions against discrimination based upon marital status. The Plaintiffs also maintain that, by regulating post-secondary students, 99-14, though not discriminatory on its face, disproportionately affects persons aged eighteen through twenty-five and runs afoul of the DFHA's and DLTC's proscriptions against age discrimination. The Plaintiffs finally claim that, by applying only to students, 99-14 discriminates on the basis of a person's occupation in violation of the DLTC.

Next, the Plaintiffs attack the validity of 99-10 as directly violating the DFHA and the DLTC. They contend that, like 99-14, 99-10 violates the DFHA and the DLTC as specifically injuring people between eighteen to twenty-five years of age, thus constituting impermissible age discrimination. Therefore, the Plaintiffs conclude that the Ordinances are invalid and unenforceable because the Ordinances directly violate the antidiscrimination [*11] provisions contained in the DFHA and the DLTC.

Furthermore, the Plaintiffs seek a declaratory judgment that the Ordinances are invalid because they force the Individual Plaintiffs to engage in behavior forbidden by the DFHA and the DLTC. The Plaintiffs contend that, in order to comply with 99-14, they must inquire into a prospective tenant's student and marital status before agreeing to rent their property. Through this questioning and any subsequent decision based on the fruits of such questioning, they believe, they will be deemed to have violated the antidiscrimination provisions of the DFHA and the DLTC.

With respect to 99-10, the Plaintiffs argue that, by conforming to its dictates, including its mandatory termination of a tenancy and subsequent ouster of offending (and non-offending) tenants, its failure to allow for notice of breach to offending tenants, its preclusion of an offending tenant from curing any breach and its wholesale disregard for the procedural and substantive terms of summary possession, they will necessarily violate the DLTC. Moreover, the Plaintiffs note that the DLTC establishes a comprehensive regime governing the rights and obligations of landlords and [*12] tenants in the State; as such, the City ordinances, which interject a layer of municipal regulation into the landlord-tenant relationship, are completely preempted. Thus, the Plaintiffs ask the Court to declare the Ordinances invalid as conflicting with state statutes.

The City defends the Ordinances against all charges that the Ordinances are the product of discrimination or are otherwise invalid under state law. Initially, the City challenges the motives and standing of the Plaintiffs to pursue this litigation. Even if the Plaintiffs have standing to pursue their claims, the City contends that the Ordinances are enforceable. It points out that, because the Ordinances are the result of a decision-making effort based upon numerous studies and a thorough legislative process, the Ordinances should be upheld. It also observes that the Ordinances, as local government land-use regulations, are entitled to a presumption of validity.

The City disputes the Plaintiffs' claims of discrimination on any ground. It denies that any one age group has been unlawfully impacted through the regulation of students or that "student" is a recognized occupation for purposes of asserting an employment status [*13] discrimination claim under the DLTC. It additionally contends that the Plaintiffs have not made the requisite showing of discriminatory motive necessary to state a claim for discrimination and, if the Plaintiffs

have accomplished as much, that it has articulated a legitimate, non-discriminatory reason for enacting the Ordinances. Finally, the City distinguishes 99-14 from impermissible zoning ordinances, noting that 99-14 merely regulates where certain people may reside and allows for the targeted persons to live elsewhere within the City. The City concludes that, for these reasons, the Plaintiffs, if properly before the Court, have not met their burden and the Ordinances are not invalid under state law.

## III. ANALYSIS

### A. *Applicable Standard*

The parties have filed cross-motions for partial summary judgment. [HN7] Under Court of Chancery Rule 56, summary judgment may be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. [15] When presented with cross-motions for summary judgment, a trial court is not relieved of its obligation to deny summary judgment if a dispute of material fact exists; a trial court is to [*14] examine each motion separately and may only grant a motion for summary judgment if the standards of Court of Chancery Rule 56 are satisfied. [16] In considering the motions, "the Court must view the evidence, and all reasonable inferences taken therefrom, in the light most favorable to the non-moving party." [17]

> 15   *Mell v. New Castle County*, 2003 Del. Ch. LEXIS 40, 2003 WL 1919331, at *3 (Del. Ch. Apr. 11, 2003).
> 16   *Continental Airlines Corp. v. American Gen. Corp.*, 575 A.2d 1160, 1164 n.5 (Del. 1990), cert. dismissed, 498 U.S. 953, 112 L. Ed. 2d 390, 111 S. Ct. 376 (1990); *Fasciana v. Electonic Data Sys. Corp.*, 829 A.2d 160, 2003 Del. Ch. LEXIS 19, 2003 WL 1016987, at *4 (Del. Ch. Feb. 27, 2003).
> 17   *Acro Extrusion Corp. v. Cunningham*, 810 A.2d 345, 347 (Del. 2002).

### B. *The Plaintiffs' Right to Challenge the Ordinances*

The City initially challenges the standing of the Plaintiffs to pursue this action, arguing that none of the Plaintiffs has suffered an injury in fact or is under an imminent threat of harm. The Plaintiffs assert that their right to pursue this action arises from both specific statutory grants and general principles of standing. They

claim that they are injured [*15] by the Ordinances in three distinct ways. First, by restricting the universe of possible lessees, the Ordinances deprive the Individual Plaintiffs of a "stick" in their bundle of property rights. Second, if the Individual Plaintiffs are to comply with the Ordinances, they will necessarily be forced to investigate a potential lessee's marital or student status, an inquiry which they believe violates the DFHA and the DLTC. In a similar fashion, if the Individual Plaintiffs are to comply with the directives of 99-10, their conforming actions will violate the substantive and procedural rules of the DLTC. Third, the stigmatization of having their properties labeled as "Student Homes" presents a palpable injury upon which standing to challenge 99-14 may be based. [18]

> 18   I acknowledge that it is something of a puzzle that this challenge has been brought by landlords who arguably stand to benefit from the enforcement of the Ordinances and the resulting reduction in the supply of student rental housing within the City. The optimal plaintiff class, as that portion of the City populace most directly harmed, is one comprised of unmarried students. However, the concept of standing does not require a plaintiff to be the theoretical best plaintiff, and this economic benevolence is not fatal to the landlord Plaintiffs.

[*16] By challenging the Plaintiffs' standing to pursue this action, the City disputes the Plaintiffs' right "to invoke the jurisdiction of a court to enforce a claim or redress a grievance." [19] [HN8] For statutes, as well as constitutional inquiries, [20] the general "test of standing is whether: (1) there is a claim of injury in fact and (2) the interest sought to be protected is arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question." [21] This analysis, however, is subservient to more specific directives from the General Assembly, for "while the general principles of standing are helpful . . ., the real determinant is the statutory language itself." [22] Therefore, I begin my analysis of whether the Plaintiffs may pursue their claims by examining the statutes at issue. [23]

> 19   *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991).
> 20   *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994).
> 21   *Gannett Co. v. State*, 565 A.2d 895, 897 (Del.

*1989).*

22   *Oceanport Indus., Inc., 636 A.2d at 900.*

23   In so doing, I will not examine the standing of each and every Plaintiff to pursue a claim. The Plaintiffs seek the invalidation of the Ordinances and have not sought damages. As long as one of the Plaintiffs has standing, the merits and outcome of the Plaintiffs' arguments may be determined. Therefore, my endeavor to evaluate the Plaintiffs' standing will cease upon concluding that one or more of the Plaintiffs has the right to pursue the claims under the statutes at issue, and no decision will be necessarily made as to the remaining Plaintiffs.

