U.S. DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| ISIDORE CORWIN AND BONNIE CORWIN | : | CIVIL ACTION |
| (INFORMA PAUPERIS STATUS) | : | |
| | : | |
| PLAINTIFFS, | : | |
| | : | NO. 07-CV-152-*** |
| V. | : | JURY TRIAL DEMANDED |
| | : | |
| B'NAI B'RITH SENIOR CITIZEN HOUSING, INC., | : | |
| ET AL | : | |
| DEFENDANTS. | : | |

- - -



FILED

JUN - 6 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PURSUANT TO FED R. CIV. P. 56 ( C ), PLAINTIFFS HEREBY MOTION FOR
SUMMARY JUDGMENT AND FOR THIS REASON:

### I. DESCRIPTION OF THE PARTIES:

PLAINTIFFS FILED THE ORIGINAL COMPLAINT ON MARCH 15, 2007,
ALLEGING THAT PLAINTIFFS WERE INJURED BY DISCRIMINATORY ACTS, BASED
ON NATIONAL ORIGIN, BY DEFENDANTS B'NAI B'RITH SENIOR CITIZEN HOUSING,
INC; SOUTHEASTERN PROPERTY MANAGEMENT, INC.; LYNN ROTAN, MANAGER,
B'NAI B'RITH SENIOR CITIZEN HOUSING, INC.; (AND PLAINTIFFS' SUBSEQUENT
PETITION TO ENJOIN DEFENDANT WILMINGTON LODGE 470, B'NAI B'RITH, INC).

PLAINTIFFS ALLEGE THE DEFENDANTS ARE RESPONSIBLE FOR
DISCRIMINATORY TERMS, CONDITIONS, PRIVILEGES, OR SERVICES; WITH THE
MOST RECENT ACT ALLEGED TO HAVE OCCURRED ON OCTOBER 30, 2006, AND IS
CONTINUING.

THE PROPERTY IS LOCATED AT 8000 SOCIETY DRIVE, CLAYMONT, DE 19703
(*C-1) AND IS NOT EXEMPT UNDER THE APPLICABLE STATUTES. IF PROVEN IN
THE MOTION FOR SUMMARY JUDGMENT, PLAINTIFFS' ALLEGATIONS WOULD
CONSTITUTE A VIOLATION OF TITLE VIII OF THE CIVIL RIGHTS ACT OF 1968, AS

1

AMENDED BY THE FAIR HOUSING ACT OF 1988, AND A VIOLATION OF THE UNITED
STATES CONSTITUTION.

THE B'NAI B'RITH APARTMENT HOUSE IS LOCATED ON THE
AFOREMENTIONED SUBJECT PROPERTY. THE APARTMENT HOUSE RECEIVES
FEDERAL FUNDING IN THE FORM OF HUD ASSISTED HOUSING 202, 811, 221D4,
PROJECT BASED SECTION 8, AND IS SUBJECT TO SUBSTANTIAL FEDERAL AND
STATE REGULATIONS. A PROMINENT SIGN IS POSTED IN THE LOBBY:

**"WE DO BUSINESS IN ACCORDANCE WITH THE FEDERAL FAIR HOUSING LAW"** FN1

----------FOOTNOTE--------------------
FN1 "THE (B'NAI B'RITH HOUSE) SHOULD NOT, ON THE BASIS OF RACE, COLOR, *NATIONAL ORIGIN,*
RELIGION, SEX, FAMILIAL STATUS, AND HANDICAP STATUS, DIRECTLY OR INDIRECTLY
DIFFERENTIATE AMONG PERSONS IN THE TYPES OF PROGRAM, SERVICES, AIDS, OR BENEFITS IT
PROVIDES OR THE MANNER IN WHICH IT PROVIDES THEM." ( HUD HANDBOOK 4350.3 REV-1,
APPENDIX 2). (EMPHASIS ADDED).
----------END FOOTNOTE--------------

## II.   STATEMENT OF THE FACTS:

ON OR ABOUT SEPTEMBER 9, 2006, PLAINTIFFS SENT A WRITTEN REQUEST
TO THE DEFENDANTS SEEKING PERMISSION TO HANG THEIR AMERICAN FLAG ON
THEIR RESPECTIVE BALCONY. ON SEPTEMBER 15, 2006, PLAINTIFFS RECEIVED A
NOTICE FROM THE DEFENDANTS DEMANDING THAT PLAINTIFFS AND ALL
TENANTS AT THE FACILITY REMOVE THEIR FLAGS (INCLUDING AMERICAN AND
OTHER FLAGS), *PROMPTLY* FROM THEIR BALCONIES. (*C-2).

THE *AMERICAN* FLAG IS A SACRED SYMBOL THAT REPRESENTS
PLAINTIFFS' AND OTHERS' NATIONAL ORIGIN AT THE FACILITY. PLAINTIFFS'
PERSONAL *AMERICAN* FLAG HAS BEEN IN THE SAME LOCATION FOR THE PAST
YEARS, ON THEIR RENTED BALCONY ON CERTAIN NATIONAL HOLIDAYS; (AND
AT THIS SAME LOCATION IS WHERE DEFENDANTS, THEMSELVES, IN A NOBEL
CAUSE, HAD POSTED THE BUILDINGS' HUD-FUNDED *AMERICAN* FLAG ON
PLAINTIFFS' BALCONY AND ON OTHER TENANTS' BALCONIES, IN A HUD-
APPROVED FLAG PROGRAM FROM YEAR TO YEAR, BETWEEN 2001 AND 2004).

OTHERS' PERSONAL *AMERICAN* FLAGS IN PAST YEARS, MOST NOTABLY
AMERICAN-CITIZEN TENANTS AT THE MULTI-ETHNIC APARTMENT FACILITY,
DISPLAY THEIR FLAGS, EVEN LARGER THAN PLAINTIFFS' AMERICAN FLAG, AND
TO PLAINTIFFS' KNOWLEDGE, WERE NEVER DIRECTED TO REMOVE THEIR FLAGS
UNTIL DEFENDANTS' SEPTEMBER 15, 2006 NOTICE. (*C-3).

TOO, OTHER RESIDENTS DECORATE THEIR BALCONIES WITH HANGING WIND CHIMES AND HANGING PATIO UMBRELLAS, AND TO PLAINTIFFS' KNOWLEDGE WERE NEVER DIRECTED TO REMOVE THEM. (*C-4).

THE DEFENDANTS' ORIGINAL FLAG POLICY SCHEME IS WITHIN DEFENDANTS' BYLAW, RULE #15, WHICH READS:

BALCONIES/PORCHES/PATIOS....

> **NO MOPS, CLOTHING, CLOTHES LINES, RUGS OR *OTHER* ARTICLES SHALL BE HUNG OUTSIDE OF THE PREMISES.** NO RUGS OR DUST MOPS SHALL BE BEATEN, CLEANED OR SHAKEN OUT OF THE WINDOWS, ... BALCONIES, OR IN HALLS..., NOR SHALL ANYTHING BE THROWN OR SWEPT BY THE RESIDENTS OR THEIR GUESTS OUT OF THE WINDOWS, DOORS... ONLY PATIO FURNITURE AND LIVE PLANTS MAY BE STORED ON...BALCONIES. NO PERSONAL BELONGINGS OF THE RESIDENT MAY BE STORED ON THE BALCONY...UNLESS APPROVED BY MANAGEMENT... . NO GAS GRILLING, CHARCOAL GRILLING, OR FOOD/SMOKERS ARE ALLOWED ...ON RESIDENT'S...BALCONY. ...
> (**BOLD**; EMPHASIS ADDED). (*C-5)

ON SEPTEMBER 18, 2006, DEFENDANTS ISSUED ANOTHER MEMO TO ALL TENANTS WHERE FLAGS COULD RETURN TO TENANTS' BALCONIES; BUT, ONLY A FLAG OF A PARTICULAR SIZE, ONES THAT CAN BE PLACED IN THE SIZE OF A "FLOWER POT", AND FLAGS THAT CAN DRAPE ON A CHAIR (*C-6), ARE PROVIDED FOR IN THE SEPTEMBER 18, 2006 FLAG POLICY AMENDMENT. OTHERWISE, FLAGS CANNOT HANG ON BALCONIES.

PLAINTIFFS ARE MEMBERS OF A PROTECTED CLASS (NATIONAL ORIGIN; AMERICAN CITIZENS). PLAINTIFFS HAVE A LARGER *AMERICAN* FLAG (3' X 5') THAT OBVIOUSLY CANNOT BE DISPLAYED IN THE PARTICULAR CIRCUMSTANCE, IN A "FLOWER POT", AND WHERE THE UNITED STATES FLAG CODE *FORBIDS* THE *AMERICAN* FLAG TO BE DRAPED (*C-7); AND IS WHERE PLAINTIFFS' FLAG IS *RESTRICTED* FROM DRAPING ON A CHAIR ON THEIR RESPECTIVE BALCONY.

ON OCTOBER 12, 2006, PLAINTIFFS WROTE A LETTER TO DEFENDANTS IN ORDER TO PROCURE EQUIVALENT STANDING FOR THEIR 3' X 5' AMERICAN FLAG (HAVING BEEN AUTOMATICALLY BANNED FROM DISPLAY IN THE ISSUING OF THE SEPTEMBER 18, 2006 MEMO), WITH AN ALTERNATIVE REQUEST TO HANG PLAINTIFFS' FLAG ON THEIR BALCONY *RAIL* (AS DO THE ½ DOZEN PATIO UMBRELLAS HANG ON OTHER BALCONY RAILS AT THE FACILITY).

ON OCTOBER 30, 2006, DEFENDANT ROTAN PREPARED A ONE-SENTENCE LETTER RESPONSE, WITH DEFENDANT ROTAN'S SIGNATURE, AND SENT IT TO THE PLAINTIFFS, STATING: "THE ANSWER IS NO...". (*C-8). (THE INTENT OF THE

DEFENDANT'S LETTER RESPONSE, ALLEGEDLY, SUPPORTS NATIONAL ORIGIN
DISCRIMINATION AGAINST INDIVIDUALS, SPECIFICALLY WITH LARGER
*AMERICAN* FLAGS, RATHER THAN INCLUSION).

ON NOVEMBER 15, 2006, PLAINTIFFS REQUESTED IF DEFENDANTS WOULD
REVIEW THEIR FLAG POLICY.  ON NOVEMBER 20, 2006, DEFENDANTS
RESPONDED TO PLAINTIFFS' REQUEST, STATING THAT B'NAI B'RITH HOUSE HAS
A RULE THAT PLAINTIFFS CANNOT ATTACHED ANYTHING TO THE BALCONY,
(AND) THAT PLAINTIFFS' AMERICAN FLAG CAN'T BE ATTACHED OR AFFIXED TO
THE BALCONY RAILING. (*C-9).