[*17]   1. The Plaintiffs' Right to Challenge the Ordinances as Violating the DFHA

[HN9] Under the DFHA, "any law of the State or any political subdivision thereof that purports to require or permit any action that would be a discriminatory housing practice under this chapter shall to that extent be invalid." [24] *Section 4613(a) of the DFHA* permits "an aggrieved person [to] commence a civil action in the county in which the discriminating [sic] housing practice is alleged to have occurred" to challenge an allegedly discriminatory law. [25] The DFHA [HN10] defines an "aggrieved person" as

any person who:

a.   Claims to have been injured, directly or indirectly, by a discriminatory housing practice;

b.   Believes that such person will be injured, directly or indirectly, by a discriminatory housing practice that is about to occur; or

c.   Is associated with a person having a protected status under this chapter and claims to have been injured, directly or indirectly, as a result of a discriminatory housing practice against such person having the protected status. [26]

For the reasons that follow, I conclude that Corullon and Bauscher, as "aggrieved persons" under the DFHA, have standing [*18] to pursue their claims that 99-14 violates the DFHA. Additionally, I conclude that all of the

Individual Plaintiffs similarly have standing to pursue their claims that 99-10 contravenes the DFHA.

24   *6 Del. C. § 4617.*
25   *Id. § 4613(a)(1)(a).*
26   *Id. § 4602(2).* The DFHA defines a "person" to include, among others, "1 or more individuals, corporations, partnerships [and] associations." *Id. § 4602(19).*

In order to understand why the Plaintiffs may pursue their claims under the DFHA, a review of their property holdings and business activities is needed. The Individual Plaintiffs, with the exception of Heagy, [27] each currently own property within the City which is rented under a City rental permit. [28] Corullon is the landlord of seven single-family, detached houses, all located in non-exempt areas, of which six presently are rented to students. [29] Bruner is the landlord of thirteen properties, all of which are located on non-exempt streets, though the identity of the renters of those properties is unknown. Bauscher is the landlord of six properties in non-exempt areas, two of which are detached, single-family homes. One [*19] of those two detached, single-family homes is currently being rented to students. All of the properties of which Redden, Anderson and Harvey are landlords are located in exempt areas. [30]

27   Since the filing of this action, Heagy has sold her only rental property, which was located in an area exempt from the restrictions of 99-14, after the City revoked her City rental permit.
28   The record demonstrates that all the Individual Plaintiffs rent their properties under City rental permits. First, I note that the Individual Plaintiffs are required by law to do so. *See* Def.'s App. at A00569. Second, three of the Individual Plaintiffs averred that they operate under a City rental permit. *See* Bauscher Dep. at 34; Anderson Dep. at 15; Harvey Dep. at 21. Thus, I conclude that there is no dispute about whether the Individual Plaintiffs rent their respective properties under a City rental permit.
29   Def.'s App. at A00029-30; Letter from Kevin J. Connors, Esq. (June 5, 2003) at 1.
30   For purposes of this evaluation, I have accepted the City's representations of whether a given property is located in an exempt area or non-exempt area. The chart prepared by the Plaintiffs and supplemented by the City indicates

whether a particular property is located on an exempt or non-exempt street. I interpret the indication that a property is on a "non-exempt street" also to denote that it is located in a zoning district subject to 99-14. *See* Def.'s App. at A00029-39.

[*20] "Aggrieved persons" include those who "claim[] to have been injured, directly or indirectly, by a discriminatory housing practice." [31] "A common idiom describes property as a 'bundle of sticks' -- a collection of individual rights which, in certain combinations, constitute property." [32] The Individual Plaintiffs' bundles include the right (subject to the valid exercise of governmental police powers) to rent to anyone deemed qualified by the property owner. 99-14 prohibits landlords in the City from renting their units in non-exempt areas to students unless the several conditions are first satisfied; here, for Corullon and Bauscher, 99-14 diminishes the pool of possible applicants for their rental units in single-family detached dwellings located in the non-exempt areas. Thus, for these two Plaintiffs, one of the sticks, or a portion of one of the sticks, in their bundles has been removed by the City through its adoption of 99-14, [33] and they may challenge the City's enactment of 99-14 as a direct violation of the DFHA.

31  *6 Del. C. § 4602(2)(a).*

32  *United States v. Craft, 535 U.S. 274, 278, 152 L. Ed. 2d 437, 122 S. Ct. 1414 (2002); see also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982); MacArtor v. Graylyn Crest III Swim Club, Inc., 41 Del. Ch. 26, 187 A.2d 417, 419 (Del. Ch. 1963).*

[*21]

33  This form of economic injury has been recognized to confer standing in the federal arena. [HN11] The federal equivalent of the DFHA is Title VIII of the Civil Rights Act, *42 U.S.C. §§ 3601-3631* (the "Federal Fair Housing Act"). In 1974, the Federal Fair Housing Act was extended to prevent discrimination on the basis of "sex." The scope of the Federal Fair Housing Act was again expanded in 1988 to prohibit discrimination based on "familial status" and "handicap status." *See City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 728, 131 L. Ed. 2d 801, 115 S. Ct. 1776 (1995).* The Federal Fair Housing Act confers

standing upon "aggrieved persons." *42 U.S.C. § 3610(a)(1)(i).* This statutory grant of standing has been interpreted to be "'as broad as is permitted by Article III of the Constitution.'" *Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 109, 60 L. Ed. 2d 66, 99 S. Ct. 1601 (1979)* (alteration in original) (quoting *Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209, 34 L. Ed. 2d 415, 93 S. Ct. 364 (1972)).* Accordingly, plaintiffs claiming standing to pursue a Federal Fair Housing Act claim need show, *inter alia,* that they suffer an injury in fact. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992).* In *Hamad v. Woodcrest Condominium Ass'n, 328 F.3d 224 (6th Cir. 2003),* a plaintiff was determined to have standing to challenge the defendant condominium's bylaws under the Federal Fair Housing Act "because, given that [the plaintiff] could not sell her third-floor unit to a family with children, the bylaws diminished the number of potential buyers for her unit." *Id. at 231.*

[*22] I reject the City's argument that any injury to the Plaintiffs is in the future and is, thus, insufficient to confer standing. As previously discussed, Corullon and Bauscher, who currently rent their detached, single-family properties located in non-exempt areas to students, have suffered an injury in fact. That some relief is found under the Ordinance's non-conforming use provision does not relegate the affected landlords' injuries to mere speculation. The burdens imposed on the landlords, if they do not rent in a conforming fashion for more than one year, are a real and present limitation on their property rights. [34]

34  Another possible present injury is that stigmatization experienced by landlords who rent "Student Homes," wherever located. While this presents an intriguing argument, because I have found that other bases for standing exist to allow a consideration of the merits of the claims, I do not reach this issue.

Moreover, I note that, even if the City were correct in its characterization of the timeliness of the Plaintiffs' injuries, [HN12] statutory standing under the DFHA is not expressly confined to present injuries because an aggrieved person is also one who "believes [*23] that such person will be injured, directly or indirectly, by a

discriminatory housing practice that is about to occur." [35] While some limit may be imposed concerning how far in the future an injury may occur, clearly the DFHA contemplates standing for more than those persons who suffer immediate injury. As such, Corullon and Bauscher may seek a relief from 99-14 on the grounds that it requires them to engage in discriminatory behavior in contravention of the DFHA. Therefore, having been injured by what they regard as a discriminatory housing practice, Corullon and Bauscher qualify as aggrieved persons and have the right to challenge the validity of 99-14 as directly violating the DFHA and to seek a declaratory judgment that 99-14 compels them to violate the DFHA.