### III. STATEMENT OF JURISDICTION :

PLAINTIFFS ALLEGE LANDLORD-OPPRESSION IN PLAINTIFFS' AND
OTHERS INABILITY TO FLY THEIR LARGER AMERICAN FLAGS ON THEIR
RESPECTIVE BALCONIES AT THE FACILITY, AND WITHOUT AN AVENUE FOR
REDRESS, EXCEPT THROUGH YOUR COURT.  THE COURT HAS SUBJECT MATTER
JURISDICTION, 28 U.S.C. SECTIONS 1331, (**3)  1343 (A)(3), (4)).

### IV. ARGUMENT:

AT THE DOCKET, IN DEFENDANTS' FILED OPPOSITIONS TO PLAINTIFFS'
ORIGINAL COMPLAINT, THERE IS NO GENUINE ISSUE OF MATERIAL FACT.
PLAINTIFFS BELIEVE THEY ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.
FED. R. CIV. P. 56 ( C ); CELOTEX CORP. V. CATRETT, 477 U.S. 317, 323, 106 S. CT. 2548
( 1986); AND THAT A SUMMARY JUDGMENT IS APPROPRIATE.

DEFENDANTS' MAKE THE CASE IN THEIR FILED "MOTION TO DISMISS"
THAT THE DEFENDANTS ARE NOT "STATE ACTORS" AND THAT THE COMPLAINT
SHOULD BE DISMISSED WITH REGARD TO PLAINTIFFS' UNCONSTITUTIONALITY
CLAIMS.  PLAINTIFFS CHALLENGE THE DEFENDANTS' REASONING.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IS NOT ONLY OF
THEMSELVES, BUT OF OTHERS; WHERE PLAINTIFFS BRING THE MOTION
PURSUANT TO 42 U.S.C. SECTION 1983, FOR  DECLARATORY JUDGMENT;
PURSUANT TO 28 U.S.C. SECTION 2201, WHERE PLAINTIFFS ALLEGE DEFENDANTS'
FLAG POLICY IS UNCONSTITUTIONAL ON ITS FACE; FOR INJUNCTIVE RELIEF
AGAINST THE ENFORCEMENT OF THE FLAG POLICY; AND FOR MONEY DAMAGES.

THE 1ST AMENDMENT PROTECTION PROHIBITS CONTENT-BASED

4

RESTRICTIONS ON SPEECH (WHITTON V. CITY OF GLADSTONE, 54 F. 3D 1400, 1405, (8TH CIR. 1995)). DEFENDANTS' FLAG POLICY IS ALLEGEDLY A CONTENT-BASED PROHIBITION OF SPEECH, WHERE THE FLAG POLICY FOR TENANTS' BALCONIES FAILS TO PROVIDE FOR LARGER *AMERICAN* FLAGS, IN PARTICULAR, PLAINTIFFS' 3' X 5' AMERICAN FLAG AND ITS MESSAGE; AND WHERE DEFENDANTS' FLAG POLICY IS NEITHER NECESSARY OR NARROWLY TAILORED TO MEET A COMPELLING STATE INTEREST.

PLAINTIFFS CLAIM THE DEFENDANTS ACTED UNDER COLOR A STATE LAW IN THEIR FLAG POLICY, AS REQUIRED BY 42 U.S.C. SECTION 1983. FN 2

--------FOOTNOTE--------------
FN2 "EVERY PERSON WHO, UNDER COLOR OF ANY STATUE, ORDINANCE, REGULATION, CUSTOM OR USAGE, OF ANY STATE...SUBJECTS, OR CAUSES TO BE SUBJECTED, ANY CITIZEN OF THE UNITED STATES...TO DEPRIVATION OF ANY RIGHTS, PRIVILEGES, OR IMMUNITIES SECURED BY THE CONSTITUTION AND LAWS, SHALL BE LIABLE TO THE PARTY INJURED IN AN ACTION OF LAW, SUIT IN EQUITY, OR OTHER PROPER PROCEEDING FOR REDRESS..." . (CIVIL ACTION FOR DEPRIVATION OF RIGHTS, 42 U.S.C. SECTION 1983).
--------END FOOTNOTE--------------

IN THE DEFENDANTS' ALLEGED UNCONSTITUTIONAL FLAG POLICY ACTIONS TOWARDS PLAINTIFFS AND OTHERS, PLAINTIFFS ALLEGE DEFENDANTS' ACTIONS ARE ATTRIBUTABLE TO THE STATE, UNDER BOTH THE CLOSE NEXUS TEST AND THE SYMBIOTIC RELATIONSHIP TEST (I.E. A JOINT VENTURE BETWEEN A LOCAL GOVERNMENT UNIT, THE DELAWARE STATE HOUSING AUTHORITY (HEREAFTER DSHA) AND THE B'NAI B'RITH HOUSE (HEREAFTER BBH)).

THE SUPREME COURT ESTABLISHED THE CLOSE NEXUS TEST IN JACKSON V. METROPOLITAN EDISON CO., 419 U.S. 345, 95 S. CT 449 (1974). PLAINTIFFS ALLEGE THERE IS A SUFFICIENTLY "CLOSE NEXUS" BETWEEN THE DSHA AND THE BBH WHERE THE DSHA (THE HUD CONTRACT ADMINISTRATOR AT THE BBH) EXERCISES SUFFICIENT CONTROL OVER THE BBH THROUGH ITS REGULATORY POWERS AND, THEREFORE, MAKES THE ACTIONS OF BBH IN ITS' FLAG POLICY ATTRIBUTABLE TO THE STATE, FOR 14TH AMENDMENT PURPOSES.

BEGINNING 2001, DEFENDANTS HAD TO RECEIVE DSHA'S APPROVAL IN THE THEN DEFENDANTS' PROPOSED FLAG PROGRAM TO STRAP *AMERICAN* FLAGS, OUTSIDE THE PREMISES, ON TENANTS' BALCONY RAILS.

THIS ABOVE AFOREMENTIONED BBH'S FLAG PROGRAM APPLICATION FOR APPROVAL BY THE DSHA, IS WHERE DEFENDANTS WERE *OBLIGATED* TO APPLY TO THE DSHA, WHO, IN TURN, APPROVED THE DEFENDANTS' FLAG PROGRAM.

AS A PRIVATE OWNER OF THE HUD-SUBSIDIZED APARTMENT BUILDING, THE DEFENDANTS *DO NOT HAVE* THE ABILITY TO INCLUDE OR EXCLUDE ACTIONS OR PROGRAMS AT THE BBH, AS IT IS EXTENSIVELY REGULATED BY HUD. THE 2001 DEFENDANTS' FLAG PROGRAM IS AN EXAMPLE THE EXTENSIVE REGULATIONS WHICH ARE "INEXTRICABLY INTERTWINED" BETWEEN THE APARTMENT HOUSE AND THE DSHA.

IN 2001, TENANTS WERE GIVEN NOTICE OF THE DEFENDANTS' APPROVED FLAG PROGRAM, WITH AN AVENUE TO DECLINE (AS THE FLAG PROGRAM WAS DESIGNED TO APPLY TO THE TENANTS' RESPECTIVE BALCONY RAILS). NO NOTICE WAS GIVEN TO TENANTS THAT THE DEFENDANTS' FLAG PROGRAM WAS AN EXCEPTION TO ANY HOUSE RULE, INCLUDING THE BBH HOUSE RULE # 15.

POST DEFENDANTS' OPERATING THE FEDERALLY FUNDED FLAG PROGRAM FOR THREE YEARS ON VIRTUALLY ALL 208 APARTMENT BALCONY RAILS AT THE FACILITY, DEFENDANTS REMOVED THE AMERICAN FLAGS IN LATE SUMMER OF 2004 (OSTENSIBLY BECAUSE THE FLAGS HAD BECOME WORN AND TATTERED). NO NOTICE OF THE FLAG REMOVAL WAS GIVEN TO TENANTS. IN TURN, PLAINTIFFS AND OTHERS HUNG THEIR OWN FLAGS AT THEIR BALCONY SITE AND TO PLAINTIFFS' KNOWLEDGE, NO TENANT WAS EVER DIRECTED TO REMOVE THE FLAGS UNTIL SEPTEMBER 15, 2006.

INITIALLY, IN 2006, HUD AUTHORIZED THE DELAWARE STATE HOUSING AUTHORITY TO INVESTIGATE PLAINTIFFS' ORIGINAL JULY 27, 2006 FLAG POLICY COMPLAINT, WHERE IT WAS RUMORED TO PLAINTIFFS THAT TENANTS COULD NO LONGER FLY THEIR FLAGS (INCLUDING AMERICAN FLAGS) ON THEIR RENTED BALCONIES (*C-10). DSHA MADE IT'S AUGUST 31, 2006 DETERMINATION, DECLARING THE COMPLAINT "*RESOLVED*", WHEN THE DSHA INVESTIGATOR SAW NO FLAGS FLYING THAT DAY ON THE BALCONIES AT THE FACILITY. (*C-11).

EVEN THOUGH BBH PRIVATELY PAYS EMPLOYEES, THE DSHA *OVERSEES* THE OPERATIONS AT THE BBH. DSHA DETERMINES IF THE BBH IS PROVIDING DECENT, SAFE, AND SANITARY HOUSING AND IS COMPLYING WITH HUD'S OCCUPANCY AND FINANCIAL REQUIREMENTS. THE REGULATORY SCHEME AT THE BBH IN IT'S BALCONY RULE AND CORRELATING FLAG POLICY, PLAINTIFFS ALLEGE ARE "FAIRLY ATTRIBUTABLE" TO THE STATE.