> [35] *6 Del. C. § 4602(2)(b).*

Furthermore, all of the Individual Plaintiffs, except Heagy, have standing to challenge 99-10 under the DFHA. 99-10 applies to the entire City, specifically, to all rental agreements for units in the City that are subject to a City rental permit. The Individual Plaintiffs, who, with the exception of Heagy, each currently rent property in the City under City rental [*24] permits will be forced to comply with the provisions of 99-10, provisions which they allege run afoul of the DFHA. [36] As such, all of the Individual Plaintiffs, except Heagy, are directly harmed by 99-10 and are "aggrieved persons" under *Section 4602 of the DFHA*. Thus, at least one Plaintiff has standing to challenge each of the Ordinances as violating the DFHA under each of the various theories asserted.

> [36] The City points out, citing the depositions of Individual Plaintiffs, that several of the Individual Plaintiffs neither fully comprehend how the Ordinances function, nor conform their practices to the Ordinances' dictates. These assertions are not relevant to the task of determining the Plaintiffs' rights to pursue this action.

2. The Plaintiffs' Right to Challenge the Ordinances as Violating DLTC

The City also challenges the Plaintiffs' standing to pursue their claims that the Ordinances violate the DLTC. The Plaintiffs contend that 99-14 directly violates the age and occupation antidiscrimination provisions of the DLTC. They additionally argue that 99-10 transgresses the DLTC by discriminating on the basis of age. Moreover, the Plaintiffs maintain that the Ordinances [*25] compel the landlords to violate the

tenant-protective processes established by, and the substantive provisions of, the DLTC. Because the Plaintiffs have failed to demonstrate that the DLTC confers, through a statutory grant of standing, the right to challenge the Ordinances as directly violating its antidiscrimination provisions, [37] I turn to the Plaintiffs' other argument that the Ordinances compel the Individual Plaintiffs to conduct their businesses in such a manner as to violate the terms of the DLTC.

> [37] I reject the Plaintiffs' argument that, "because the DLTC expressly references and mimics the DFHA, Plaintiffs' Landlord-Tenant Code claims are subject to the same requirements for standing." Pls.' Reply Br. in Support of Its Mot. for Partial Summ. J. and Answering Br. in Opp'n to Def.'s Mot. for Partial Summ. J. at 3 n.3 (citing *25 Del. C. § 5116*). [HN13] The DLTC's statutory grant of standing provides "for any violation of the rental agreement or this Code, or both, by either party, the injured party shall have a right to maintain a cause of action in any court of competent civil jurisdiction." *25 Del. C. § 5117*. I note that, because the City is not a party to the rental agreement, *Section 5117* does not grant standing to the Plaintiffs to press their claims seeking to invalidate the Ordinances for directly violating the antidiscrimination provisions of the DLTC. This view is reinforced by subsection c of the antidiscrimination section of the DLTC:
>
> > (c) [HN14] In the event of discrimination under this section, the tenant may recover damages sustained as a result of the landlord's action, including, but not limited to, reasonable expenditures necessary to obtain adequate substitute housing.
>
> *Id. § 5116(c).* Thus it is doubtful that the Plaintiffs have been granted by the DLTC any right to sue the City, a non-party to rental agreements entered into by the Individual Plaintiffs, for alleged direct violations of the antidiscrimination provisions of the DLTC.

[*26] *Delaware's Declaratory Judgment Act* [38] provides:

[HN15] Any person ... whose rights, status or other legal relations are affected by a statute [or] municipal ordinance... may have determined any question of construction or validity arising under the statute [or] ordinance ... and obtain a declaration of rights, status or other legal relations thereunder. [39]

[HN16] This does not authorize Courts to render advisory opinions or to adjudicate hypothetical questions because "the courts will entertain declaratory judgment actions only where the alleged facts are such that an 'actual controversy' exists and eventual litigation appears to be unavoidable." [40] The oft-stated standards for determining whether an "actual controversy" exists are:

(1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination. [41]

[*27] Though the parties have framed their arguments concerning the Plaintiffs' right to seek a declaratory judgment under the general principles of standing, and specifically the requirement that a plaintiff suffer an "injury-in-fact," their debate is best analyzed as whether there is a "controversy between parties whose interests are real and adverse."

38  *10 Del. C. Ch. 65.*
39  *10 Del. C. § 6502.*
40  *Leonard Loventhal Account v. Hilton Hotels Corp.,* 2000 Del. Ch. LEXIS 149, 2000 WL 1528909, *10 (Del. Ch. Oct. 10, 2000), aff'd, 780 A.2d 245 (Del. 2001).
41  *Rollins Int'l, Inc. v. International Hydronics Corp.,* 303 A.2d 660, 662-63 (Del. 1973).

I conclude that Corullon and Bauscher may challenge 99-14 as compelling discriminatory behavior

prohibited by the DLTC. Furthermore, I determine that the Individual Plaintiffs may contest 99-10 under the theory that compliance with 99-10 requires the Individual Landlords to disobey the DLTC's procedural and substantive requirements. The Plaintiffs protest that, in order not to run afoul of 99-14, the Individual Plaintiffs must inquire into the student and marital status of a potential tenant, [*28] thereby contravening the antidiscrimination provisions of the DLTC. Moreover, in complying with the penal terms of 99-10, it is claimed that the Individual Plaintiffs are forced to ignore the procedural and substantive rules established in the DLTC. The afflicted parties are not mere intermeddlers, but instead, to act in conformity with the terms of the Ordinances, they must conduct themselves in a manner they believe violates state law. Persons so injured may seek judicial review in order to escape the impossible task of complying with regulatory schemes which command the undertaking of diametrically opposed courses of action. [42] Thus, Corullon and Bauscher, in relation to 99-14, and the Individual Plaintiffs, in relation to 99-10, have a right to challenge the Ordinances on the grounds that the Ordinances impermissibly require them to contravene the DLTC. Having resolved the issues concerning the Plaintiffs' right to challenge the Ordinances, I turn to the merits of the Plaintiffs' arguments. [43]

42  I note that the City has not suggested that the doctrine of exhaustion of administrative remedies is somehow pertinent. *See Levinson v. Delaware Compensation Rating Bureau, Inc.,* 616 A.2d 1182 (Del. 1992).
[*29]
43  Throughout the remainder of this opinion, I use the term "Plaintiffs" to refer to those Plaintiffs previously determined to have standing to pursue the claim at issue.

C. *The Validity of the Ordinances*

The City argues that the starting point for any evaluation of the validity of the Ordinances is that they should be respected as the product of careful study and the balancing of the competing land-use needs of its residents. In particular, regarding the question of the validity of 99-14, the City stresses that, as a zoning ordinance, 99-14 should be afforded a presumption of validity and accorded a corresponding degree of deference by the Court. [HN17] It is true that municipal

zoning ordinances are presumed to be valid [44] and are afforded deference by a reviewing court. [45] The City's retreat to this standard of review is not dispositive, though, for

> it is a necessary corollary to the relationship between the state, acting through its Legislature, and the municipal corporation that where a conflict exists between a state statute and a municipal ordinance, the statute must always prevail. [46]

I assume for purposes of my analysis that the Ordinances are the product [*30] of valid exercise of the City's powers. "The question is whether the provisions of the [Ordinances], enacted pursuant to the grant of power by the General Assembly to the [City], conflict with other legislative enactments so as to preclude the application of the ordinance[s]." [47] Therefore, I now turn to the Plaintiffs' claims that the Ordinances violate the DFHA and the DLTC.