6

THE DEFENDANTS, ALLEGED "STATE ACTORS", IS WHERE THE SUPREME COURT FIRST ARTICULATED THE CLOSE NEXUS TEST AND THE SYMBIOTIC RELATIONSHIP TEST (BURTON V. WILMINGTON PARKING AUTHORITY, 365 U.S. 715, 81 S. CT. 856 (1961). THE ALLEGED SYMBIOTIC RELATIONSHIP BETWEEN DSHA AND BBH, IS WHERE DSHA IS NOT ONLY RESPONSIBLE FOR BBH MANAGEMENT REVIEWS (*C-12); BUILDING AND APARTMENT INSPECTIONS (*C-13); TRAINING OF DEFENDANT ROTAN (*C-14); COMMUNICATION E-MAILS BETWEEN DSHA AND BBH (*C-15 & 16); REVIEW OF THE DEFENDANTS' PETITIONED INCREASE IN THE MAXIMUM PERMISSIBLE RENT (*C-17); BUT, ALSO WHERE THE ACTUAL *CONSTRUCTION* OF THE BBH WAS PROVIDED FOR BY DSHA (*C-18). WHEN BBH PUBLISHES ADVERTISEMENTS, INDICATING THE AVAILABILITY OF HOUSING AT BBH TO THE PUBLIC, DSHA REVIEWS AND APPROVES THE MARKET PLAN (*C-19). TOO, SUBSIDY FUNDS FOR BBH ARE PROVIDED FOR BY HUD, THROUGH DSHA (AT *C-18); AND WHERE THE LANDLORD ON A MORTGAGE AT BBH HAD ENTERED INTO A HOUSING ASSISTANCE PAYMENTS CONTRACT WITH DSHA (*C-20), PLAINTIFFS CONTEND THIS IS FURTHER PROOF THAT BBH ACTS UNDER COLOR OF STATE LAW, AND IN ITS DIRECT FINANCIAL DEALINGS WITH DSHA. DSHA HAS A SUBSTANTIAL FINANCIAL INTEREST IN BBH WHERE BBH ACTS ESSENTIALLY LIKE A GOVERNMENT CONTRACTOR – WHERE THE STATE PAYS BBH A COMMISSION FOR HOUSING AND OPERATING A SECTION EIGHT/202 COMPLEX.

(AT 365 U.S. AT 724 IT STATES THAT THE COURT HELD THAT THE STATE HAD "SO FAR INSINUATED ITSELF INTO A POSITION OF INTERDEPENDENCE WITH THE PARTY THAT IT MUST BE *RECOGNIZED* AS A JOINT PARTICIPANT.")

WITH THE ONGOING DSHA'S OBLIGATIONS AND RESPONSIBILITIES REGARDING FAIR HOUSING AT BBH, THIS FACT ALONE INDICATES THE DEGREE OF STATE PARTICIPATION AND INVOLVEMENT IN THE DEFENDANTS' FLAG POLICY AND THE FLAG POLICY'S ALLEGEDLY DISCRIMINATORY ACTION WHERE IT WAS THE DESIGN OF THE 14TH AMENDMENT TO CONDEMN SUCH.

FIRST AMENDMENT PROTECTIONS ARE NOT DEPENDENT UPON THE POPULARITY OF THE VIEWS OR POSITION TAKEN BY THE DEFENDANTS, AS IN THE SIZE AND MANNER OF FLAGS ALLOTTED FOR ON TENANT BALCONIES AT THE FACILITY, NOR DO THEY ONLY SERVE TO PROTECT THE INTERESTS OF

7

THOSE IN THE MAJORITY (TENANTS WITH SMALLER FLAGS THAT CAN FIT IN A
FLOWER POT OR OTHER-NATIONAL ORIGIN FLAGS THAT ARE ABLE TO DRAPE ON
A CHAIR).

BESIDES ALLEGED CONSTITUTIONAL VIOLATIONS, PLAINTIFFS ALLEGE IN
THEIR COMPLAINT DEFENDANTS' ALLEGED VIOLATION OF TITLE VIII OF THE
CIVIL RIGHTS ACT OF 1988 AND VIOLATIONS OF THE DELAWARE FAIR HOUSING
ACT, 6 DEL. C. SECTION 4601 ET *SEQ.* AND THIS IS WHERE PLAINTIFFS CONTEND
THEY ARE BEING TREATED *DIFFERENTLY* (*C-21, (2-5,B5)) IN THE DISPLAY OF
THEIR 3' X 5' NATIONAL ORIGIN'S FLAG, WHERE A ½ DOZEN PATIO UMBRELLAS
ARE PERMITTED BY DEFENDANTS TO BE ON DISPLAY ON BALCONY RAILS (*C-22),
BUT NOT PLAINTIFFS' AMERICAN FLAG.

THE FLAG POLICY EXAMINED UNDER REASONABLENESS, PLUS A LACK OF
DISCRIMINATORY INTENT (ROSENBERGER, 515 U.S. AT 829), IS WHERE PLAINTIFFS
ARGUE THAT THEIR FUNDAMENTAL RIGHTS TO FREE SPEECH HAVE BEEN
SUPPRESSED BY THE DEFENDANTS WHERE THE DEFENDANTS HAVE ALLOWED
PATIO UMBRELLAS TO HANG ON TENANTS' BALCONY RAILS, BUT DENY
PLAINTIFFS THE SAME OPPORTUNITY TO EXPRESS THEIR NATIONAL ORIGIN
MESSAGE WITH THEIR AMERICAN FLAG ON AN IDENTICAL BALCONY RAIL.

ON NATIONALLY-CELEBRATED VETERANS DAY, 2006, WITH PLAINTIFFS'
FAILED ATTEMPT TO DISPLAY THEIR PATRIOTISM TO AMERICA AND TO MR.
PLAINTIFFS' FATHER (A WORLD WAR I VETERAN (*C-23)) IN THE HANGING OF
THEIR AMERICAN FLAG ON THEIR BALCONY RAIL, THIS IS EXACTLY WHEN
DEFENDANTS' "UNREASONABLENESS" IN THE REFUSAL OF SUCH, WHILE
PERMITTING THE LARGER UMBRELLAS TO HANG ON BALCONY RAILS, HAD A
SIGNIFICANT ADVERSE IMPACT ON THE PLAINTIFFS THAT DAY, BASED ON THEIR
NATIONAL ORIGIN(*C-24 (2-13,C)).

IN CLARK V. JETER, 486 U.S. 456, 461, IF A LAW BURDENS A FUNDAMENTAL
RIGHT, THEN THE COURT MUST APPLY STRICT SCRUTINY TO THE LAW.
PLAINTIFFS SUGGEST IF A COURT EXAMINED DEFENDANTS' FLAG POLICY UNDER
STRICT SCRUTINY (PERRY, 460 U.S. AT 46), WHERE THERE WAS NO COMPELLING
REASON GIVEN FOR THE DENIAL OF PLAINTIFFS' REQUEST TO FLY THEIR
AMERICAN FLAG ON THEIR BALCONY RAIL, IS WHERE THE POLICY WOULD FAIL.

8

RESTRICTIONS ON SPEECH IN NONPUBLIC FORA ARE "REASONABLE" WHEN "CONSISTENT WITH THE (GOVERNMENT'S) LEGITIMATE INTEREST IN PRESERVING THE PROPERTY….FOR THE USE TO WHICH IT IS LAWFULLY DEDICATED." (PERRY, 460 U.S. AT 50-51; POSTAL SERVICE V. COUNCIL OF GREENBURGH CIVIC ASSNS., 453 U.S. 114, 129-130). IN DEFENDANTS' SEPTEMBER 15, 2006 MEMO, DEFENDANTS STATE BECAUSE OF "SAFETY CONCERNS" DEFENDANTS CANNOT ALLOW FLAGS OR ANY OTHER HANGING ITEMS ON TENANTS' BALCONIES. THE STATE'S INTEREST IN THE BBH'S FLAG POLICY IS APPARENTLY "SAFETY".

THE SUPREME COURT HELD THAT THE GOVERNMENT MUST PRESENT SUBSTANTIAL SUPPORTING EVIDENCE IN ORDER FOR A REGULATION THAT THREATENS SPEECH TO BE UPHELD: "WHEN THE GOVERNMENT DEFENDS A REGULATION ON SPEECH AS A MEANS TO …PREVENT ANTICIPATED HARMS, IT MUST DO MORE THAN SIMPLY POSIT THE EXISTENCE OF THE DISEASE TO BE CURED. IT MUST DEMONSTRATE THAT THE RECITED HARMS ARE REAL, NOT MERELY CONJECTURAL, AND THAT THE REGULATION WILL IN FACT ALLEVIATE THESE HARMS IN A DIRECT AND MATERIAL WAY". TURNER, 512 U.S. AT 664, QUOTED AT ECLIPSE ENTERPRISES, INC. V. THOMAS GULOTTA, 134 F. 3D 63; 1997.

TITLE VIII DOES NOT *ALLOW* OPERATORS OF HUD-SUBSIDIZED APARTMENT FACILITIES "TO DISCRIMINATE AGAINST ANY PERSON IN THE TERMS, CONDITIONS, OR PRIVILEGES OF … RENTAL OF A DWELLING, OR IN THE PROVISION OF SERVICES OR FACILITIES IN CONNECTION THEREWITH, BECAUSE OF … NATIONAL ORIGIN." 42 U.S.C.A. SECTIONS 3603(B) AND 3607 FN3

-------------FOOTNOTE---------
FN3. THE CORRESPONDING PROVISION OF THE DELAWARE FAIR HOUSING ACT (DFHA) PROHIBITS COVERED HOUSING FACILITY OWNERS AND OPERATORS "TO DISCRIMINATE AGAINST ANY PERSON IN THE TERMS, CONDITIONS OR PRIVILEGES OF … RENTAL OF A DWELLING, OR IN THE PROVISION OF SERVICES OR FACILITIES IN CONNECTION THEREWITH, BECAUSE OF RACE, COLOR, *NATIONAL ORIGIN*…." DEL. C. SECTION 4603(B)(2). (EMPHASIS ADDED).
-------------END FOOTNOTE---------

THE ALLEGED AFOREMENTIONED SYMBIOTIC RELATIONSHIP BETWEEN DSHA AND BBH NEEDS TO INCLUDE EVIDENCE OF DETAILED REGULATIONS FOR BBH UNDER GENERAL HUD PROGRAM REQUIREMENTS 24 CFR PART 5 AND 4350.3 HANDBOOK, WHERE BBH CAN OPERATE AND ADMINISTER AND PROMULGATE NEW RULES. HOWEVER, HOUSE RULES SUCH AS THE DEFENDANTS' FLAG POLICY

MUST ABIDE BY THE HUD HANDBOOK. (SEE HOUSE RULES SECTION 6-9, A.#2, WHERE THE FLAG POLICY MUST NOT INFRINGE ON TENANTS' RIGHTS; MUST NOT CREATE A DISPARATE IMPACT ON TENANTS (A.#4); MUST NOT DISCRIMINATE AGAINST INDIVIDUALS BASED UPON MEMBERSHIP IN A PROTECTED CLASS (B.#D); AND MUST NOT BE EXCESSIVE OR EXTREME, BUT FAIR (B.#E.1)). (*C-25).

## V. CONCLUSION

PLAINTIFFS BELIEVE THAT HAVE SUCCEEDED IN OFFERING EVIDENCE IN THEIR MOTION FOR SUMMARY JUDGMENT IN THAT THE DEFENDANTS (*C-26) ACTED UNDER COLOR OF STATE LAW AS REQUIRED IN A SECTION 1983 CLAIM; AND THAT THE COURT WILL GRANT SUMMARY JUDGMENT.