44  *Hayward v. Gaston, 542 A.2d 760, 769 (Del. 1988)* [HN18] ("As an attribute of governmental authority, zoning is a legislative function and is presumed to be valid unless shown to be arbitrary or capricious. The burden of rebutting the presumption of validity rests with the party challenging the zoning.") (citations omitted); *Tate v. Miles, 503 A.2d 187, 191 (Del. 1986).*

45  *Mifflin Rd. Neighborhood Ass'n v. City of Dover*, 1986 Del. Ch. LEXIS 503, 1986 WL 13500, at *5 n.1 (Del. Ch. Nov. 28, 1986).

46  *State v. Putnam, 552 A.2d 1247, 1249 (Del. Super. 1988).* Similarly, zoning regulations have been invalidated if found to be in conflict with federal antidiscrimination statutes. *See Potomac Group Home Corp. v. Montgomery County, Md., 823 F. Supp. 1285, 1294 (D. Md. 1993)* ("Recognizing the purpose and breadth of provisions of the [Federal Fair Housing Act], courts have consistently invalidated a wide range of municipal licensing, zoning and other regulatory practices.").

[*31]

47  *Putnam, 552 A.2d at 1250.*

1. The Validity of 99-14

The Plaintiffs attack 99-14 on several grounds. They contend that 99-14 discriminates on the basis of marital status and age, thereby violating the DFHA and the DLTC. Specifically, the Plaintiffs assert that 99-14 on its face discriminates based upon the marital status of a lessee. Furthermore, the Plaintiffs claim that 99-14 discriminates on the basis of occupation in violation of the DLTC. Accordingly, the Plaintiffs ask that the Court declare 99-14 invalid.

Responding to charges of discrimination, the City argues that "even if it can be shown that the majority of individuals who utilize rental housing in university communities are college students who fall predominantly into a certain age group or marital status, absent more and clear evidence of discrimination, the ordinances are valid." [48] In its briefs and at oral argument, the City makes much about a perceived distinction between discriminating against a protected class and regulating where a person may reside. Accordingly, with respect to the charge of discriminating on the basis of marital status, the City contends that 99-14 is a valid exercise [*32] of the City's police power because "unmarried couples who are students can live together, so long as it is in a specified student house location." [49] Despite the City's arguments, I conclude that 99-14 is unlawful under the DFHA.

48  Opening Br. in Supp. of Cross-Mot. of Def., City of Newark, for Partial Summ. J. on State Law Claims and Answering Br. of Def., City of Newark, in Opp'n to Pls.' Mot. for Partial Summ. J. on State Law Claims ("Def.'s Opening Br.") at 30.

49  *Id.* at 35.

[HN19] The task of interpreting a statute is essentially one of ascertaining and giving effect to legislative intent. [50] The broad ameliorative goals of the DFHA cannot be disputed. The statute itself notes that its purpose is "to eliminate, as to housing offered to the public for sale, rent or exchange, discrimination based upon race, color, national origin, religion, creed, sex, marital status, familial status, age or handicap." [51] The DFHA is to "be liberally construed to the end that its purposes may be accomplished and all persons may fully enjoy equal rights and access to housing for themselves and their families." [52] When the language of a statute is unambiguous, the Court's only role [*33] is to apply the literal meaning of those words. [53] In so doing, the words

are given their common, ordinary meaning. [54]

50   *Coleman v. State, 729 A.2d 847, 851 (Del. 1999); Hudson Farms, Inc. v. McGrellis, 620 A.2d 215, 217 (Del. 1993).*

51   *6 Del. C. § 4601(a); see also Quaker Hill Place v. State Human Relations Comm'n, 498 A.2d 175, 181 (Del. Super. 1985)* ("*Saville I*").

52   *6 Del. C. § 4601(b).* Achieving the desirable ends set forth is of such importance that, "in defining the scope or extent of any duty imposed by [the DFHA], ... higher or more comprehensive obligations established by otherwise applicable federal, state or local enactments may be considered." *Id.*

53   *Coleman, 729 A.2d at 851; Arnold v. Society for Sav. Bancorp., 650 A.2d 1270, 1287 (Del. 1994).*

54   *Hudson Farms, Inc., 620 A.2d at 217.*

[HN20] Pursuant to *Section 4617 of the DFHA*, "any law of the State or any political subdivision thereof that purports to require or permit any action that would be a discriminatory housing practice [*34] under this chapter shall to that extent be invalid." A "discriminatory housing practice" is "an act that is unlawful under § 4603, § 4604, § 4605, § 4606 or § 4618 of [the DFHA]." [55] Under the DFHA, engaging in any of a number of forms of discrimination, including discrimination on the basis of "marital status" or "age," constitutes a discriminatory housing practice. *Section 4603 of the DFHA provides:*

[HN21] Except as exempted by § 4607 of this title, it shall be unlawful:

(1) To discriminate in the sale or rental, to refuse to sell or rent, to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, national origin, religion, creed, sex, marital status, familial status, age or handicap.

(2) To discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, national origin, religion, creed, sex, marital status, familial status, age or

handicap. [56]

[HN22] "Marital status" is "the legal relationship of parties as determined by the laws of marriage applicable [*35] to them or the absence of such a legal relationship." [57] "Age," for purposes "of defining what is a discriminatory housing practice, . . . means any age 18 years or older." [58] In certain respects, the DFHA is broader in its antidiscriminatory protections than those of its federal counterpart, the Federal Fair Housing Act. Importantly, the DFHA, unlike the Federal Fair Housing Act, expressly includes "marital status" and "age" as bases for housing discrimination. [59] Thus, in an expansion of its federal counterpart, the DFHA forbids discrimination on the basis of a person's status as married or unmarried, or on the basis of a person's age over 18 years old. [60]

55   *6 Del. C. § 4602(10).*

56   *6 Del. C. § 4603(b)(1-2).* Furthermore, the DFHA declares: [HN23] "Notwithstanding the provisions enumerated in § 4619 of this title, it shall be unlawful to assist, induce, incite or coerce another person to commit any of the discriminatory housing practices prohibited by this chapter." *Id. § 4606.*

57   *Id. § 4602(16).*

58   *Id. § 4602(1).*

59   *Compare 42 U.S.C. § 3604 with 6 Del. C. § 4603.*

[*36]

60   Delaware's Fair Housing Act is also broader in its prohibitions against discrimination on the basis of marital status and age than those of the *Pennsylvania Human Relations Act. Compare 6 Del. C. § 4603 with 43 P.S. § 955(h)* ("It shall be an unlawful discriminatory practice . . . for any person to: (1) Refuse to sell, lease, finance or otherwise to deny or withhold any housing accommodation or commercial property from any person because of the race, color, familial status, age, religious creed, ancestry, sex, national origin or handicap or disability of any person, prospective owner, occupant or user of such housing accommodation or commercial property."). The term "age" is defined under Pennsylvania law to include "any person forty years of age or older and shall also include any other person so protected by further amendment to the *Federal Age Discrimination in Employment*

2003 Del. Ch. LEXIS 66, *36

*Act. Id. § 954(h).* Furthermore, "the term 'familial status' means one or more individuals who have not attained the age of eighteen years being domiciled with: (1) a parent or other person having legal custody of such individual or individuals; or (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person." *Id. § 954(t).*