PLAINTIFFS ALLEGE THE RESULT ACHIEVED BY DEFENDANTS' AMENDED FLAG POLICY DOES NOT ERADICATE THE EFFECTS OF THE FREE SPEECH VIOLATION ON PLAINTIFFS... AND TO ALLOW IT TO DO SO, WOULD BE TO PERMIT THE DEFENDANTS TO EFFECTIVELY "SILENCE" PLAINTIFFS AND OTHERS' PRIVATE VIEWS BY "TAKING OVER" THE CONTENTS AND MANNER OF A FLAG DISPLAY OF THE LARGER *AMERICAN* FLAGS THAT WERE FORMERLY APPROVED.

PLAINTIFFS CLAIM THAT THE DEFENDANTS HAVE WRONGFULLY DISCRIMINATED AGAINST PLAINTIFFS, BASED ON FACTS THAT THE DEFENDANTS' FLAG POLICY APPLICATION UNCONSTITUTIONALLY AND ARBITRARILY DENIES PLAINTIFFS' 3' X 5' *AMERICAN* FLAG TO BE ON DISPLAY ON PLAINTIFFS' BALCONY, AND WHERE THE TITLE VIII DEFENDANTS HAVE NOT SHOWN ANY JUSTIFICATION FOR ITS ACTIONS (AND POSSIBLY WHERE AN AFFIRMATIVE COURSE OF ACTION COULD HAVE BEEN TAKEN, BUT WAS NOT ADOPTED, THAT WOULD HAVE ENABLED DEFENDANTS' "BONA FIDE INTEREST" TO BE SERVED WITH LESS DISCRIMINATORY IMPACT ON PLAINTIFFS).

PLAINTIFFS, THEREFORE, SEEK RELIEF THAT PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT BE GRANTED AND THAT THE DEFENDANTS' FLAG POLICY BE DECLARED INVALID; AND, BECAUSE THE ALLEGEDLY UNLAWFUL SECTIONS OF THE FLAG POLICY ARE INTEGRAL TO THE B'NAI B'RITH HOUSE BALCONY RULE NO. 15 AND CANNOT BE SEVERED, PLAINTIFFS BELIEVE DEFENDANTS' FLAG POLICY SHOULD BE EXEMPT, INVALIDATED IN ITS ENTIRETY, AS APART OF HOUSE RULE NO. 15 AND STRUCK DOWN ON ITS FACE.

## SIGNATURE PAGE

RESPECTFULLY SUBMITTED BY:

*Isidore Corwin POA Bonnie Corwin*

ISIDORE CORWIN, PLAINTIFF PRO SE
B'NAI B'RITH SENIOR HOUSING APARTMENT COMPLEX
APT. 608
8000 SOCIETY DRIVE
CLAYMONT, DELAWARE, 19703
PHONE/FAX 302-798-5116

*Bonnie Corwin*

BONNIE CORWIN, PLAINTIFF PRO SE
B'NAI B'RITH SENIOR HOUSING APARTMENT COMPLEX
APT. 608
8000 SOCIETY DRIVE
CLAYMONT, DELAWARE, 19703
PHONE/FAX 302-798-5116

DATED    *June 5, 2007*

ATTACHMENTS:  CERTIFICATION IN LIEU OF OATH OR AFFIDAVIT.

EXHIBITS: EXHIBIT LIST (25)

## CERTIFICATION IN LIEU OF OATH OR AFFIDAVIT

*WE,  **ISIDORE AND BONNIE CORWIN,**  CERTIFY THAT THE FOREGOING STATEMENTS IN THE "MOTION FOR SUMMARY JUDGMENT" MADE BY US ARE TRUE AND TO THE BEST OF OUR KNOWLEDGE.*

*WE CERTIFY THAT WE HAVE PROVIDED ALL INFORMATION AVAILABLE TO THE PRESIDING MAGISTRATE IN THIS CASE, AND WITH COPY OF THE "MOTION FOR SUMMARY JUDGMENT" SENT VIA U.S. MAIL  TO THE ATTORNEY WHO HAS GIVEN HIS APPEARANCE IN THE CASE.*

*WE FURTHER CERTIFY THAT THE ATTACHED ENCLOSURES ARE TRUE AND SUCH STATEMENTS AND ENCLOSURES ARE EXACT COPIES.*

RESPECTFULLY SUBMITTED,
***ISIDORE CORWIN AND BONNIE CORWIN***

BY:

BY:

DATED:

# CORWIN V. B'NAI B'RITH SENIOR ET AL

## CASE NO. 07-152 ***

\*\*\*\*\*\*

## EXHIBITS (\*C 1 - 26)

**NEW CASTLE COUNTY**

87 Reads Way
New Castle, DE 19720
(302)395-5555 Fax (302)395-5545

**Parcel Detail**

| **Report Date** | 09/13/2002 02:03 PM | **Submitted By** | | Page 2 |
|---|---|---|---|---|

### Children

No Items Found

### Addresses

| Address | | City | | State | ZIP |
|---|---|---|---|---|---|
| 6000 | SOCIETY | DR | 873 | CLAYMONT | DE | 19703 |

### Contacts

| | | | | | | |
|---|---|---|---|---|---|---|
| **Contact ID** | AC12588 | **Name** | BNAI BRITH SR CIT HOUS INC | | | |
| **Organization** | | | **Position** | | **Profession** | |
| **Mailing Address** | 1403 H. ARRINGTON JR BLVD S | | | | | |
| **City** | BIRMINGHAM | | **State/Province** AL | | **ZIP/PC** 35205 | |
| **Country** | | | ☐ **Foreign** | | **Reference #** | |
| **Day Phone** | | | **Evening Phone** | | **Fax** | |
| **Pager** | | | **PIN #** | | **Mobile #** | |
| | | | **E-Mail** | | | |
| **Owner From** 09/01/1978 | **To** | | ☒ **Primary** | | 0.00 % | |

### Notices

| Notice Assessed | Description Assessed By | Comments | Effective | Expire | Ordinance # | |
|---|---|---|---|---|---|---|

No Items Found

### Exemptions

| Type Expire | Description Comments | Rate | Value | Calc Exempt Amount | Effective |
|---|---|---|---|---|---|
| 080 | CHARITABLE AND BENEVOLENT | 1.00 | 0.00 | 8778500.00 | |

### Preferentials

| Land Use | Description | Soil Type | Size | Rate/Value | Total | Expire | Expire |
|---|---|---|---|---|---|---|---|

End of Report

C-1

# B'nai B'rith Senior Citizen Housing, Inc.

September 15, 2006

Dear Residents:

We understand that some residents wish to hang flags from their balcony. Unfortunately, because of safety concerns we cannot allow flags or any other hanging items on your balcony. Although we hung small flags on the balconies to honor the victims of 9/11, that was a special circumstance which we hope we never have to repeat.

Residents that have flags on their balconies must remove them promptly. Thank you for your cooperation.

Sincerely:

Lynne Rotan, administrator

C-2

B'nai B'rith House - retirement living for senior citizens
8000 Society Drive □ Claymont, Delaware 19703 □ 302-798-6846 Fax: 302-798-2275

EQUAL HOUSING OPPORTUNITY

```
 1   State of Delaware)
                     )
 2   New Castle County)

 3              CERTIFICATE OF REPORTER

 4              I, Elaine G. Parrish, Registered
     Professional Reporter and Notary Public, do hereby
 5   certify that there came before me on the 4th day of
     November, 2005, the deponent herein, LYNNE ROTAN, who
 6   was duly sworn by me and thereafter examined by counsel
     for the respective parties; that the questions asked of
 7   said deponent and the answers given were taken down by
     me in stenotype notes and thereafter transcribed into
 8   typewriting under my direction.

 9              I further certify that the foregoing is a
     true and correct transcript of the testimony given at
10   said examination of said witness.

11              I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
12   interested in the event of this suit.

13
                 _____
14                   Elaine G. Parrish

15                   Certification No. 170-RPR

16                   (Expires January 31, 2009)

17
     DATED:    November 18, 2005
18

19

20

21

22

23

24
```



```
 1    September 11th, 2001, yes.

 2        Q.    Can tenants still hang the American flags off

 3    their balconies if they want to?

 4        A.    They shouldn't be, no.

 5        Q.    Do they?

 6        A.    Not that I have noticed.

 7        Q.    You have never seen any American flags hanging

 8    off any balconies after the September 11th observance?

 9        A.    Not that I personally noticed.

10        Q.    Well, how long did the flag hanging go on after

11    September 11th?  How long was that allowed?

12        A.    We let them stay for quite some time.

13        Q.    Well, how long is quite some time?

14        A.    I don't know for sure, but until the flags

15    started to look, you know, you're not supposed to hang a

16    flag when it starts to look - for want of a better word

17    - ratty.

18        Q.    Did you ever give a directive to take the flags

19    down?

20        A.    I asked my maintenance staff when they were in

21    the areas to ask about taking the flags down.

22        Q.    All right.  Well, my question was did you ever

23    order anybody to take flags down?

24        A.    I didn't put a notice out to the tenants.  Is
```



C-3.2

1    Q.   Have you told anybody in any apartment to remove

2    a hanging item such as the ones we have seen, wind

3    chimes, flower baskets --

4        A.   Since here?

5        Q.   Yeah.   Let me just rephrase the question.

6        A.   I'm sorry.   Go ahead.

7        Q.   In terms of hanging wind chimes, flags, flower

8    baskets, thermometers, Christmas light cords, any of

9    those items, have you told any tenant, you, personally,

10   any tenant to remove any of those items at any time

11   during your entire employment?

12       A.   I don't recall what happened during any time in

13   my entire employment.   I have not done so since the

14   original case was begun.

15       Q.   But as you sit here today you have no

16   recollection of ever doing so?

17       A.   I don't recall if I did or not, no.

18       Q.   Okay.   I am going to show you something that's

19   in the productions already, P-26, do you recognize that

20   as a notice that you posted to tenants?

21       A.   Yes.

22       Q.   "Notice to all residents", and I'm quoting from

23   P-26, "due to conflict surrounding decorations on

24   individual floors, all personal items, plants,

### 9. Household and Guests

Resident will be held directly responsible for the conduct and actions of their household and/or visiting guests. Resident, other household members, and guest(s) understand that they are prohibited from: threatening or assaulting any person within the premises and from acting violently or in such a manner as to threaten the health, safety, or welfare of other persons or their property on the premises; or violating any provision of the Landlord and Tenant Act adopted by the state. Residents and their guests shall not play in public areas except in those designated recreational areas in accordance with the rules and regulations and times posted in said areas. Children under the age of 12 years must be supervised by the Resident at all times. No playing is permitted in hallways, lobbies, elevators, etc. Planted and landscaped areas shall not be walked upon nor used as play areas. Residents will be held liable for any damage. Failure to follow these rules may result in the Lease being terminated.