A municipal ordinance bearing a striking resemblance to 99-14, itself the product of a factual background similar to that currently before this Court, was upheld in a pair of related cases, *Smith v. Lower Merion Township,* 1992 U.S. Dist. LEXIS 7177, 1992 WL 112247 (E.D. Pa. May 7, 1992), *aff'd, 995 F.2d 219 (3d Cir. 1993),* and *Farley v. Zoning Hearing Bd. of Lower Merion Township, 161 Pa. Commw. 229, 636 A.2d 1232 (Pa. Commw. Ct. 1994).* Lower Merion Township, which, like the City, is the residence of many college students, adopted a plan of zoning which regulated the location of, and established occupancy limits for, a category of housing labeled "Student Homes." A "Student Home" was defined by the Lower Merion Township ordinance as: "A living arrangement for students, unrelated by blood, marriage or legal adoption, attending or about to attend a college or university or who are on a semester or summer break from studies a [sic] college or university, or any combination of such persons." *Smith,* 1992 U.S. Dist. LEXIS 7177, 1992 WL 112247, at *4; *Farley, 636 A.2d at 1234-35.* In *Smith,* "the plaintiffs asserted that the ordinance violated their constitutional rights..., thus falling under the statutory aegis of *42 U.S.C. § 1983* and the Fair Housing Act, *42 U.S.C. § 3601, et seq.*" *Smith,* 1992 U.S. Dist. LEXIS 7177, 1992 WL 112247, at *1. The court, applying a rational basis review, denied the plaintiffs' motion for a preliminary injunction against the enforcement of the ordinance. *Id.* 1992 U.S. Dist. LEXIS 7177, 1992 WL 112247 at *4. In a subsequent action, a Pennsylvania state court arrived at an equivalent outcome considering similar constitutional arguments. *Farley, 636 A.2d at 1238-39.*

Though the City relied upon the Lower Merion experience in both formulating, *see supra* note 6, and defending 99-14, *see* Def.'s Opening Br. at 31-33, I briefly note several differences between the actions in *Smith* and *Farley* and the one *sub judice.* First, of primary concern in *Smith* and *Farley* were constitutional, and not state or federal statutory law, claims. Second, even if the *Smith* and *Farley* plaintiffs had vigorously pressed claims for violations of the Federal Fair Housing Act and the *Pennsylvania Human Relations Act* to similar defeats, such cases would remain distinguishable based upon the noted differences between the DFHA and the narrower underlying antidiscrimination provisions of the Federal Fair Housing Act and the *Pennsylvania Human Relations Act.* Therefore, these companion cases are of limited utility in deciding the case at hand.

[*37] The parties have directed the Court to few decisions involving alleged violations of the DFHA. "In the absence of Delaware decisions construing this provision," I may also review "decisions construing various federal antidiscrimination statutes." [61] [HN24] A natural source of guidance, due to the similarity in structure, language and purpose between the underlying statutes, are decisions construing the provisions of the Federal Fair Housing Act. [62] However, I am not limited to this particular line of jurisprudence.

> Although such similarity exists between [6 Del. C. §] 4603 and Title VIII, federal case law indicates that there is considerable overlap between analysis under Title VII and analysis under other federal antidiscrimination statutes, including Title VIII. Additionally, a comprehensive body of decisional law has developed under Title VII involving analysis of the issue of whether particular evidence demonstrates an intent to discriminate. [63]

Therefore, when helpful, I will consult these bodies of law for guidance.

61 *Saville v. Quaker Hill Place, 531 A.2d 201, 203 (Del. 1987)* ("*Saville III*").
62 *See id.* at 204.
[*38]
63 *Id.* (citations omitted); *see also Gamble v. City of Escondido, 104 F.3d 300, 304 (9th Cir.*

2003 Del. Ch. LEXIS 66, *38

*1997)* ("We apply Title VII discrimination analysis in examining [Federal] Fair Housing Act . . . discrimination claims.").

[HN25] Two families of discrimination claims may be brought by an aggrieved person under the DFHA. "To make out a *prima facie* case under Title VIII, a plaintiff can show either discriminatory treatment or discriminatory effect alone, without proof of discriminatory intent." [64] "Disparate treatment occurs when a decision maker 'simply treats some people less favorably than others because of [a protected trait].'" [65] A claim by an aggrieved person that a statute or ordinance impermissibly discriminates on its face is a form of disparate treatment claim. [66] Conversely, "when a decision maker's practices are facially neutral in their treatment of different groups but in fact unjustifiably disadvantage one or more groups," a claim for disparate impact exists. [67] Hence, the Plaintiffs' arguments that 99-14 discriminates upon its face based upon the marital status of student renters are claims of disparate treatment, while the Plaintiffs' claims [*39] of age discrimination are properly treated as disparate impact claims.

[64] *Doe v. City of Butler, Pa.*, 892 F.2d 315, 323 (3d Cir. 1989) (citation omitted). It has also been noted that "disparate treatment and disparate impact are two of four types of discrimination which commentators have identified as confronting the handicapped." *Saville III, at 204.*

[65] *Saville III, at 204* (alteration in original) (quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977)). An example of such an instance is when "an applicant is rejected based on an unlawful whim of [a] landlord." *Quaker Hill Place v. Saville,* 523 A.2d 947, 955 (Del. Super.) ("Saville II"), aff'd, 531 A.2d 201 (Del. 1987).

[66] One court, in analyzing under the Federal Fair Housing Act a state statute found to be facially discriminatory, opined that "some courts have identified a third type of case [in addition to disparate treatment and disparate impact] where a challenged practice discriminates against the handicapped on its face." *Larkin v. Michigan Dep't of Social Servs.,* 89 F.3d 285, 289 (6th Cir. 1996) (citing *Potomac Group Home Corp.,* 823 F. Supp. at 1295; *Horizon House Developmental Servs., Inc. v. Township of Upper Southampton,*

804 F. Supp. 683, 693 (E.D. Pa. 1992), aff'd mem., 995 F.2d 217 (3d Cir. 1993)). However, because other courts, notably the United States Supreme Court, treat facially discriminatory statutes as "just a type of intentional discrimination or disparate treatment," I will evaluate the claim that 99-14 discriminates on its face on the basis of marital status as a claim for disparate treatment. *Larkin,* 89 F.3d at 289 (citing *U.A.W. v. Johnson Controls, Inc.,* 499 U.S. 187, 197-200, 113 L. Ed. 2d 158, 111 S. Ct. 1196 (1991); *Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1500-01 (10th Cir. 1995)).

[*40]

[67] *Saville III, at 204.*

The distinction between these two categories of claims is a critical one because "the differences in the nature and quality of evidence required in such cases are significant." [68] *Saville II* reaffirmed, and further refined, "the standards . . . applied when determining the order and allocation of the burdens of production and persuasion in private, non-class actions, *Section 4603(1)* discrimination cases" as set forth in *Saville I.* [69] On the one hand, *Saville II* notes that [HN26] when analyzing claims of disparate treatment, the respective burdens of proof of the parties in litigating claims of disparate treatment are measured under the test announced in the trilogy of *McDonnell Douglas Corp. v. Green,* [70] *Board of Trustees of Keene State College v. Sweeney,* [71] and *Texas Dept. of Community Affairs v. Burdine.* [72] As described by *Saville I,*

> the Courts of Delaware follow the standard established by *McDonnell Douglas Corp. v. Green* . . . that the complainant has the initial burden of establishing a *prima facie* case of discrimination. If that is done, then the burden shifts to the person charged with discrimination [*41] to articulate some legitimate, nondiscriminatory, reason for the rejection. Finally, if the respondent succeeds, the burden of going forward reverts to the complainant to prove that the stated reason was a sham. [73]

In disparate treatment cases, "proof of motive to discriminate . . . is an essential element of the complainant's case." [74] On the other hand, the test for

cases of disparate impact has evolved separately from that of the standard for deciding claims of disparate treatment. [75] I first evaluate, under the framework of *Saville II,* the allegation by the Plaintiffs that 99-14 facially discriminates on the basis of marital status, resulting in the disparate treatment of a protected trait under the DFHA.

68    *Saville II, at 955.*

69    *Id., at 953* (citations omitted).