### 10. Moving

Moving in and out of an apartment must be accomplished between the hours of 8 a.m. and 4 p.m. The moving procedures should be coordinated with the Office. The Resident is responsible for any damages to the premises caused by moving in and out of the premises. Vehicles will not be permitted on the grass or sidewalks.

### 11. Attorney Fees

If Landlord employs an attorney because of a violation by the Resident of the Lease or Rules and Regulations, Resident shall pay all attorney fees and cost of collection or litigation if Landlord prevails in such action.

### 12. Alcoholic Beverages

Alcoholic beverages are not permitted on the grounds, common areas or recreational facilities. The drinking of alcoholic beverages must be confined to your individual unit. The only exception to this will be for a B'nai B'rith sponsored event.

### 13. Apartment Occupancy

The maximum occupancy standards must be followed. Occupants are limited to those persons listed on the most recent Resident certification. The Resident must advise and receive written permission in advance from management of any change in household composition. Resident may be permitted to have an out of town guest(s) visit their household; however, this visit is restricted to no more than 14 days and nights within a twelve (12) month period. Exceptions may be made on special extenuating circumstances at the discretion of management. However, a written letter of request is required detailing any extenuating circumstances before any visit beyond the time described above is granted. A person(s) making recurring overnight visits will be counted as a household member(s) and constitutes material non-compliance of the Lease Agreement. Residents are responsible for the actions of their guests. The leased apartment is to be occupied only as a private dwelling. Overnight guests are expected to sign in at the office as they enter and again as they end their visit.

### 14. Absence from your apartment

The office staff is to sign you out if you will be away overnight, on vacation or are admitted to the hospital. Absence form your unit during a calendar year is restricted to no more than 60 days for extended family visits and no more than 180 days due to illness.

### 15. Balconies/Porches/Patios/Breezeways/Hallways/Windows

No mops, clothing, clothes lines, rugs or other articles shall be hung outside of the premises. No rugs or dust mops shall be beaten, cleaned or shaken out of the windows, porches, patios, balconies, or in the halls or corridors of the building, nor shall anything be thrown or swept by the Residents or their guest out of the windows, doors or other openings, or in the halls of the building. Only patio furniture and live plants may be stored on patios, porches and/or balconies. No personal belongings of the Resident may be stored on the balcony, halls or corridors unless approved by management, no rugs or mats outside door of interior hallway. No grilling, charcoal grilling or food smokers/cookers are allowed in the hallways, breezeways, grounds or on Resident's patio or balcony. All Residents must observe strict care not to leave windows open when it rains, sleets, snows or in high winds. Before leaving the apartment


C-5

9-18-06

To all residents:

It seems that clarification may be needed concerning hanging flags on the balconies. B'nai B'rith House is not opposed to residents displaying flags on their balconies as long as they do not violate the Rules and Regulations to do so. This means you cannot hang flags on the balcony, you may be creative; for example- you may put a flag on a stick in a flower pot, drape one on a chair, etc. Just be sure flag will not come loose and fall on your neighbor.

If you have any questions, please contact the office.
L. Rotan

C-6



This website is dedicated to the
 

# THE FLAG OF THE UNITED STATES OF AMER

**Site Key:** (◀) Click to Listen (🖨) Click to Print    *Search:*

**History of the Flag**

**Historic & Current Flags of America**

**Patriotic Writings**

**Special Links**

**A Salute to Those Who Serve - Past and Present**

**Frequently Asked Questions**

**Related Information**

**Related Links**

**Home**

# Flag Etiquette

### STANDARDS of RESPECT

The Flag Code, which formalizes and unifies the traditional ways in which we giv respect to the flag, also contains specific instructions on how the flag is not to be They are:

- The flag should never be dipped to any person or thing. It is flown upside d only as a distress signal.
- The flag should not be used as a drapery, or for covering a speakers desk, draping a platform, or for any decoration in general. Bunting of blue, white red stripes is available for these purposes. The blue stripe of the bunting sho be on the top.
- The flag should never be used for any advertising purpose. It should not be embroidered, printed or otherwise impressed on such articles as cushions, handkerchiefs, napkins, boxes, or anything intended to be discarded after temporary use. Advertising signs should not be attached to the staff or halya
- The flag should not be used as part of a costume or athletic uniform, except a flag patch may be used on the uniform of military personnel, fireman, policeman and members of patriotic organizations.
- The flag should never have placed on it, or attached to it, any mark, insignia letter, word, number, figure, or drawing of any kind.
- The flag should never be used as a receptacle for receiving, holding, carryir delivering anything.

When the flag is lowered, no part of it should touch the ground or any other objec should be received by waiting hands and arms. To store the flag it should be folde neatly and ceremoniously.

The flag should be cleaned and mended when necessary.

When a flag is so worn it is no longer fit to serve as a symbol of our country, it sh be destroyed by burning in a dignified manner.

**Note:** Most American Legion Posts regularly conduct a dignified flag burning ceremony, often on Flag Day, June 14th. Many Cub Scout Packs, Boy Scout Troo and Girl Scout Troops retire flags regularly as well. Contact your local American Legion Hall or Scout Troop to inquire about the availability of this service.

C - 7

# B'nai B'rith Senior Citizen Housing, Inc.

**10-30-06**

**To: Isidore & Bonnie Corwin**

**From: Lynne Rotan**

**RE: Flag hanging**

**The answer to your question is no, please refer to your
Rules and Regulations, #15.**



# B'nai B'rith Senior Citizen Housing, Inc.

Isidore and Bonnie Corwin
8608 Society Drive
Claymont, DE   19703

November 20, 2006

Dear Mr. & Mrs. Corwin:

We have received your letter requesting us to list Epiphany and Ash Wednesday on our calendar.  We cannot and do not list every holy day/ holiday for each religion represented in our building.

We do list days which have a service scheduled in the building, assuming that we were informed there will be a service and we do list those holidays for which B'nai B'rith House is closed. If a holiday has a service scheduled we will be happy to put that on our calendar should someone bring it to our attention.

In addition we have reviewed your most recent information concerning flying the flag. Your right to fly the flag is not being "abridged". We have a rule that you cannot attach anything to the balcony, many apartment buildings have similar rules.  You may in fact fly the flag; it cannot be attached or affixed to the balcony railing.

Sincerely:

Lynne Rotan, administrator

C-9


EQUAL HOUSING OPPORTUNITY

ELAINE GARBON, PROJECT MANAGER
HUD MULTI FAMILY DIVISION
WANAMAKER BUILDING
110 SQUARE EAST
PHILADELPHIA, PA 19107
TELE 215-656-0609, EXT 3413
FAX 215-656-3427

TODAY'S DATE: JULY 27, 2006

RE: B'NAI B'RITH HOUSE, CLAYMONT, DE


DEAR MS. GARBON,

MY HUSBAND AND I, SECTION-EIGHT TENANTS, APPRECIATE YOUR
INVESTIGATION INTO OUR COMPLAINT ISSUES AT THE B'NAI B'RITH
HOUSE FOR SENIORS IN CLAYMONT, DELAWARE, PER SUPERVISOR MR.
RANDAL SCHEETZ, PHILADELPHIA'S MULTI-FAMILY HOUSING.

THE TYPE OF COMPLAINTS IN OUR REVIEW WITH YOU IN TUESDAY'S
TELECONFERENCE, WE BELIEVE ARE ISSUES ONLY ABOUT "RESPECT" AND
"DIGNITY" OF A RENT-PAYING TENANT.

WITH THIS IN MIND, IN YOUR HUD MULTI-FAMILY INVESTIGATION,
MS. GARBON, WILL WE BE ABLE TO RESPOND TO B'NAI B'RITH'S "SIDE"
PRIOR TO HUD'S CONCLUSIONS IN THESE ISSUES? THE REASON WE ARE
ASKING IS BECAUSE OF B'NAI B'RITH HOUSE'S MANAGER, MRS. ROTAN'S
HISTORY IN TELLING UNTRUTHS IN A PRIOR HUD INQUIRY REGARDING
ILLEGAL MANDATORY MEETINGS CALLED AT B'NAI B'RITH HOUSE IN 2004.

AS WELL, SINCE MONDAY, TO CORRECT YOUR INQUIRY ABOUT THE
AIR CONDITIONING AT THE BBH, THE HALLWAY COMMON AREAS ARE
ONCE AGAIN VERY WARM WHERE I GOT SICK TO MY STOMACH
YESTERDAY JUST IN TRAVELING TO THE POST OFFICE BOX IN THE LOBBY.
SO, BY THIS EXPERIENCE, WE ARE *NOW* CONCLUDING THE TEMPERATURE
STATUS IN THE COMMON AREAS IS NOT RESOLVED, AS WE THOUGHT. (THE
COMPLAINT OF THE TOO WARM AND STIFLING TEMPERATURES IN THE
COMMON AREAS OF THE B'NAI B'RITH HOUSE WAS THE INITIAL
COMPLAINT WE FILED WITH HUD MULTI FAMILY IN JUNE, 2006, WITH MR.
RODELL BURTON, DIRECTOR OF HUD MULTI-FAMILY).

PAGE 1 OF 2

C-10 1

TOO, WE WANTED TO MAKE APART OF OUR COMPLAINT ISSUES AT THE B'NAI B'RITH HOUSE AN ISSUE CONCERNING THE ABILITY TO FLY THE AMERICAN FLAG ON OUR RENTED BALCONY AT BBH:

IN 2001, B'NAI B'RITH MANAGEMENT STRAPPED ONTO WILLING TENANT'S BALCONIES, THE AMERICAN FLAG, IN RESPONSE TO 9/11. AFTER THESE FLAGS FLEW FOR THREE YEARS ON TENANTS' BALCONIES AND PRIOR TO B'NAI B'RITH, CLAYMONT, DELAWARE'S HOSTING A B'NAI B'RITH CONVENTION IN OCTOBER, 2004, BBH MAINTENANCE REMOVED ALL THESE AMERICAN FLAGS FROM THE BALCONIES (SOMETIMES WHERE MAINTENANCE ENTERED THE APARTMENT *WITHOUT* NOTICE AND REMOVED THE FLAGS).

SUBSEQUENTLY TO THE BBH'S AMERICAN FLAG REMOVAL OFF BBH BALCONIES, AND UPON TENANT'S INQUIRY AT THE BBH RENTAL OFFICE AS TO THEIR ABILITY TO RE-HANG AN AMERICAN FLAG ON THEIR BALCONY, MANAGEMENT'S INSTRUCTED THE TENANTS THAT TENANTS CANNOT FLY THE AMERICAN FLAG OFF THEIR BALCONY ANYMORE.