70    *411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).*

71    *439 U.S. 24, 58 L. Ed. 2d 216, 99 S. Ct. 295 (1978).*

72    *450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).*

73    *Saville I, 498 A.2d at 182-83.* [HN27] "The analysis [under the *McDonnell Douglas/Burdine* test] is neither rigid nor mechanized and the general requirements of proof must be flexibly tailored to the facts of each case." *United States v. Town Hall Terrace Ass'n,* 1997 U.S. Dist. LEXIS 3119, 1997 WL 128353, at *3 (W.D.N.Y. Mar. 14, 1997).

[*42]

74    *Saville II, at 955.*

75    *Saville II* directed the Court to apply the test derived from *Griggs v. Duke Power Co., 401 U.S. 424, 28 L. Ed. 2d 158, 91 S. Ct. 849 (1971),* in evaluating disparate impact claims. *Saville II, at 955.* In accordance with that methodology, *Saville II* noted that "in [disparate impact] cases, statistical evidence without proof of motive usually is sufficient." *Id.*

Since the time of *Griggs* and *Saville II,* much has changed in the treatment of disparate impact claims under the Federal Fair Housing Act. As one judge summarized the evolution:

The disparate impact path begins, of course, with *Griggs v. Duke Power Co.* . . . Later, however, in a series of significant decisions culminating in *Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642, 104 L. Ed. 2d 733, 109 S. Ct. 2115 (1989),* the Supreme Court redirected disparate impact analysis away from the principles

voiced in *Griggs.* During this period, the Court recharacterized the relevance of a defendant's intent, shifted the burden of persuasion entirely to the plaintiff, and relaxed the employer's obligation to prove the challenged practice was a "business necessity."

After two years of intense dialogue about antidiscrimination policy approaches, much lobbying and political posturing, a presidential veto in 1990, innumerable amendments and revisions, and high level negotiations between congressional leaders and the Bush White House, Congress passed the Civil Rights Act of 1991, Pub.L. 102-166, 105 Stat. 1071, codifying certain developments and reversing others in an effort to shore up Title VII's protections for victims of discrimination.

*Hack v. President and Fellows of Yale College, 237 F.3d 81, 93-94 (2d Cir. 2000)* (Moran, J., dissenting) (citations omitted), *cert. denied, 534 U.S. 888, 151 L. Ed. 2d 142, 122 S. Ct. 201 (2001).* The ultimate outcome of this process is still being debated. This controversy, although intriguing, is not pertinent to the issues addressed by this memorandum opinion.

[*43] The Plaintiffs' contention that 99-14 facially discriminates on the basis of the affected students' marital status is a claim of disparate treatment. Accordingly, *Saville II* directs me to analyze the Plaintiffs' claim under the *McDonnell Douglas Corp./Burdine* test. [HN28] Under this methodology, "the plaintiff must first make a modest showing that a *prima facie* housing discrimination claim exists. [76] This burden is satisfied if a plaintiff demonstrates that the statute or ordinance at issue is facially discriminatory. [77]

76    *Town Hall Terrace Ass'n,* 1997 U.S. Dist. LEXIS, 1997 WL 128353, at *3.

77    *See Arc of N.J., Inc. v. New Jersey, 950 F. Supp. 637, 643 (D.N.J. 1996)* ("A plaintiff makes

out a *prima facie* case under Title VIII . . . by showing either: (1) intentional disparate treatment . . .; or (2) disparate impact alone, without proof of discriminatory intent. A case of disparate treatment may be established against a public entity by demonstrating that a given legislative provision discriminates against [a protected class or trait] on its face.") (citation omitted); *Association for Advancement of the Mentally Handicapped, Inc. v. City of Elizabeth, 876 F. Supp. 614, 620 (D.N.J. 1994)* ("If the statute or ordinance is discriminatory on its face, then the burden is on the defendant to justify the discriminatory classification."); *Horizon House Developmental Servs., Inc., 804 F. Supp. at 693-94*; *see also Hack, 237 F.3d at 90* (Plaintiffs failed to state a claim under the Federal Fair Housing Act "because the complaint alleged neither intent to discriminate, nor a facially discriminatory policy, nor facts necessary to constitute disparate impact discrimination.").

[*44] There can be no doubt that 99-14 discriminates on its face based upon marital status. By its express terms, the operation of 99-14 turns upon the marital status of the students. A "Student Home" is "[a] living arrangement in a single-family detached dwelling comprised of post-secondary students, *unrelated by* blood, *marriage*, or legal adoption." [78] Thus, by 99-14's express terms, post-secondary students who are married to each other are not subject to the various restrictions imposed by 99-14, but unmarried students, and the landlords who rent to them, are subject to a host of conditions if the rental unit is in a non-exempt portion of the City. This differing treatment, on the face of 99-14, constitutes facial discrimination. [79]

78   99-14 (emphasis added).
79   *See Marriott Senior Living Servs., Inc. v. Springfield Township, 78 F. Supp.2d 376, 388 (E.D. Pa. 1999)* ("Thus, [HN29] to establish that an ordinance is facially invalid, a plaintiff must show that the accused ordinance treats someone protected by the [Federal Fair Housing Act] in a different manner than others are treated."); *Arc of N.J., Inc., 950 F. Supp. at 643* (A legislative provision discriminates on its face when it "applies different rules to the [members of a protected class] than are applied to others.").

[*45] The City strenuously argues that the Plaintiffs are unable to show any ill or impermissible motive on behalf of the City in enacting 99-14. However, while "'proof of discriminatory motive is critical, ... it can in some situations be inferred from the mere fact of differences in treatment.'" [80] *Saville III* notes that "a comprehensive body of decisional law has developed under Title VII involving analysis of the issue of whether particular evidence demonstrates an intent to discriminate." [81] The United States Supreme Court, in a Title VII case, addressed what evidence was needed to demonstrate an intent to discriminate in the context of a facially discriminatory statute:

> The absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination.... The beneficence of an employer's purpose does not undermine the conclusion that an explicit gender-based policy is sex discrimination under § 703(a) [of Title [*46] VII]. [82]

Thus, as explored in the jurisprudence of Title VII, and adopted in Title VIII litigation, in those instances of ordinances which facially discriminate against a protected trait, a plaintiff need not prove the malevolent motives of the legislative body. Therefore, I reject the City's contention that the failure to prove malevolent or discriminatory motive apart from the facially discriminatory ordinance is fatal to the Plaintiffs' claim, and conclude that the Plaintiffs have stated a *prima facie* case of discrimination on the basis of marital status.

80   *Saville III, at 204* (quoting *International Bhd. of Teamsters, 431 U.S. at 335 n.15*).
81   *Id.*
82   *U.A.W. v. Johnson Controls, Inc., 499 U.S. at 199-200*; *see also Larkin, 89 F.3d at 290*; *Bangerter, 46 F.3d at 1500-01*; *Marriott Senior Living Servs., Inc., 78 F. Supp.2d at 388*; *Potomac Group Home Corp., 823 F. Supp. at 1295*; *Horizon House Developmental Servs., Inc., 804 F. Supp. at 694*.

2003 Del. Ch. LEXIS 66, *46

That the Plaintiffs have stated a *prima facie* case does not end my inquiry. [HN7] "Once [a] [*47] complainant establishes his *prima facie* case, the *burden of production* shifts to the person charged with discrimination to *articulate* a legitimate, non-discriminatory reason for [her discriminatory actions]." [83] As distinguished from the burden of persuasion, the defendant, in order to satisfy this burden of production, need only produce

> "'evidence [which] raises a genuine issue of fact as to whether it discriminated against the [plaintiff]. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for [the plaintiff's discriminatory treatment by the defendant]. The explanation must be legally sufficient to justify a judgment for the defendant. . . . Placing this burden of production on the defendant thus serves simultaneously to meet the [plaintiff's] *prima facie* case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the [plaintiff] will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.'" [84]

83  *Saville II, at 954* (footnote omitted); *see also Arc of N.J., Inc., 950 F. Supp. at 643* ("If a Title VIII plaintiff establishes that a statute or ordinance is facially discriminatory, the burden shifts to the governmental defendant to justify the disparate treatment.").