FRICTION NOW EXISTS BETWEEN TENANTS WHERE ONE TENANT FLIES THE *CANADIAN FLAG* FROM HER BALCONY AND WHERE OTHER TENANTS, LIKE US, FEEL WE ARE BREAKING A BBH HOUSE RULE TO FLY THE AMERICAN FLAG ON OUR BALCONIES, ESPECIALLY ON OUR USA NATIONAL HOLIDAYS.

IF POSSIBLE, WE WOULD LIKE THIS ISSUE TO BE APART OF YOUR INVESTIGATIVE PACKAGE.

PLEASE FEEL FREE TO CONTACT US ANYTIME. THANK YOU AGAIN.


SINCERELY,
ISIDORE AND BONNIE CORWIN

C – 10, 2



HOUSING MANAGEMENT OFFICE
(302) 739-7416           26 THE GREEN           (302) 739-7423 FAX
                    DOVER, DELAWARE 19901           (302) 739-4264 TDD

August 31, 2006

Isidore and Bonnie Corwin
Apartment 608
B'nai B'rith House
Claymont, DE 19703-1749

Dear Mr. & Mrs. Corwin:

On August 16, 2006, I visited B'nai B'rith House to investigate the complaints you sent to the Philadelphia Housing and Urban Development (HUD) office. Management was not informed of the nature of the visit until the day I arrived at the office. I have summarized your complaints by date and included the observations based on this visit. In addition, I have included the action that needs to be taken to resolve each observation.

**1. Complaint:**    **July 7, 2006**



**Observation:**

**2. Complaint:**    **July 7, 2006**

Maintenance should not be allowed to wash rags in coin-operated washers. Tenants have complained that they found grease on their clothing. Management should provide a separate washer for maintenance.

C –11,1

Isidore and Bonnie Corwin
August 31, 2006
Page Four

**Observation:**



**8. Complaint:    July 22, 2006**

Mr. Corwin in now in a wheelchair and would like the walking paths in the garden area
expanded for wheelchair use.

**Observation:**

When received, this request was forwarded to the attorney's office as a request for a reasonable
accommodation. Sketches and pictures of the area are being drawn up by the maintenance staff
at the request of the attorney's office. Once the analysis of the area and the cost involved is
completed by senior management and the legal counsel, a final recommendation and decision
will be made. Please keep in mind that a reasonable accommodation may be denied because of
undue financial and administrative burden.

**Resolution: Under Review.    Open.**

**9. Complaint:    July 27, 2006**

Flying of American flags after September 11, 2001 and subsequent removal of those flags in
2004. Not allowed to fly American flag anymore but a tenant is flying the Canadian flag.

**Observation:**

I inspected the outside of the building and looked at each balcony. There were no
Canadian or any other type of flag on any tenant's balcony. After September 11, 2001, Ms.
Rotan asked permission to do something special in commemoration of the events. She was
permitted to fly the American flag from each balcony. When the flags became worn and tattered
they were removed from the balconies.

**Resolution:  Item resolved.**

$C-11.2$

1   manager.

2       Q.   What's your relationship business wise with

3   Phyllis Davis?

4       A.   She would be the person that comes on property

5   if I have a problem and she wants to come help me with

6   it or when we have a management review from the Housing

7   Authority, a management company representative comes and

8   it's generally her.

9       Q.   Does anyone at SPM have any kind of supervisory

10  authority over you?

11      A.   No.

12      Q.   And your paychecks come from where?

13      A.   They come from SPM.  The money doesn't come from

14  SPM.  All the money to pay the bills and pay the payroll

15  comes from B'nai B'rith.

16      Q.   And who actually signs your paycheck?

17      A.   I don't get a paycheck.  I get direct deposit.

18  So nobody signs it as far as I know.

19      Q.   That's convenient.  Okay.  All right.  Now, is

20  there any other kind of training that you get besides

21  what you have mentioned?  I think you have covered it

22  but I'm not sure.  You mentioned seminars in various

23  places.

24      A.   I have gone to some few seminars, odds and ends



WILCOX & FETZER LTD.
Registered Professional Reporters

$C-12$

Response to the State Human Relations Commission, State of Delaware forms for Case
No. NC-H-991-04

1. Lynne S. Rotan, Administrator, 8000 Society Drive, Claymont, DE   19703. 302 798
6846

2. B'nai B'rith Senior Citizen Housing, Inc., incorporated 11-24-1971, Housing
Payments Assistance Payments Contract 8-27-1989. President-David Schlecker, Vice-
President-Asher Rubin and other board members

3. 8000 Society Drive, Claymont, DE   19703

4. No other properties

5. Daily operations of the property are done by employee of the B'nai B'rith House,
Lynne Rotan and the management agency is Southeastern Property Management, Inc.

6. B'nai B'rith House is an eight story high rise apartment building whose purpose is to
provide modern, efficient, low-cost living accommodations for senior citizens.

7. Receive assistance under our Housing Assistance Payments Contract, DE26-H004-
007.

8. No

9. Advertising is minimal. Inquiries are told of the minimal qualifications, information
packets including our resident selection criteria, application assistance and information
statement, application, newsletter, rules and regulations, brochure, list of items needed
and cover letter are given to persons who come to the building or we mail it to phone
inquires. Applicants are told to read over paperwork, complete it, gather all paperwork
needed and call for an appointment.

10. & 11. We have been advised not to provide this information

12. Ad enclosed is used in all advertisements.

13.Enclosed

14. Enclosed

15. Inspections are required by the Delaware State Housing Authority, one is conducted
annually by DSHA, one is conducted by B'nai B'rith House management. During this
inspection, balconies are not inspected. Balconies are inspected from the outside, from
the ground occasionally. If problems are observed residents are notified, if resident has
question we schedule inspection, notify resident of upcoming inspection from inside their
unit and proceed from there.

$C-13$

```
1        A.    Paul Hegarty, H-e-g-a-r-t-y, is a maintenance
2    assistant.
3        Q.    Got it.
4        A.    And Nickey Feeley, N-i-c-k-e-y, F-e-e-l-e-y, is
5    the housekeeper.
6        Q.    Between you, Carol Sherr, Frank Bedo and these
7    other four employees would that be the whole staff of
8    the building basically?
9        A.    Yes.
10       Q.    Okay.  Did you ever have any training courses,
11   seminars, books that you had to read, guidebooks,
12   handbooks?
13       A.    I have gone to training since I have been
14   employed.  I go to training provided by the Delaware
15   State Housing Authority.  I go to training provided by
16   B'nai B'rith Senior Housing International Committee.  I
17   have also gone to training provided by SPM,
18   Incorporated.
19       Q.    SPM is?
20       A.    SPM.
21       Q.    Is Southeast --
22       A.    I guess it's --
23       Q.    -- Property Management?
24       A.    Uh-huh.
```



WILCOX & FETZER LTD.
Registered Professional Reporters

C-14

# Lynne Rotan

**From:** Michelle Arthurs [Michelle@dsha.state.de.us]
**Sent:** Thursday, May 27, 2004 2:16 PM
**To:** bbhlynne@myexcel.com
**Cc:** Tricia Conley
**Subject:** Re: Corwins

In reference to the Corwin suit, it is against the privacy act to give the names, address, etc of other residents, past and current. Your attorney should also advise you of this.

In reference to the printout from the pharmacy, your applicants/residents should sign some type of statement, allowing you to use/have/ keep this information in the file.

The statement in the elderly agreement is fine.

In reference to the credit checks, if you look on page 4-19 E, it states how to handle the credit checks.

If you have further questions, please feel free to contact me.

Thanks,
Michelle

P.S. The 59 for Zacharias was cut off again..

Lynne Rotan" <bbhlynne@myexcel.com> 5/26/2004 8:09:04 AM >>>
5-26-04

Dear Michelle,

It was good to see all of you yesterday. The training was good, I enjoyed the efficiency and clarity of the speakers.

After you get a chance to look at the Corwin suit and the elderly agreement papers, please let me know your thoughts and suggestions. I□m really upset about being sued for discrimination!

SPM tells me it is HUD regs that we must do credit checks. Since you told me DSHA doesn□t do them, I am sure they are wrong. Is it anywhere in the handbook?
Also, as part of their recert process we ask the tenants to get us a printout from the pharmacy if they want to claim RX expense. SPM says we must get them to sing a verification form for this to be in the folders. We never have and DSHA has never mentioned it in our review. May we still proceed as we have done in the past?

Thanks for your help.

Have a good holiday weekend.

Lynne

B'nai B'rith House
8000 Society Drive
Claymont, DE   19703
302 798 6846
Fax 302 798 2275

"Housing REALLY Matters"

6/1/2004

C-15

**Lynne Rotan**

From:    Michelle Arthurs |Michelle@dsha.state.de.us]
Sent:    Wednesday, July 28, 2004 10:20 AM
To:      bbhlynne@myexcel.com
Subject: Re: meeting

Hi Lynne,

To answer your first question, yes it is fine to mandate that all attend the meetings. That way no one can claim discrimination since all are involved in the meeting. My suggestion is to really communicate that lease violations can and will be given to those individuals that are effecting the livability of others.

As to the Booth's corner incident, you do not have any obligation since it happen off the premise. If a resident was arrested and then charged with a criminal activity, then that is a different matter.
Could I bother you for a list of names again for the training? Properties should be taking advantage of this opportunity.

If you need anything else, just let me know.

Thanks,
Michell

"Housing REALLY Matters"

------------------------------
Michelle Arthurs,
Housing Property and Loan Management Officer
Michelle@dsha.state.de.us
Delaware State Housing Authority
http://www2.state.de.us/dsha
26 The Green
Dover, DE  19901
Phone (302)739-7416
Fax (302)739-5507

e
>>> "Lynne Rotan" <bbhlynne@myexcel.com> 7/26/2004 11:52:26 AM >>>
Dear Michelle,

I have scheduled a mandatory meeting for all tenants this month. We have had an unusually high number of tenants fighting with each, calling the police (over the weekends when we are not here, no reports to us from police), yelling in the halls, making threats etc. I have sent notices door to door telling people it is required and that we will discuss lease issues, rules and regs and community living. A social worker will be here from Jewish Family Services to assist. I felt we need a third party and someone with their skills. I guess I□m asking if it□is okay that I told everyone they have to attend and also if you have any suggestions to make? I don□t like speaking in public and need all the help I can get. The meetings are scheduled for August 11. 12 and 13. 2floors, 2floors and then 3floors.

Also, there was an incident at Booth□s Corner□s Farmer□ is market on July 2 that was just reported to me. Should I, may I or do I have an obligation to step in when something happens with tenants off the premises?

Finally, we still have room for the Fair Housing Seminar on August 4 is anyone else wants to come.

Looking forward to you assistance.