[*48]

84  *Saville II, at 955* (quoting *Burdine, 450 U.S. at 254-56*). "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id. at 954-55.*

The City has produced an immense record concerning the concentration of charges and arrests for the complained of activities in single-family units rented to students. This voluminous record evidences that students comprise the bulk of the offenders for the

offenses complained about by non-student residents of the City. The record further demonstrates that the City relied upon this vast amount of evidence in formulating the Ordinances. The City argues that from this record, "reflecting decades-long efforts to preserve single-family neighborhoods, not as a means of discriminating against others . . . there is ample reason for the Court to conclude that the City . . . has offered a legitimate, non-discriminatory reason for enacting the challenged Ordinances." [85]

85  Br. of Def., City of Newark, in Reply to Pls.' Answering Br. in Opp'n to Def.'s Mot. for Partial Summ. J. ("Def.'s Reply Br.") at 20-21.

The City relies upon *Village of Belle Terre v. Boraas* [86] for the proposition [*49] that a legitimate, non-discriminatory reason for enacting the 99-14 is the preservation of single-family housing. In *Village of Belle Terre*, the Supreme Court held that "the police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." [87] Nevertheless, I reject the City's invocation of this rationale as a legitimate, non-discriminatory reason for 99-14's facial discrimination on the basis of marital status.

86  *416 U.S. 1, 39 L. Ed. 2d 797, 94 S. Ct. 1536 (1974).*
87  *Id. at 9.*

*Saville II* requires the City to articulate a legitimate, non-discriminatory reason *for the facial discrimination of 99-14. Village of Belle Terre* might be of value were the City explaining why 99-14 is a valid exercise of its police power. However, I have assumed throughout this decision that the Ordinances are duly authorized exercises of the City's police power. [88] The City cannot satisfy its burden by merely reiterating this justification; indeed, to allow so would render the City's burden of production illusory. [*50] [89] Put another way, the City has failed to articulate any argument for discriminating upon the basis of marital status that raises a genuine issue of fact as to whether it discriminated against unmarried, student renters. [90] Thus, the City has failed to articulate any legitimate, non-discriminatory reason for facially discriminating against unmarried couples. Accordingly, the City has failed to meet its burden of production under the second inquiry of the *McDonnell Douglas/Burdine*

test. [91]

88  *See supra* pp. 22-23.

89  *See Bangerter, 46 F.3d at 1503* (rejecting "the district court's use of the rational relationship test to review [a city's] challenged actions").

90  This argument is underscored by the DFHA itself, which recognizes the validity of properly authorized single-family housing that does not offend its prohibitions against discrimination. *Section 4607 of the DFHA provides:*

(c) [HN31] Nothing in this chapter limits the applicability of any reasonable local, state or federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling as long as they are applied to all occupants and do not operate to discriminate or have the effect of discriminating on the basis of race, color, national origin, religion, creed, sex, marital status, familial status, age or handicap. Nor does any provision in this chapter regarding familial status or age apply with respect to housing for older persons as defined in § 4602(15) of this title.

*6 Del. C. § 4607(c)*; *cf. City of Edmonds, 514 U.S. 725, 131 L. Ed. 2d 801, 115 S. Ct. 1776* (addressing the scope of the exemption to the Federal Fair Housing Act provided for by *42 U.S.C. § 3607(b)(1))*. Ironically, the City cites this subsection of the DFHA, emphasizing the initial exemption, while failing to pay adequate heed to the ensuing qualification. Def.'s Opening Br. at 39.

[*51]

91  I also reject any argument that because the unmarried students may live elsewhere within the City, (*i.e.*, in exempt areas) the City is essentially free to create "student ghettos" while violating, on the face of the operative ordinance, the terms of the DFHA. Such a novel concept has no known support in the law, nor should it.

In summary, the Plaintiffs have stated a *prima facie*

case that 99-14 discriminates on the basis of marital status under the DFHA. The City did not satisfy its burden of production by articulating a legitimate, non-discriminatory reason for the facial discrimination of 99-14 on the basis of marital status, and, accordingly, did not produce any evidence that raises a genuine issue of fact as to whether it unlawfully discriminated. Therefore, I conclude that 99-14, under the guise of a zoning ordinance, constitutes a discriminatory housing practice under the DFHA. [92]

92  I do not address the Plaintiffs' remaining arguments that 99-14 discriminates on the basis of age or that it violates the DLTC.

2. The Validity of 99-10

The Plaintiffs challenge 99-10 on several grounds. They contend that, much like 99-14, 99-10 impermissibly discriminates [*52] based upon age. The Plaintiffs also argue that 99-10 impinges upon the exclusive jurisdiction of the DLTC by requiring that certain remedies and punitive measures be undertaken by a landlord which would violate the scheme prescribed by the DLTC. Examples of contradictory provisions provided for by 99-10 and cited by the Plaintiffs include mandatory termination of the tenancy upon certain convictions, termination of the tenancy without providing an opportunity for the offending lessee to cure, termination of the tenancy absent notice, vacation by the offending tenants within seven days, and the wholesale disregard by 99-10 for the statutory procedures for effecting summary possession. Finally, the Plaintiffs assert that any ordinance regulating the landlord-tenant relationship is preempted by the DLTC, which constitutes a comprehensive statutory scheme.

The City, in turn, disputes the Plaintiffs' allegation that 99-10 forces landlords to engage in discriminatory practices based upon age or occupation. Furthermore, the City maintains that 99-10 does not interfere with the jurisdiction of the DLTC. The City also notes that "the DLTC regulates the rights and remedies of parties and beneficiaries [*53] under an agreement to rent real property. It does not affect land-use regulation and its provisions are irrelevant to the zoning ordinances of the City." [93] Next, the City argues that the DLTC does not preclude a landlord from terminating a lease and evicting a lessee if that lessee is convicted of engaging in illegal conduct. Finally, the City disagrees with the Plaintiffs' contention that the DLTC preempts any other regulation

of the landlord-tenant relationship.

93  Def.'s Reply Br. at 21-22.

Initially, I reject the City's contention that the DLTC does not apply to zoning ordinances *per se*. [94] 99-10 [HN32] requires that rental agreements under a City rental permit contain specific provisions. If individual landlords would violate the DLTC, a state law, by including such provisions in their rental agreements, then the City is also precluded from requiring landlords to include a similarly offensive provision. To hold otherwise would negate the hierarchal relationship between state and local governments. [95]

94  For these purposes, I accept, but with some skepticism, the City's position that 99-10, which amended the Housing and Property Maintenance portion of the City Code, is a zoning ordinance. *See* Def.'s Opening Br. at 40.

[*54]

95  *See supra* note 46 and accompanying text.

At times, however, the Plaintiffs seem to assert that 99-10 may be struck down under *25 Del. C. § 5101*. *Section 5101(a)* provides:

[HN33] This Code [the DLTC] shall regulate and determine all legal rights, remedies, and obligations of all parties and beneficiaries of any rental agreement of a rental unit within this State, wherever executed. Any rental agreement, whether written or oral, shall be unenforceable insofar as the agreement or any provision thereof conflicts with any provision of this Code, and is not expressly authorized herein.