7/28/2004

B'nai B'rith Senior Citizens Housing, Inc
8000 Society Drive
Claymont, DE  19703

### NOTICE TO ALL TENANTS OF INTENTION TO SUBMIT A REQUEST TO HUD FOR APPROVAL OF AN INCREASE IN THE MAXIMUM PERMISSIBLE RENTS

April 27, 2007

Take notice that on April 27, 2007, we plan to submit a request for approval of an increase in the maximum permissible rents for B'nai B'rith House to the Delaware State Housing Authority.  The proposed increase is needed for the following reasons:

1.     Increase in Utility & Insurance expenses.
2.     Increase in Operation & Maintenance expenses.
3.     Increase in Employee & Administrative expenses.
4.     Request to add a Full Time Resident Services Coordinator

The rent increases for which we have requested approval are:

| BEDROOMS | PRESENT RENT | PROPOSED RENT |
|----------|--------------|---------------|
| 1        | 627          | 655           |

A copy of the materials that we are submitting to DSHA in support of our request will be available during normal business hours at                                     B'nai B'rith House
8000 Society Drive
Claymont, DE 19703

for a period of 30 days from the date of service of this notice for inspection and copying by tenants of B'nai B'rith House and, if the tenants wish, by legal or other representatives acting for them individually or as a group.

During a period of 30 days from the date of service of this notice, tenants of B'nai B'rith House may submit written comments on the proposed rent increase to us at
B'nai B'rith House

Resident's representatives may assist residents in preparing those comments.  (If, at DSHA's request or otherwise, we make any material change during the comment period in the materials available for inspection and copying, we will notify the tenants of the change or changes, and the tenants will have a period of 15 days from the date of service of this additional notice <or the remainder of any applicable comment period, if longer> in which to inspect and copy the materials as changed and to submit comments on the proposed rent increase.) These comments will be transmitted to HUD, along with our evaluation of them and our request for the increase.  You may also send a copy of your comments directly to HUD at the following address:

RE:     B'nai B'rith House                         Delaware State Housing Authority
DE26-H004-007                              26 The Green
Dover, DE 19901
DSHA will approve, adjust upward or downward, or disapprove the proposed rent increase upon reviewing the request and comments.  When DSHA advises us in writing of its decision on our request, you will be notified.  If the request is approved, any allowable increase will be put into effect only after a period of at least 30 days from the date you are served with that notice and in accordance with the terms of existing leases.

THIS PROPOSED RENT INCREASE WILL NOT INCREASE THE TENANT RENT WHICH YOU ARE PAYING IF YOU RECEIVE SECTION 8 ASSISTANCE.  IF YOU HAVE ANY QUESTIONS, PLEASE FEEL FREE TO CONTACT THE RENTAL OFFICE.

C-17

# B'nai B'rith Senior Citizen Housing, Inc.

**APARTMENTS     FEATURES     HISTORY     PURPOSE     ELIGIBILITY     CONTACT US**

## History

B'nai B'rith Senior Citizen Housing is a non-profit
housing corporation, created under the laws of the
State of Delaware to construct and operate an
apartment house designed specifically for Senior
Citizens, age 62 and older and adults 18 years and
older with a mobility impairment.

The Board of Directors is made up of responsible
volunteers from the community.

Construction funds were provided by the Delaware
State Housing Authority with subsidy funds
provided through them by the United States
Department of Housing and Urban Development
(HUD). The subsidy funds assure residents
comfortable living at a cost they can afford.





Click for a larger map and directions

B'nai B'rith House | 8000 Society Drive | Claymont, DE 19703 | 302.798.6846          Copyright Information, All Rights F

1     Q.    -- between Christian -- wait for me to finish.

2     A.    I'm sorry.

3     Q.    Between Christian and Jewish publications on

4     tables in the lobby?

5     A.    No.

6     Q.    All right. Does somebody review your

7     affirmative marketing plan?

8     A.    It's -- do you mean the form that goes to

9     Delaware Housing Authority?

10    Q.    Yes.

11    A.    Yes.

12    Q.    So it's the Delaware Housing Authority reviews

13    your affirmative marketing plan --

14    A.    Delaware State Housing Authority reviews it and

15    approves it.

16    Q.    And approves it.  Okay.  Has that agency or any

17    other agency made a finding of discrimination or

18    anything improper about your affirmative marketing plan?

19    A.    No.

20    Q.    When did you first become aware that the Corwins

21    were upset about removing the crucifix?

22    A.    When we got the first complaint from the

23    Division of Human Relations in Delaware.

24    Q.    Was -- had she or Mr. Corwin or anyone on their

**WILCOX & FETZER LTD.**
Registered Professional Reporters

$C-19$

# RENTAL AGREEMENT

THIS AGREEMENT made and entered into this 1st day of October 2001, between B'nai B'rith Senior Citizen Housing, Inc., as Landlord, and _____ Irene Cowan _____, as Tenant.

WHEREAS, the landlord is the MORTGAGOR on a mortgage covering the Development in which the hereinafter described unit is part, which Mortgage is financed by the Delaware State Housing Authority; and

WHEREAS, Landlord on the aforementioned mortgage has entered into a Housing Assistance Payments Contract with the Delaware State Housing Authority ("DSHA"), which Contract has been approved by the Department of Housing and Urban Development ("HUD"), and which Contract provides that Housing Assistance Payments shall be made to the Landlord, for units under lease in accordance with the Housing Assistance Payment Contract, in amounts equal to the difference between the Contract Rent for such units and that portion of said rent payable by the Tenant in accordance with HUD's established regulations and criteria; and

WHEREAS, pursuant to said Contract, the Landlord has agreed (1) that the Tenant's share of rent charged for the unit hereinafter described shall be thirty percent (30%) of Tenant's income, but in any event not exceed the Contract rent; and (2) that a recertification of the Tenant's income will be obtained at intervals of not less that once per year as required by the Federal Housing Commissioner and that rent charged shall be adjusted by the Landlord to reflect income changes shown by the recertification.

## 1.  PARTIES AND DWELLING UNIT

The parties to this agreement are B'nai B'rith Senior Citizen Housing, Inc., referred to as the Landlord, and _Isidore + Irene Cowan_ referred to as the Tenant.  The Landlord leases to the Tenant Unit Number 608, located at 8000 Society Drive in the project known as B'nai B'rith House.

## 2.  LENGTH OF TIME (TERM)

The initial term of this Agreement shall begin on Oct. 1, 2001 and end on Sept. 30, 2002.  After the initial term ends, the Agreement will continue for successive terms of one month each unless automatically terminated as permitted by paragraph 23 of this Agreement.

-1-

accessibility that pertain to HUD-subsidized multifamily housing, along with reference to their implementing regulations.  Throughout this handbook, reference is made to applicable civil rights and nondiscrimination requirements with respect to key admissions and occupancy activities in HUD subsidized multifamily housing.

C.   Owners must be familiar with the regulations implementing these civil rights laws regarding fair housing and program accessibility, and with the applicable HUD Notices explaining those requirements.  HUD's Office of Fair Housing and Equal Opportunity (FHEO) also provides technical assistance on these requirements.

D.   Other applicable laws and regulations include the following:

   1.    Any state civil rights laws or local ordinances pertaining to housing; and

         **Note:**  Owners may be subject to local and/or state laws that prohibit discrimination based upon membership in other classes (e.g., marital status or sexual orientation).

   2.    Any other legislation protecting the individual rights of tenants, applicants, or staff that may subsequently be enacted.

## 2-5    Fair Housing Act, Title VIII of the Civil Rights Act of 1968

A.    **General**

The Fair Housing Act prohibits discrimination in most housing and housing-related transactions with respect to the following bases:

   1.    Race;

   2.    Color;

   3.    Religion;

   4.    Sex;

   5.    Disability;

   6.    Familial status; or

   7.    National origin.

The Act applies to all housing units subject to this handbook.

B.    **Prohibited Actions**

Under the Fair Housing Act, owners or other housing providers must not take any of the actions listed below based on race, color, religion, sex, disability, familial status, or national origin:

C-21,1

4350.3 REV-1

1. Deny anyone the opportunity to apply to rent housing, or deny to any qualified applicant the opportunity to lease housing suitable to his or her needs;

2. Provide anyone housing that is different from that provided to others;

3. Subject anyone to segregation, even if by floor or wing;

4. Restrict anyone's access to any benefit enjoyed by others in connection with the housing program;

5. Treat anyone differently in determining eligibility or other requirements for admission, in use of the housing amenities, facilities or programs, or in the terms and conditions of a lease. See paragraph 2-5C for a discussion of the owner's obligation to provide reasonable accommodations to persons with disabilities;

6. Deny anyone access to the same level of services;

   **NOTE:** An owner should be certain that all services at the project are supplied in a nondiscriminatory fashion. For example, there cannot be a preference for providing a service to persons of a specific religion, even if the agency providing the service is a faith-based organization.

7. Deny anyone the opportunity to participate in a planning or advisory group that is an integral part of the housing program;

8. Publish or cause to be published an advertisement or notice indicating the availability of housing that prefers or excludes persons;

9. Discriminate in the provision of brokerage services or in residential real estate transactions;

10. Discriminate against someone because of that person's relation to or association with another individual; or

11. Retaliate against, threaten, or act in any manner to intimidate someone because he or she has exercised rights under the Fair Housing Act.

C. **Additional Protections for Persons with Disabilities**

Although the Fair Housing Act generally requires applicants to be given equal treatment and prohibits discrimination against anyone with respect to the prohibited bases, there are certain limited circumstances when the Act requires a housing provider to treat persons with disabilities differently to enable them to have equal access to, or enjoyment of, housing and other housing-related programs. Specifically, the Fair Housing Act requires housing providers to provide "reasonable accommodations" to persons with disabilities. This means an owner may have to modify rules, policies, practices, procedures and/or services to afford a person with a disability an equal opportunity to use and enjoy the housing. In addition, the Fair Housing Act contains specific accessibility


C-21.2

1       Q.    It's just a closer view of it?

2       A.    I think it may be.

3       Q.    Okay.   I am going to show you another exhibit.

4   I don't know if this is in the production, so I'll give

5   a copy to counsel.   And I would ask you if you remember

6   seeing a hanging umbrella as depicted in P-22(a) hanging

7   from the balcony of that apartment?

8       A.    I remember seeing the umbrella but I was not

9   aware it was hanging.

10      Q.    Okay.   Did you ever do anything about that

11  umbrella in P-22(a)?

12      A.    No, because it wasn't -- it was not in my

13  impression it was hanging.

14      Q.    Okay.   Now, I am going to show you exhibit P-24.

15  Do you recognize that as a determination of the Delaware

16  Division of Human Relations concerning the Corwins'

17  complaint of a religious discrimination against you and

18  B'nai B'rith?

19      A.    Yes.

20      Q.    And I am going to call your attention to, if

21  you'll flip through it, page, well, there is no page

22  number so you're going to have to let me direct your

23  attention.