[HN34] Municipal ordinances are not within the scope of *25 Del. C. § 5101(a)* as this section only addresses the enforceability of "agreements" and, thus, cannot be invalidated pursuant to *25 Del. C. § 5101(a)* [96] Therefore, the enforceability of 99-10 is not governed by *25 Del. C. § 5101(a)*; instead, the question is whether 99-10, a City ordinance, requires the landlords to implement a mandatory lease provision in violation of the DLTC.

96  *Langley v. Elsmere Assocs.*, 1994 Del. Super. LEXIS 134, 1994 WL 149256, at *1 (Del. Super. Feb. 23, 1994).

[*55] [HN35] Pursuant to 99-10, in the event of two or more convictions for a variety of detailed offenses by any tenant, the termination of the rental agreement results. Additionally, "all [tenants at the address of the violator] have no more than seven days to vacate the dwelling from the date of the second such conviction." [97] However, this express, fixed time-frame for vacating the rental unit violates the protective provisions established in the DLTC. Under *Section 5513* of the DLTC:

(a) [HN36] If the tenant breaches any rule or covenant which is material to the rental agreement, the landlord shall notify the tenant of such breach in writing, and shall allow at least 7 days after such notice for remedy or correction of the breach.

* * *

(3) If the tenant's breach of a rule or covenant also constitutes a material breach of an obligation imposed upon tenants by a municipal, county or state code, ordinance or statute, the landlord may terminate the rental agreement and bring an action for summary possession.

[HN37] The grounds for and procedures governing an action for summary possession are set forth in the DLTC [98] and the Rules Governing Civil Practice in the Justice of the [*56] Peace Court of the State of Delaware. Notably, "notice of hearing [for summary possession] and the complaint shall be served at least 5 days and not more than 30 days before the time at which the complaint [for summary possession] is to be heard." [99] Also, significantly, a defendant in an action for summary possession "may demand a trial by jury within 10 days after being served." [100] Finally, the DLTC sets forth the procedures to be followed by the successful plaintiff in an action for summary possession:

(a) [HN38] Upon rendering a final judgment for plaintiff, but in no case prior to the expiration of the time for the filing

2003 Del. Ch. LEXIS 66, *56

of an appeal or motion to vacate or open the judgment, the court shall issue a writ of possession directed to the constable or the sheriff of the county in which the property is located, describing the property and commanding the officer to remove all persons and put the plaintiff into full possession.

(b) The officer to whom the writ of possession is directed and delivered shall give at least 24 hours' notice to the person or persons to be removed and shall execute it between the hours of sunrise and sunset.

* * *

(c) The plaintiff has the obligation [*57] to notify the constable to take the steps necessary to put the plaintiff in full possession.

(d) The issuance of a writ of possession for the removal of a tenant cancels the agreement under which the person removed held the premises and annuls the relationship of landlord and tenant. [101]

97  City of Newark, Del., Ordinance 99-10.
98  See 25 Del. C. Ch. 57.
99  Id. § 5705(a).
100  Id. § 5713(a); J.P. Civ. R. 38.
101  25 Del. C. § 5715.

I conclude that because the terms of 99-10 requiring ouster of the tenants within seven days of the second conviction totally ignore, and conflict with, procedural requirements imposed by the DLTC, it is unenforceable. While the DLTC demands adherence to certain procedures, 99-10 simply ejects offending tenants within a set time-frame, in complete disregard of the Individual Plaintiffs' obligation to satisfy the DLTC's requirements governing the removal of tenants. Although theoretically

the statutory process could be completed within seven days, [102] 99-10 provides no guidance in the event that compliance cannot be achieved in accordance with its schedule. Moreover, a tenant [*58] could lawfully demand a jury trial, a right obviously central to the American system of justice, and such a demand would result in delay beyond the seven-day limit of 99-10. Finally, 99-10 ignores the important roles of an independent judiciary, in providing an opportunity for the tenant to be heard and in issuing a writ of possession, and the constable or sheriff, who executes the writ of possession, in implementing the remedy of summary possession. No landlord could insist upon the inclusion of these provisions in a rental agreement, and neither can the City. [103]

102  I note that, due to practical concerns, this theoretically efficient system does not, in fact, accurately reflect the summary possession action in practice. Moreover, such system is implicitly premised upon a landlord's almost immediate receipt of information regarding the second conviction.
103  I have determined that 99-10, as adopted, is unenforceable. Thus, I do not reach the other arguments asserted by the Plaintiffs in seeking the invalidation of 99-10 under state law.

## IV. CONCLUSION

For the foregoing reasons, the Plaintiffs are granted partial summary judgment on their claim that the Ordinances [*59] are invalid under state law. The City's cross-motion for partial summary judgment is denied. Counsel are requested to confer and submit a form of order to implement this Memorandum Opinion. [104]

104  I have not addressed the question of severability, a topic the City and the Plaintiffs have not argued in any detail, and I defer decision on severability until the parties have had the opportunity to set forth their views in some detail.

John W. Noble

Vice Chancellor

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ISIDORE CORWIN AND BONNIE CORWIN, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No.:  1:07-cv-00152-*** |
| v. | ) ) | |
| B'NAI B'RITH SENIOR CITIZEN HOUSING, INC., SOUTHEASTERN PROPERTY MANAGEMENT, INC., AND LYNNE ROTAN, an agent, servant or employee of B'Nai B'Rith Senior Citizen Housing, Inc., | ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

<u>**ORDER**</u>

This matter having been brought before the Court by Daniel A. Griffith, Esquire of Marshall, Dennehey, Warner, Coleman & Goggin, attorneys for the Defendants; and the Court having considered the moving papers and any opposition filed thereto; and having heard the arguments of counsel; and for other and further good cause shown;

It is on this          day of                    , 2007, hereby **ORDERED** and **ADJUDGED** that Plaintiffs' Complaint be and hereby are **DISMISSED** pursuant to Fed. R. Civ. P. 12 (b)(6) for failure to state a claim upon which relief can be granted.

_____
J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ISIDORE CORWIN AND BONNIE )
CORWIN, )
                    )
        Plaintiffs, )
                    )    C.A. No.:  1:07-cv-00152-***
      v. )
                    )
B'NAI B'RITH SENIOR CITIZEN )    JURY TRIAL DEMANDED
HOUSING, INC., SOUTHEASTERN )
PROPERTY MANAGEMENT, INC., )
AND LYNNE ROTAN, an agent, )
servant or employee of B'Nai B'Rith )
Senior Citizen Housing, Inc., )
                    )
        Defendants. )

## CERTIFICATE OF SERVICE

      I, Daniel A. Griffith, Esquire hereby certify that on the date indicated below a true and

correct copy of Defendants' Notice of Motion to Dismiss Plaintiffs' Complaint pursuant to Fed.

R. Civ. P. 12(b)(6), Opening Brief in support of the Motion, and proposed Order were forwarded

to the below named addressee via electronic filing and U.S. Mail, postage pre-paid:

Isidore Corwin
Bonnie Corwin
B'Nai B'Rith House
8000 Society Drive
Apartment #608
Claymont, DE 19703-1749

                                    **MARSHALL, DENNEHEY, WARNER,**
                                       **COLEMAN & GOGGIN**

                              */s/ Daniel A. Griffith, Esquire DE ID 4209*
                              DANIEL A. GRIFFITH, ESQUIRE
                              Delaware Bar I.D. No. 4209
                              1220 N. Market Street
                              P.O. Box 8888
                              Wilmington, DE 19899-8888
                              (302) 552-4300
                              *Attorney for Defendants*

Dated: April 25, 2007