24      A.    Okay.



WILCOX & FETZER LTD.
Registered Professional Reporters

C - 22

| Form MAG-41<br>Commonwealth of Pennsylvania<br>Department of Military Affairs | RECORD OF<br>BURIAL PLACE OF VETERAN | WAR FILE |
|---|---|---|

| NAME<br>McDERMOTT, Lawrence Lowell | DATE OF BIRTH<br>8/26/96 | DATE OF DEATH<br>5/3/47 |
|---|---|---|

| VETERAN OF<br>World I WAR | SERVED IN<br>ARMY (X) NAVY ( ) MARINE CORPS ( ) |
|---|---|

| DATES OF SERVICE<br>9/4/18 - 7/26/19 | ORGANIZATION (S)<br>U.S. General Hospital #14 | RANK<br>Pvt |
|---|---|---|

| CEMETERY<br>OR<br>PLACE OF<br>INTERMENT | NAME<br>St. Bernards |
|---|---|
| | LOCATION<br>Bradford, Pa. |

| LOCATION OF GRAVE IN CEMETERY<br>SECTION         RANGE<br>LOT NO.         GRAVE NO. | HEADSTONE<br><br>GOVERNMENT ( ) COUNTY ( ) FAMILY ( ) |
|---|---|

| INFORMATION GIVEN BY         BVS<br>DATE May 3, 1947 | REMARKS |
|---|---|

After being Recorded in the County Veterans' Grave Registration Record This Card is to be sent to
THE ADJUTANT GENERAL'S OFFICE, Harrisburg, Pennsylvania, for final Record.

C-23

## 2-18   Discrimination in Terms, Conditions, Privileges, Services, and Facilities

A.   Owners must not deny or limit services based on race, color, religion, sex, disability, familial status, or national origin of the applicant, tenant, or a person associated with the applicant or tenant.

B.   Prohibited activities include, but are not limited to, the following:

1.   Using different requirements in leases.  Examples include charging different rents, charging different security deposits, or requiring persons with disabilities who use electric wheelchairs or motorized scooters to have personal liability insurance.  (For more information about lease requirements, see paragraph 6.5);

**NOTE:** This prohibition includes the use of different house rules for different tenants.  For instance, owners must not have more stringent noise requirements for families with children than for families without children.

2.   Failing to provide or delaying maintenance on rental units;

3.   Failing to process a rental offer;

4.   Limiting the use of privileges, services, or facilities associated with renting a unit; and

5.   Denying or limiting services because the renter failed or refused to provide sexual favors, or providing extra benefits to an individual in exchange for the provision of sexual favors.

C.   Federal discrimination laws generally prohibit housing providers from implementing policies or practices that appear to be neutral on their face but have a significant adverse or disproportionate impact on persons based on race, color, religion, sex, national origin, familial status, or disability.

## 2-19   Discrimination in Marketing, Statements, and Notices

A.   Owners must market available units in a nondiscriminatory manner.

1.   This requirement covers printed or published notices, statements, or advertisements.  Examples of notices and statements include any applications, flyers, brochures, deeds, signs, banners, posters, billboards, or other documents used to market available units.  For additional information about advertising requirements, please refer to paragraph 4-12 D.

2.   The marketing requirement also covers oral notices or statements.

review the Disclosure Form. (See paragraph 6-27 Briefing with New Tenants.)

D.     **Record-Keeping Requirements**

There are specific records that owners must keep to verify their compliance with the Disclosure Rule requirements.

1.     Disclosure form.  Owners must keep records of the Disclosure Form provided to each tenant for three years from the commencement of the leasing period.

2.     Lead Hazard Information Pamphlet.  A record of the distribution of the Lead Hazard Information Pamphlet is required under the HUD-EPA Disclosure Rule and the EPA Lead Pre-Renovation Education Rule. A record is not required under the new HUD regulation, but it is recommended.

## 6-9     House Rules

A.     **Overview**

1.     Developing a set of house rules is a good practice.  By identifying allowable and prohibited activities in housing units and common areas, owners provide a structure for treating tenants equitably and for making sure that tenants treat each other with consideration.  House rules are also beneficial in keeping the properties safe and clean and making them more appealing and livable for the tenants.

2.     The decision about whether to develop house rules for a property rests solely with the owner, and HUD's review or approval is not required. Owners, however, must be careful not to develop restrictive rules that limit the freedom of tenants.  If owners develop house rules for a property, these rules must be consistent with HUD requirements for operating HUD subsidized projects, must be reasonable, and must not infringe on tenants' civil rights.

3.     House rules are listed in the lease as an attachment to the lease.  It is important, however, to recognize that house rules do not replace the lease.

4.     House rules must not create a disparate impact on tenants based on race, color, national origin, religion, sex, disability, or familial status.

B.     **Key Requirements**

1.     House rules must:

a.     Be related to the safety, care, and cleanliness of the building or the safety and comfort of the tenants;

C-25,1

---

**Example – Possible Topics for House Rules**

Safety and care of the building:  Guest rules, locks and lost keys, access to the front door, and security systems.

Cleanliness of the building:  Trash disposal, littering, hallway obstructions, and lobby rules.

Safety and comfort of tenants:  Noise levels, fire safety, and security.

---

    b.     Be compliant with HUD requirements;

    c.     Not circumvent HUD requirements;

    d.     Not discriminate against individuals based upon membership in protected class;

    e.     Be reasonable.

         (1)    Reasonable house rules are within the bounds of common sense.  They are not excessive or extreme, and most importantly, they are fair.

         (2)    Figure 6-5 identifies examples of reasonable and unreasonable house rules.  The table does not include all possible situations; therefore, owners must use their own discretion to determine whether a house rule is reasonable or not while developing house rules for their properties;

    f.     Comply with state and local requirements.

**Figure 6-5:  Reasonable versus Unreasonable House Rules**

| Reasonable House Rules | Unreasonable House Rules |
|---|---|
| Requesting that all visitors sign in when entering the building. | Not allowing a visitor in a tenant's apartment during nighttime. |
| Not allowing smoking in the common areas of the building. | * |
| Asking tenants to turn sound equipment low after a certain time at night. | Asking tenants to turn the lights off after a certain time at night. |
| Asking all children under the age of 12 to be accompanied by an adult resident when using building facilities. | Asking all children under the age of 12 to be accompanied by an adult resident at all times in the building. |

C-25,2

1    issue a report and it says, you know, either you owe HUD

2    for so much or -- we don't deal directly with HUD.  We

3    deal with the Delaware State Housing Authority.

4         Q.   So the flow of the money goes which way?  It

5    goes from HUD to what?

6         A.   I imagine it goes from HUD to Delaware State

7    Housing Authority.  I'm not really privy to that.  The

8    money goes from Delaware State Housing Authority to us.

9         Q.   So the Delaware State Housing Authority pays the

10   owners of the facility?

11        A.   Yes.

12        Q.   And the owner of the facility is the B'nai

13   B'rith?

14        A.   B'nai B'rith Wilmington Lodge.  B'nai B'rith

15   Senior Housing, Incorporated.

16        Q.   Do you know who the officers of B'nai B'rith

17   Senior Housing, Incorporated are:  The president,

18   vice-president and so forth?

19        A.   The president is David Schlecker,

20   S-c-h-l-e-c-k-e-r.

21        Q.   And the vice-president, if you know?

22        A.   The vice-president I believe is Stephen

23   Scheinberg:  S-t-e-p-h-e-n, S-c-h-e-i-n-b-e-r-g.

24        Q.   Is there a secretary that you know of?



C-26

U.S. DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| ISIDORE CORWIN AND BONNIE CORWIN | : | CIVIL ACTION |
| (INFORMA PAUPERIS STATUS) | : | |
| | : | |
| PLAINTIFFS, | : | |
| | : | **NO. 07-CV-152-\*\*\*** |
| V. | : | **JURY TRIAL DEMANDED** |
| | : | |
| B'NAI B'RITH SENIOR CITIZEN HOUSING, INC., | : | |
| ET AL | : | |
| DEFENDANTS. | : | |

- - -

## ORDER

THIS MATTER HAVING BEEN BROUGHT BEFORE THE COURT BY

ISIDORE AND BONNIE CORWIN, PLAINTIFFS PRO SE, AND THE COURT HAVING

CONSIDERED THE MOVING PAPERS IN PLAINTIFFS' MOTION FOR SUMMARY

JUDGMENT AND OPPOSITION THERETO, AND HAVING HEARD THE ARGUMENTS

OF COUNSEL, AND FOR OTHER AND FURTHER GOOD CAUSE SHOWN,

IT IS ON THIS _____ DAY OF _____, 2007, THE

COURT ISSUES AN ORDER THAT THE DEFENDANTS ACTED IMPROPERLY IN THAT

THE DEFENDANTS' FLAG POLICY FOR TENANTS' BALCONIES AT THE B'NAI

B'RITH HOUSE IN CLAYMONT VIOLATES THE FAIR HOUSING ACT AND THE U.S.

CONSTITUTION AND HEREBY, THE SUBJECT FLAG POLICY MUST BE STRUCK

DOWN PURSUANT TO FED R. CIV. P. 56 ( C ), AND WHERE THE DEFENDANTS SHALL

RESCIND PLAINTIFFS' COSTS.

_____

J.

# IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF DELAWARE

- - -

ISIDORE CORWIN AND BONNIE CORWIN :  CIVIL ACTION
(INFORMA PAUPERIS STATUS)     :
             :
    PLAINTIFFS,    :
             :
             :
             : NO. 07-152-***
             : JURY TRIAL DEMANDED
   V.         :
             :
B'NAI B'RITH SENIOR CITIZEN HOUSING, INC., :
ET AL           :
    DEFENDANTS.   :

- - -

## CERTIFICATE OF SERVICE

   WE, ISIDORE AND BONNIE CORWIN, PRO SE, DO HEREBY CERTIFY
THAT ON ___*June 5, 2007*___ , WE CAUSED THE ORIGINAL AND (1) COPY
OF THE FOREGOING **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** TO
BE FILED WITH THE CLERK OF THE COURT AND A COPY OF SUCH FILING
WAS SERVED IN THE MANNER INDICATED UPON THE FOLLOWING PARTIES'
COUNSEL OF RECORD:

BY U.S MAIL TO:
ATTORNEY DANIEL GRIFFITH
MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
1220 N. MARKET ST
PO BOX 8888
WILMINGTON, DE 19899-8888

BY:  ISIDORE & BONNIE CORWIN, PRO SE
    8608 SOCIETY DRIVE
    CLAYMONT, DELAWARE 18703
    PHONE/FAX: 302-798-5116









Peter T. Dalleo, Clerk
U.S. District Court for the District of Delaware
844 North King Street
Lockbox "18"
Wilmington, De 19801-3570